1  LOUIS R. MILLER (State Bar No. 54141)
   smiller@millerbarondess.com
2  AMNON Z. SIEGEL (State Bar No. 234981)
   asiegel@millerbarondess.com
3  COLIN H. ROLFS (State Bar No. 280654)
   crolfs@millerbarondess.com
4  JUSTIN P. MCCARTHY (State Bar No. 317169)
   jmccarthy@millerbarondess.com
5  MILLER BARONDESS, LLP
   1999 Avenue of the Stars, Suite 1000
6  Los Angeles, California 90067
   Telephone:   (310) 552-4400
7  Facsimile:   (310) 552-8400

8  Attorneys for Plaintiff Herring Networks, Inc.

9

10

11            **UNITED STATES DISTRICT COURT**

12           **SOUTHERN DISTRICT OF CALIFORNIA**

13

14  HERRING NETWORKS, INC.,            **CASE NO. 3:19-cv-01713-BAS-BGS**

15            Plaintiff,               Assigned for All Purposes to:
                                       Hon. Cynthia Bashant
16       v.
                                       **PLAINTIFF HERRING**
17  RACHEL MADDOW; COMCAST             **NETWORKS, INC.'S OPPOSITION**
    CORPORATION; NBC UNIVERSAL         **TO DEFENDANTS' SPECIAL**
18  MEDIA, LLC; AND MSNBC CABLE        **MOTION TO STRIKE**
    LLC,
19                                     **NO ORAL ARGUMENT UNLESS**
            Defendants.                **REQUESTED BY THE COURT**
20
                                       *[Filed Concurrently with Declaration of*
21                                     *Charles Herring; Declaration of*
                                       *Professor Stefan Th. Gries and*
22                                     *Declaration of Amnon Z. Siegel]*

23
                                       Action Filed:    September 9, 2019
24                                     Hearing Date:    December 16, 2019
                                       Trial Date:      None
25

26

27

28

441437.6                                               Case No. 3:19-cv-01713-BAS-BGS
─────────────────────────────────────────────────────────────────────────
    HERRING NETWORKS, INC.'S OPPOSITION TO DEFENDANTS' SPECIAL MOTION TO STRIKE

MILLER BARONDESS, LLP
ATTORNEYS AT LAW
1999 AVENUE OF THE STARS, SUITE 1000  LOS ANGELES, CALIFORNIA 90067
TEL: (310) 552-4400   FAX: (310) 552-8400

1

2

# **<u>TABLE OF CONTENTS</u>**

<u>Page</u>

I.  INTRODUCTION ................................................................................................1

II.  STATEMENT OF FACTS ..................................................................................3

    A.  Kristian Rouz ...........................................................................................4

    B.  Maddow Falsely States That OAN "Really Literally Is Paid Russian Propaganda" ............................................................................................4

III.  LEGAL STANDARD .........................................................................................5

IV.  ARGUMENT ......................................................................................................6

    A.  Maddow's False Statement Is Not Protected Opinion ...............................6

        1.  Maddow's Statement Is Provably False .........................................7

            (a)  The Language of the Statement Shows It Was Not Opinion ............8

            (b)  The Context of the Statement Shows It Was Not Opinion .................9

            (c)  Linguistic Analysis Confirms Maddow's Statement Was Not Opinion ..............................................................................................12

        2.  Maddow's Statement Also Implied Additional Undisclosed, False Assertions of Fact ...............................................................14

    B.  Maddow's Comment Is Not Only Capable Of A Defamatory Meaning, It Is Affirmatively Defamatory ..................................................................18

    C.  Defendants' "Substantial Truth" Argument Lacks Merit .........................19

    D.  At A Minimum, Discovery Should Be Permitted ...................................21

V.  CONCLUSION ..................................................................................................21

21

22

23

24

25

26

27

28

MILLER BARONDESS, LLP
ATTORNEYS AT LAW
1999 AVENUE OF THE STARS, SUITE 1000  LOS ANGELES, CALIFORNIA 90067
TEL: (310) 552-4400   FAX: (310) 552-8400

1

# **TABLE OF AUTHORITIES**

2

**Page**

3

## **FEDERAL CASES**

4

*Agard v. Hill*,
   No. CIV 2-10-cv-0323-GEM-JFM (PS), 2010 WL 1444580 (E.D. Cal. Apr. 9,
   2010).................................................................................................................. 15

*Church of Scientology of Cal. v. Flynn*,
   744 F.2d 694 (9th Cir. 1984)........................................................................... 18

*Cochran v. NYP Holdings, Inc.*,
   58 F. Supp. 2d 1113 (C.D. Cal. 1998)............................................................. 17

*Flowers v. Carville*,
   310 F.3d 1118 (9th Cir. 2002)........................................................................... 9

*Gardner v. Martino*,
   563 F.3d 981 (9th Cir. 2009)...................................................................... 16, 17

*Knievel v. ESPN*,
   393 F.3d 1068 (9th Cir. 2005)......................................................................... 19

*Koch v. Goldway*,
   17 F.2d 507 (9th Cir. 1987)............................................................................. 11

*Manufactured Home Cmtys., Inc. v. County of San Diego*,
   544 F.3d 959 (9th Cir. 2008)............................................................................. 7

*Masson v. New Yorker Magazine, Inc.*,
   501 U.S. 496 (1991) ................................................................................... 19, 20

*Milkovich v. Lorain Journal Co.*,
   497 U.S. 1 (1990) ............................................................................... 14, 15, 16

*Planned Parenthood Fed'n of Am., Inc. v. Ctr. for Med. Progress*,
   890 F.3d 828 (9th Cir. 2018)............................................................................. 6

*Troy Grp., Inc. v. Tilson*,
   364 F. Supp. 2d 1149 (C.D. Cal. 2005)...................................................... 18, 19

*Unelko Corp. v. Rooney*,
   912 F.2d 1049 (9th Cir. 1990)............................................................... 7, 10, 11

*Unsworth v. Musk*,
   Case No. 2:18-cv-08048-SVW-JC, 2019 WL 4543110 (C.D. Cal. May 10, 2019).............. 8

*Woodbridge Structured Funding, LLC v. Sovereign Funding*,
   No. MJG-11-3421, 2012 WL 13006189 (D. Md. June 21, 2012)...................... 21

*Wynn v. Chanos*,
   75 F. Supp. 3d 1228 (N.D. Cal. 2014) ............................................................ 19

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

MILLER BARONDESS, LLP
ATTORNEYS AT LAW
1999 AVENUE OF THE STARS, SUITE 1000   LOS ANGELES, CALIFORNIA 90067
TEL: (310) 552-4400   FAX: (310) 552-8400

1

## STATE CASES

2

*Bently Reserve LP v. Papaliolios,*
    218 Cal. App. 4th 418 (2013)................................................................ 19, 20

3

*Briganti v. Chow,*
4     No. B289046, 2019 WL 6242111 (Cal. Ct. App. Nov. 22, 2019) (certified for
    publication)............................................................................................ 6

5

*Campanelli v. Regents of Univ. of Cal.,*
6     44 Cal. App. 4th 572 (1996)................................................................ 7, 20

7

*Cheveldave v. Tri Palms Unified Owners Ass'n,*
    27 Cal. App. 5th 1202 (2018)............................................................... 6

8

*Competitive Enter. Inst. v. Mann,*
9     150 A.3d 1213 (2016) ................................................... 8, 11, 15, 16

10 *Dickinson v. Cosby,*
    37 Cal. App. 5th 1138 (2019)............................................................... passim

11

*Good Gov't Grp. of Seal Beach, Inc. v. Superior Court,*
12     22 Cal. 3d 672 (1978)........................................................................... 1

13 *HMS Capital, Inc. v. Lawyers Title Co.,*
    118 Cal. App. 4th 204 (2004).............................................................. 5, 14

14

*Hughes v. Hughes,*
15     122 Cal. App. 4th 931 (2004).............................................................. 19

16 *Kahn v. Bower,*
    232 Cal. App. 3d 1599 (1991)............................................................. 8

17

*O'Connor v. McGraw-Hill, Inc.,*
18     159 Cal. App. 3d 478 (1984)............................................................... 7, 12

19 *Oasis W. Realty, LLC v. Goldman,*
    51 Cal. 4th 811 (2011)......................................................................... 6

20

*Shumate v. Johnson Publ'g Co.,*
21     139 Cal. App. 2d 121 (1956)............................................................... 20

22 *Weller v. Am. Broad. Cos., Inc.,*
    232 Cal. App. 3d 991 (1991)............................................................... 14

23

24

## STATE STATUTES

25

Cal. Civ. Proc. Code § 425.16(b)(2) .......................................................... 5

26

27

28

MILLER BARONDESS, LLP
ATTORNEYS AT LAW
1999 AVENUE OF THE STARS, SUITE 1000   LOS ANGELES, CALIFORNIA 90067
TEL: (310) 552-4400   FAX: (310) 552-8400

1

## **OTHER AUTHORITIES**

2   *Merriam-Webster Online Dictionary*,
       https://www.merriam-webster.com/dictionary/literally (last visited Nov. 7, 2017) ............. 9

3

*Merriam-Webster Online Dictionary*,
4       https://www.merriam-webster.com/dictionary/really (last visited Nov. 7, 2017) ................ 9

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

MILLER BARONDESS, LLP
ATTORNEYS AT LAW
1999 AVENUE OF THE STARS, SUITE 1000   LOS ANGELES, CALIFORNIA 90067
TEL: (310) 552-4400   FAX: (310) 552-8400

1

## I.    <u>INTRODUCTION</u>

2

On July 22, 2019, The Rachel Maddow Show on MSNBC ran a hit piece on

3  One America News Network ("OAN").  Rachel Maddow ("Maddow") made an

4  assertion that went well beyond anything reported in an article published by another

5  publication, *The Daily Beast*.  She told her audience that OAN "really literally is

6  paid Russian propaganda."

7

This was not a statement of opinion.  Either OAN is paid by the Russian

8  government to produce favorable content, or it is not.  And it is not.  OAN has never

9  received a penny from Russia or the Russian government and does not produce

10  biased news to promote Russia.  OAN is an American news network operated by

11  Plaintiff Herring Networks, Inc. ("Herring" or "Plaintiff"), a company owned and

12  financed by the Herrings, a proud and loyal American family.  Maddow's

13  demonstrably false statement of fact defeats Defendants' special motion to strike.

14

Defendants ask this Court to hold, *as a matter of law*, that when Maddow said

15  OAN "really literally is paid Russian propaganda," she was only expressing a

16  hyperbolic opinion.  Defendants' burden is a high one.  Where a statement could be

17  construed as either fact or opinion, "the issue *must* be left to the jury's

18  determination."  *Good Gov't Grp. of Seal Beach, Inc. v. Superior Court*, 22 Cal. 3d

19  672, 682 (1978) (emphasis added).  In other words, Defendants' motion fails unless

20  they prove that their characterization of Maddow's statement is the *only* possible

21  interpretation.  Defendants cannot meet this standard.

22

Maddow's statement is easily susceptible to an interpretation that makes it a

23  statement of fact (i.e., either OAN is paid by Russia for favorable content or it isn't).

24  Defendants contend Maddow was using "loose, figurative" language.  But Maddow

25  did not hedge her words, nor did she couch them in terms of opinion.  To the

26  contrary, she stated clearly that OAN "*really literally* is paid Russian propaganda."

27

Defendants claim that by "really literally," Maddow meant "figuratively."

28  This disputed issue of fact cannot be resolved at this stage.  Indeed, transcripts from

MILLER BARONDESS, LLP
ATTORNEYS AT LAW
1999 AVENUE OF THE STARS, SUITE 1000  LOS ANGELES, CALIFORNIA 90067
TEL: (310) 552-4400   FAX: (310) 552-8400

Maddow's other shows reveal that when Maddow uses "literally," she in fact means "literally." And Maddow herself believes that her millions of viewers watch her show to learn, in her own words, "useful information" and "good, true stories about what's going on and why it matters." (Declaration of Amnon Siegel ("Siegel Decl.") Ex. E at 20, 25.) In this story, Maddow went well beyond any facts reported by *The Daily Beast* and gave her viewers false information about OAN knowing that it would damage the network.

An analysis of Maddow's statement by Stefan Th. Gries, Ph.D.—a linguistics professor at the University of California, Santa Barbara—further demonstrates that Maddow's statement was not opinion. Professor Gries conducted a thorough analysis of Maddow's segment, identifying and analyzing linguistic markers (including words, tone, and cadence) used by Maddow. His report is attached to his concurrently filed declaration. Professor Gries concludes that an average viewer likely would *not* have understood Maddow's statement to be opinion. This is confirmed by the fact that, despite knowing how to do so, Maddow did not use any typical opinion-markers when she stated that OAN "really literally is paid Russian propaganda."

Moreover, Maddow's statement implied other false, undisclosed facts. Defendants' argument that Maddow disclosed all the facts—i.e., *The Daily Beast* article—underlying her defamatory statement is incorrect. Maddow did not merely tell her millions of viewers that, as reported by *The Daily Beast*, a single OAN employee also wrote articles on global finance for Sputnik News. Instead, Maddow went well beyond that, intentionally leading her viewers to believe (falsely) that there was far more to the story—that there was a real and significant connection between the news reported on OAN and the Russian government. This implication was false and *per se* harmful to OAN.

Finally, Defendants' cursory "substantial truth" argument is wrong. It is not true in the slightest that OAN's news constitutes "paid Russian propaganda."

MILLER BARONDESS, LLP
ATTORNEYS AT LAW
1999 AVENUE OF THE STARS, SUITE 1000   LOS ANGELES, CALIFORNIA 90067
TEL: (310) 552-4400   FAX: (310) 552-8400

1   Defendants' contention that because *other* parts of Maddow's report might have
2   contained accurate facts, this false statement is protected, is contrary to law.
3   Maddow is not entitled to make false assertions with impunity, so long as she
4   includes other facts.  If anything, Maddow's placement of this false statement of fact
5   between other factual statements makes it *more* likely for a viewer to believe it to be
6   true (and less likely to believe that she was merely expressing an opinion).

7        Defendants cannot meet their burden to show that Maddow's statement was
8   non-actionable opinion as a matter of law.  There is a question of fact as to how a
9   reasonable viewer would understand Maddow's statement that cannot be resolved in
10  a special motion to strike.  Because the statement easily could be construed as one of
11  fact, this issue should be resolved by a jury.  Defendants' motion should be denied.

## II.    STATEMENT OF FACTS

13       The Herring family launched OAN on July 4, 2013 to deliver timely national
14  and international news 24 hours a day.  (Compl. ¶ 16.)  OAN is owned and operated
15  by Plaintiff Herring, which is wholly-owned by the Herring family.  (*Id.* ¶ 18.)  The
16  Herrings are proud, dedicated, and loyal Americans.  (*Id.*)  They alone own and
17  finance OAN.  (*Id.*)

18       Defendant Comcast Corporation ("Comcast") is both the largest cable
19  provider in the United States and a major entertainment company with numerous
20  cable and broadcast channels.  (*Id.* ¶ 19.)  Among its news channels is MSNBC,
21  which Comcast owns and operates through its subsidiaries, Defendants
22  NBCUniversal Media, LLC and MSNBC Cable LLC.  (*Id.*)

23       Despite OAN's rapid rise and growing audience, Comcast has refused to
24  carry OAN on its cable service.  (*Id.* ¶ 20.)  On July 15, 2019, Charles Herring
25  emailed the President of Content Acquisition for Comcast.  (*Id.* ¶ 21.)  Herring
26  stated his concern that Comcast is refusing to carry OAN because Comcast opposes
27  distributing another conservative news channel to counter MSNBC.  (*Id.*)

28       Exactly one week after that email, the most popular show on MSNBC, The

MILLER BARONDESS, LLP
ATTORNEYS AT LAW
1999 AVENUE OF THE STARS, SUITE 1000   LOS ANGELES, CALIFORNIA 90067
TEL: (310) 552-4400   FAX: (310) 552-8400

MILLER BARONDESS, LLP
ATTORNEYS AT LAW
1999 AVENUE OF THE STARS, SUITE 1000   LOS ANGELES, CALIFORNIA 90067
TEL: (310) 552-4400   FAX: (310) 552-8400

1   Rachel Maddow Show, ran a hit piece on OAN.  (*Id.* ¶ 22.)  This is what happened:

2   ### A.   **Kristian Rouz**

3   One of OAN's employees is a young man named Kristian Rouz ("Rouz").

4   (Compl. ¶ 23.)  Rouz collects and analyzes articles from other sources and writes

5   articles based on those sources for OAN.  (*Id.*)  Rouz's articles go through OAN's

6   editorial process before they are published.  (*Id.*)  Rouz does not have decision-

7   making authority with respect to the content that is aired on OAN.  (*Id.*)

8   Rouz was born in the Ukraine.  (*Id.* ¶ 24.)  When he moved to the United

9   States, he had no friends or family here.  (*Id.*)  To make ends meet, Rouz began

10   writing articles for Sputnik News in 2014.  (*Id.*)  Rouz's work for Sputnik News has

11   no relation to his work for OAN, and Plaintiff had no knowledge of Rouz's outside

12   freelance work for Sputnik News.  (*Id.* ¶ 26.)  Rouz has never been an employee of

13   Sputnik News.  (*Id.*)  He worked as a freelancer for Sputnik News, receiving

14   approximately $40 an article.  (*Id.*)

15   Rouz chose the topics and viewpoints of the articles he wrote for Sputnik

16   News.  (*Id.* ¶ 24.)  Those articles provided updates about various topics in global

17   economics—e.g., "Japan Q1 GDP Beats Expectations Despite Weak Consumer

18   Spending."  (*Id.* ¶¶ 24 -25.)  Plaintiff did not know that Rouz wrote articles for

19   Sputnik News.  (Declaration of Charles Herring ("C. Herring Decl.") ¶ 3.)

20   On July 22, 2019, *The Daily Beast*—an online publication—published an

21   article entitled, "Trump's New Favorite Channel Employs Kremlin-Paid Journalist."

22   (Compl. ¶ 27.)  The article identified Rouz as "on the payroll" of Sputnik News.

23   (*Id.* ¶ 29.)  But the article did not identify any facts tying Rouz's work for OAN to

24   Sputnik News or the Russian government.  (*Id.*)  This is because there are no such

25   facts.  (*Id.*)

26   ### B.   **Maddow Falsely States That OAN "Really Literally Is Paid**
     **Russian Propaganda"**
27

28   Maddow is the host of her own show on MSNBC, The Rachel Maddow

Show.  (Compl. ¶ 30.)

On July 22, 2019, Maddow's show opened with a segment about OAN.  (*Id.* ¶ 35, Ex. A.)  This was the show's "A-block," which is the headlining and typically longest segment of the show.  (*Id.* ¶ 34.)  Maddow began by discussing the article from *The Daily Beast.* (*Id.* ¶ 37.)  But Maddow also made a new unsupported statement not found anywhere in the article: "In this case, the most obsequiously pro-Trump right wing news outlet in America *really literally is paid Russian propaganda.*" (*Id.* ¶ 38 (emphasis added).)

This statement was entirely false.  OAN has taken no money outside the Herring family whatsoever, and none of OAN's content is paid for or influenced by the Russian government.  (*Id.* ¶ 39.)

On July 25, 2019, OAN wrote to Comcast and Maddow pursuant to California Code of Civil Procedure § 48, demanding a retraction.  (*Id.* ¶ 40, Exs. A, B.)  Defendants refused.  (*Id.* ¶ 41.)  On August 6, 2019, counsel for NBC Universal claimed in a letter that when Maddow—a graduate of Stanford and Oxford Universities and a Rhodes Scholar—said, "literally," she actually meant, "'*not* being literally true.'" (*Id.* ¶¶ 41-42, Ex. D.)

Plaintiff's Complaint, filed on September 9, 2019, asserts a single claim for defamation.

## III.   LEGAL STANDARD

In deciding anti-SLAPP motions, courts consider the pleadings as well as affidavits.  Cal. Civ. Proc. Code § 425.16(b)(2).  Courts must "accept as true the evidence favorable to the plaintiff and evaluate the defendant's evidence only to determine if it has defeated that submitted by the plaintiff as a matter of law." *HMS Capital, Inc. v. Lawyers Title Co.*, 118 Cal. App. 4th 204, 212 (2004) (citation omitted).[1]

---

[1] Plaintiff does not dispute that the first prong of the anti-SLAPP statute is

MILLER BARONDESS, LLP
ATTORNEYS AT LAW
1999 AVENUE OF THE STARS, SUITE 1000  LOS ANGELES, CALIFORNIA 90067
TEL: (310) 552-4400    FAX: (310) 552-8400

"If the plaintiff 'can show a probability of prevailing on *any part of its claim*, the cause of action is not meritless' and will not be stricken . . . ." *Oasis W. Realty, LLC v. Goldman*, 51 Cal. 4th 811, 820 (2011) (citation omitted).  Plaintiff's burden is low: a plaintiff need only show "that the challenged claims have *minimal merit*." *Dickinson v. Cosby*, 37 Cal. App. 5th 1138, 1155 (2019) (emphasis added); *Briganti v. Chow*, No. B289046, 2019 WL 6242111, at *3 (Cal. Ct. App. Nov. 22, 2019) (certified for publication) (same).

Where the motion turns on the facts, "discovery must be allowed . . . before any decision is made." *Planned Parenthood Fed'n of Am., Inc. v. Ctr. for Med. Progress*, 890 F.3d 828, 834 (9th Cir. 2018).

## IV.   ARGUMENT

### A.   Maddow's False Statement Is Not Protected Opinion

To defeat this motion, Plaintiff need only show the minimal merit of its claim. *See Cheveldave v. Tri Palms Unified Owners Ass'n*, 27 Cal. App. 5th 1202, 1214 (2018).

Defendants' primary argument is that, as a matter of law, Maddow's statement constitutes protected opinion that cannot form the basis of a defamation claim.  (Dkt. No. 18-1 ("Mem.") at 8:4-6.)[2]  As set forth below, Defendants are wrong for multiple reasons.

_____

satisfied— i.e., that Maddow's statements arise from free speech in connection with a public issue.

[2] "Defamation is the intentional publication of a statement of fact that is false, unprivileged, and has a natural tendency to injure or that causes special damage." *Dickinson*, 37 Cal. App. 5th at 1155 (citation omitted).  If the person defamed is a public figure, the plaintiff must also prove actual malice (knowledge of falsity or reckless disregard of the truth).  *Id.*  Defendants' motion challenges only two elements of Plaintiff's claim.  Specifically, Defendants argue Maddow's statement: (1) was a statement of opinion, not fact; and (2) was substantially true.  Defendants do not contest (and thus concede for purposes of their motion) the remaining elements.

MILLER BARONDESS, LLP
ATTORNEYS AT LAW
1999 AVENUE OF THE STARS, SUITE 1000   LOS ANGELES, CALIFORNIA 90067
TEL: (310) 552-4400   FAX: (310) 552-8400

### 1.   Maddow's Statement Is Provably False

Maddow's statement—that OAN "really literally is paid Russian propaganda"—was not a statement of opinion.  It was a factual assertion that OAN is paid by Russia to disseminate news favorable to Russia.  This statement is provably false and thus actionable as defamation.

A court may find a statement to be protected opinion only if it can "declare as a matter of law that no reasonable person could construe [the statement] as provably false."  *Manufactured Home Cmtys., Inc. v. County of San Diego*, 544 F.3d 959, 964 (9th Cir. 2008).  Where a statement is "neither 'clearly fact' nor 'clearly opinion'" the determination as to whether the statement is defamatory "must be left to the trier of fact."  *O'Connor v. McGraw-Hill, Inc.*, 159 Cal. App. 3d 478, 485 (1984); *Campanelli v. Regents of Univ. of Cal.*, 44 Cal. App. 4th 572, 578 (1996) ("If the court concludes the statement could reasonably be construed as either fact or opinion, the issue should be resolved by a jury.").  That is the case here.

A statement is defamatory if it "declares or implies a provably false assertion of fact."  *Dickinson*, 37 Cal. App. 5th at 1163 (citation omitted).  To make this determination, courts apply a "totality of the circumstances test":

> First, we examine the *language of the statement itself*, to determine whether the words could be understood in a defamatory sense.  Second, we examine *the context in which the statement was made*.

*Id.* (emphasis added).[3]

Defendants cannot show, as a matter of law, that their characterization of Maddow's statement as hyperbolic opinion is the *only* reasonable one.  Thus, their motion fails.

---

[3] Other courts apply a similar standard, with the addition of a third prong: whether the assertion "is susceptible of being proved true or false."  *Unelko Corp. v. Rooney*, 912 F.2d 1049, 1053 (9th Cir. 1990).  Because this inquiry depends on the language of the statement, it is addressed as part of the first prong in Section A.1.(a).

MILLER BARONDESS, LLP
ATTORNEYS AT LAW
1999 AVENUE OF THE STARS, SUITE 1000  LOS ANGELES, CALIFORNIA 90067
TEL: (310) 552-4400   FAX: (310) 552-8400

MILLER BARONDESS, LLP
ATTORNEYS AT LAW
1999 AVENUE OF THE STARS, SUITE 1000  LOS ANGELES, CALIFORNIA 90067
TEL: (310) 552-4400   FAX: (310) 552-8400

(a)   <u>**The Language of the Statement Shows It Was Not Opinion**</u>

The statement that OAN "is paid Russian propaganda" is easily susceptible to an interpretation that makes it provably false.  *See Kahn v. Bower*, 232 Cal. App. 3d 1599, 1609 (1991) (holding that allegation of "incompetence" was reasonably susceptible of a provably false meaning).  Namely, either OAN is paid by Russia for favorable coverage, or it isn't.  As a matter of provable fact, OAN is not paid by Russia for coverage.  OAN has never received money from Russia, and none of OAN's content is influenced by Russians or the Russian government.  (Compl. ¶ 39; C. Herring Decl. ¶ 5.)

The recent decision in *Unsworth v. Musk* demonstrates that Maddow's statement could reasonably be construed as a factual assertion.  In *Unsworth*, Elon Musk tweeted that a cave diver in a rescue mission in Thailand was a "pedo guy."  *See* Case No. 2:18-cv-08048-SVW-JC, 2019 WL 4543110, at *2 (C.D. Cal. May 10, 2019).  Musk moved to dismiss the diver's defamation claim, arguing that his tweet was a nonactionable opinion because it was an "over-the-top," "non-literal insult[]."  *Id.* at *6.  The court disagreed, holding that "Defendant's tweets were susceptible of being proved true or false because Plaintiff either is a pedophile or he is not and, if he were, evidence could prove it."  *Id.* at *8.  Maddow's statement that OAN is "paid Russian propaganda" is similarly susceptible to being proved true or false.

Further, courts "consider whether the statement was cautiously phrased in terms of the author's impression."  *Dickinson*, 37 Cal. App. 5th at 1164.  Maddow did not cautiously phrase her statement.  She did not say "in my opinion" or "in my view."  *See Competitive Enter. Inst. v. Mann*, 150 A.3d 1213, 1245 (D.C. Ct. App. 2016) (noting, in rejecting argument that statements in article were opinion, that the author "does not employ language normally used to convey an opinion, such as 'in my view,' or 'in my opinion,' or 'I think'").

Instead, Maddow emphasized that OAN "*really literally* is paid Russian

MILLER BARONDESS, LLP
ATTORNEYS AT LAW
1999 AVENUE OF THE STARS, SUITE 1000  LOS ANGELES, CALIFORNIA 90067
TEL: (310) 552-4400   FAX: (310) 552-8400

1  propaganda."  The definition of "literally" is, "used to emphasize the *truth and*

2  *accuracy* of a statement or description."  *Merriam-Webster Online Dictionary*,

3  https://www.merriam-webster.com/dictionary/literally (last visited Nov. 7, 2017)

4  (emphasis added).  And "really" is defined to mean, "in reality," "truly," and

5  "unquestionably."  *Merriam-Webster Online Dictionary*, https://www.merriam-

6  webster.com/dictionary/really (last visited Nov. 7, 2017).

7     Defendants argue that the recently added *secondary* definition of "literally,"

8  which has a figurative meaning, should apply here.  (Mem. at 16:6-12 (citing

9  *Merriam-Webster Online Dictionary*).)  The Ninth Circuit, however, rejected the use

10  of disputed dictionary definitions to escape a defamation suit.  *Flowers v. Carville*,

11  310 F.3d 1118 (9th Cir. 2002).

12     In *Flowers*, the plaintiff sued over the claim he had "doctored" tapes.  310

13  F.3d at 1127.  The defendants cited the dictionary, arguing that "doctor" can be used

14  in a "neutral sense," meaning "to adapt or modify for a desired end by alteration or

15  special treatment," while the plaintiff pointed to the other definition of "doctor" as

16  to "conceal the real state or actual quality of by deceptive alteration."  *Id*. at 1127-28

17  (citation omitted).  The Ninth Circuit held that because the statement was

18  "susceptible of different constructions, one of which is defamatory, resolution of the

19  ambiguity *is a question of fact for the jury*."  *Id*. at 1128 (emphasis added) (citation

20  omitted).  The same is true here.

21     **(b)**   **The Context of the Statement Shows It Was Not**
   **Opinion**
22

23     Courts also consider the context of a statement—"the audience to whom the

24  statement was directed, the forum in which the statement was made and the author

25  of the statement," *Dickinson*, 37 Cal. App. 5th at 1164 (citations omitted)—in

26  deciding whether the statement could reasonably be construed as fact.

27     Here, context proves that when Maddow said that OAN "really literally is

28  paid Russian propaganda," she meant it.  Maddow is not the sort of person an

MILLER BARONDESS, LLP
ATTORNEYS AT LAW
1999 AVENUE OF THE STARS, SUITE 1000   LOS ANGELES, CALIFORNIA 90067
TEL: (310) 552-4400   FAX: (310) 552-8400

audience would expect to misuse "literally."  She is a graduate of Stanford and Oxford Universities and a Rhodes Scholar.  (Compl. ¶ 41.)  In fact, on the show, Maddow regularly uses "literally" in its primary meaning, as she did here:

- "Meanwhile, today the Trump administration tried to push through one of the most controversial judicial nominees of Trump's time in office.  They *literally* nominated him to the job two days ago . . . ."  (Siegel Decl. Ex. A at 6-7 (emphasis added).)

- "It's *literally* an emergency, a formally declared emergency . . . ."  (Siegel Decl. Ex. B at 10 (emphasis added).)

- "[T]he U.S. military [is] apparently diverting C17 cargo flights to stop at President Trump's golf course in Scotland, *literally* to have U.S. airmen stay at his golf resort . . . ."  (Siegel Decl. Ex. C at 14 (emphasis added).)

- "They are *literally* de-funding the day care center at Andrews Air Force Base."  (Siegel Decl. Ex. D at 17 (emphasis added).)

Maddow's use of the word "literally" is consistent.  Therefore, her audience would *not* have understood her assertion that OAN "really literally is paid Russian propaganda" as metaphorical hyperbole.  *See Dickinson*, 37 Cal. App. 5th at 1157 (considering evidence that defendant "acted in conformance with his general practices" when issuing press release).

   Defendants argue that Maddow's show was "replete with other colorful rhetorical hyperbole" and that statements made in the context of commentary-focused media "are presumed to be non-actionable."  (Mem. at 12:15-20,16:14.)  This, too, goes nowhere.

   In *Unelko Corp. v. Rooney*, Unelko sued over a statement on "60 Minutes" that its product Rain-X "didn't work."  912 F.2d at 1050.  The Ninth Circuit observed that the overall tenor of the show was "humorous and satirical" and "characterized by hyperbole."  *Id*. at 1054.  The Ninth Circuit nevertheless reversed an order dismissing Unelko's defamation claim because the "humorous and satirical nature of [the segment] does not negate the impression that [the speaker] was

making a factual assertion about Rain-X's performance." *Id.*

The case against Defendants is even stronger. Unlike *Unelko*, the general tenor of Maddow's show was (and is) not satirical and hyperbolic; it is a cable news show with a wide viewership for people seeking out the news. And even if the segment or the show was characterized by hyperbole (it is not), that does not absolve Maddow's liability for her demonstrably false statement.

Defendants also contend that "[s]tatements uttered in political discussions are . . . presumptively protected opinion," for which they cite *Koch v. Goldway*, 817 F.2d 507 (9th Cir. 1987). (Mem. at 12.) *Koch*, however, concerned an entirely different context—a "heated political debate and dispute" between bitter political rivals. 817 F.2d at 509.

In *Koch*, the defendant was a city council member and then mayor. 817 F.2d at 508. The plaintiff was a property owner opposed to rent control, who had appeared before the city council and then campaigned against the mayor on rent control issues. *Id.* The mayor referred to the property owner as a Nazi war criminal. *Id.* The Ninth Circuit found that the statement was an opinion, a slur between political rivals, and it was obvious "the mayor had not suddenly lost interest in rent control and politics in order to focus on war criminals." *Id.* 509.

This case, by contrast, does not arise from a heated political campaign. Instead, it arises from Maddow's false, unprovoked statement on the popular news channel, MSNBC, that OAN is paid Russian propaganda.[4] Further, statements "do not find shelter under the First Amendment simply because they are embedded in a larger policy debate." *Mann*, 150 A.3d at 1242-43 (denying anti-SLAPP motion regarding statements made about a climate scientist's work on global warming).

Defendants' conclusory claim that Maddow's audience understands her show as only political opinion is also contradicted by Maddow's own statements. In a

---

[4] Maddow did not even contact Herring before the segment. (C. Herring Decl. ¶ 4.)

MILLER BARONDESS, LLP
ATTORNEYS AT LAW
1999 AVENUE OF THE STARS, SUITE 1000   LOS ANGELES, CALIFORNIA 90067
TEL (310) 552-4400   FAX (310) 552-8400

recent interview with *The New York Times Magazine*, Maddow said that her show's mantra "is increasing the amount of useful *information* in the world" (Siegel Decl. Ex. E at 20 (emphasis added)); and that she hopes her viewers acquire "good, *true* stories about what's going on and why it matters" (*id.* at 25 (emphasis added)).  She contends that her show is factual and unbiased:

> I'm not trying to get anybody elected.  I'm not trying to get any policy passed.  I'm not trying to get people to call their member of Congress . . . . *I'm trying to explain what's going on in the world*.

(*Id.* at 24 (emphasis added).)

Thus, when Maddow tells her viewers that OAN "really literally is paid Russian propaganda," she intends her audience to believe that the statement is true, and they do.  This disputed factual issue precludes granting Defendants' motion. *See O'Connor*, 159 Cal. App. 3d at 485 (where a statement could be understood as either fact or opinion, the determination "must be left to the trier of fact").

Plaintiff already has evidence (without the benefit of discovery) that viewers interpreted Maddow's statement as a factual assertion that OAN is Russian propaganda.  For example, on the same day that Maddow's segment aired, OAN received a message through its website expressing shock that OAN is "a propaganda tool for Russian oligarchs" (C. Herring Decl. ¶ 6 & Ex. A), showing that the viewer took Maddow's assertion as true.

### (c)   Linguistic Analysis Confirms Maddow's Statement Was Not Opinion

Professor Gries' expert analysis further demonstrates that Maddow's statement would likely *not* have been understood by an average viewer as a statement of opinion.  (*See* Declaration of Stefan Th. Gries, Ph.D. ("Gries Decl.") Ex. A ("Gries Report").)  Professor Gries, a professor of linguistics at the University of California, Santa Barbara, has published extensively in the fields of corpus linguistics (the study of language in samples of real-world text) and statistical

MILLER BARONDESS, LLP

ATTORNEYS AT LAW

1999 AVENUE OF THE STARS, SUITE 1000   LOS ANGELES, CALIFORNIA 90067

TEL: (310) 552-4400   FAX: (310) 552-8400

methods in linguistics.  (Gries Decl. ¶¶ 2-3.)  He is the second most cited cognitive linguist[5] and sixth most widely-cited living corpus linguist.  (*Id.* ¶ 4.)

In his report, Professor Gries explains that listeners rely on a number of criteria to evaluate whether a statement is fact or opinion—e.g., modal verbs or adverbs, grammatical construction and intonation.  (Gries Report § 1.1.)  Using these and other criteria, Professor Gries conducted a thorough linguistic analysis of Maddow's statement that OAN is "paid Russian propaganda."  (*See id.* § 1.3.)  He determined that "there are virtually no lexical, grammatical, or intonational characteristics" that would lead a viewer to conclude that Maddow's statement was a statement of opinion, rather than fact.  (*Id.*)

Professor Gries further found that Maddow consistently used markers (such as "I mean" or "I guess") and intonation in her segment to distinguish her opinions from factual information.  (*Id.* § 1.3.3.)  Maddow, however, did not use any of these opinion-markers when she claimed that OAN is "paid Russian propaganda."  (*Id.*)  As Professor Gries puts it: "[i]n a highly-structured and transparent way, Maddow separates informational/factual reporting and opinion *in a way that marks [the sentence at issue] as factual*."  (*Id.* (emphasis added).)

Professor Gries also evaluated Defendants' reliance on dictionary definitions to argue that "literally" connotes opinion.  (*Id.* § 2.)  Among other things, Professor Gries explains that, instead of dictionaries (which can be inferior tools for determining ordinary meaning), linguists today rely instead on "large databases of texts produced in authentic/natural speech situations" (called "corpora").  (*Id.* § 2.1.)  Professor Gries points out that "the sentence in question does not just use *literally*, but *really literally*."  (*Id.* § 2.2)  Professor Gries conducted a search for "really literally" in the Corpus of Contemporary American English and found that "when

---

[5] Cognitive linguistics, which draws from both linguistics and psychology, studies how language interacts with cognition.

MILLER BARONDESS, LLP
ATTORNEYS AT LAW
1999 AVENUE OF THE STARS, SUITE 1000   LOS ANGELES, CALIFORNIA 90067
TEL: (310) 552-4400     FAX: (310) 552-8400

ordinary speakers in TV talk shows" use the term "really literally," the expression "typically modifies propositions *that are supposed to be interpreted literally*." (*Id.* (emphasis added).)

Ultimately, Professor Gries concludes "it is very unlikely that an average or reasonable/ordinary viewer would consider the sentence in question to be a statement of opinion." (*Id.* § 3.) This type of expert opinion in linguistics is admissible in defamation cases. *See Weller v. Am. Broad. Cos., Inc.*, 232 Cal. App. 3d 991, 1007 (1991) (affirming admission of testimony of professor of linguistics in defamation action "concerning how the average viewer was likely to understand the broadcasts"). And in the context of an anti-SLAPP motion, the Court must accept evidence favorable to the plaintiff, such as Professor Gries' declaration, as true. *HMS Capital*, 118 Cal. App. 4th at 212.

### 2. Maddow's Statement Also Implied Additional Undisclosed, False Assertions of Fact

Even assuming *arguendo* that Maddow's statement was an opinion (it wasn't), it was still defamatory. "Statements of opinion . . . do not enjoy blanket protection." *Dickinson*, 37 Cal. App. 5th at 1163-64 (denying anti-SLAPP motion where statements "impl[ied] provably false assertions of fact"). "Rather, 'a statement that implies a false assertion of fact, even if couched as an opinion, can be actionable.'" *Id.* at 1163 (citation omitted). "Even if the speaker states the facts upon which he bases his opinion, if those facts are either incorrect or incomplete, or if his assessment of them is erroneous, the statement may still imply a false assertion of fact." *Milkovich v. Lorain Journal Co.*, 497 U.S. 1, 18-19 (1990) (holding that a reasonable factfinder could conclude that defendant's statements falsely implied the fact that plaintiff perjured himself, and thus they were not protected opinion).

Defendants contend that Maddow's statement is not actionable because she "expressly disclosed the underlying facts on which she based her 'paid Russian propaganda' comment—those reported in *The Daily Beast* articles." (Mem. at 8:18-

MILLER BARONDESS, LLP
ATTORNEYS AT LAW
1999 AVENUE OF THE STARS, SUITE 1000  LOS ANGELES, CALIFORNIA 90067
TEL: (310) 552-4400   FAX: (310) 552-8400

19.)  This argument is dependent on Defendants' characterization of Maddow's statement as an opinion, which, as discussed above, it is not.  Because Defendants' opinion argument fails, so does their argument that Maddow's statement was protected opinion based on disclosed facts.  *See Mann*, 150 A.3d at 1245 (rejecting argument that statements in article were protected opinions based on disclosed facts because "a jury could reasonably interpret" the author's statements as asserting facts, not opinions).[6]

Even assuming Maddow's statement that OAN "really literally is paid Russian propaganda" was an opinion, as Defendants contend, it implies facts beyond anything reported in *The Daily Beast* article.  *See Milkovich*, 497 U.S. at 18-19.  Specifically, Maddow implied the following false assertions of fact:

- OAN is paid by Russia for running content prepared for or at the direction of the Russian government;

- OAN is paid by Russia to disseminate news that is biased or misleading in favor of Russia and/or the Russian government; and

- OAN airs content prepared by Rouz at Russia's behest.

These factual implications are disastrous for a news agency.

The Complaint specifically alleges that Maddow falsely implied a connection between OAN's content and Russia.  (Compl. ¶ 49.)  As Defendants concede, "[i]n construing an anti-SLAPP motion under Rule 12(b)(6), courts accept as true the allegations in the complaint . . . ."  (Mem. at 5:27-28.)

Plaintiff's allegations are more than plausible.  The *Daily Beast* article did not identify *any* facts tying OAN's news reporting to Sputnik News or the Russian

---

[6] Defendants are not shielded from liability because Maddow discussed some facts reported by *The Daily Beast* before making the false statement of fact that OAN is "paid Russian propaganda."  *See Agard v. Hill*, No. CIV 2-10-cv-0323-GEM-JFM (PS), 2010 WL 1444580, at *6 (E.D. Cal. Apr. 9, 2010) (finding negative review constituted actionable defamation, even though it contained "multiple uncontested facts," because it went beyond any disclosed facts).

MILLER BARONDESS, LLP
ATTORNEYS AT LAW
1999 AVENUE OF THE STARS, SUITE 1000 LOS ANGELES, CALIFORNIA 90067
TEL: (310) 552-4400   FAX: (310) 552-8400

government (because there are no such facts).  The article identified only a single OAN employee, Rouz, who also wrote freelance articles for Sputnik News.  (Compl. ¶ 29.)  Rouz's work for Sputnik News had demonstrably no relation to his work for OAN.  (*Id.* ¶ 26.)  Maddow's claim that it did was false.

Maddow devoted the most important segment of her show (the headliner "A-block") to OAN and went beyond *The Daily Beast* article to state that OAN "really literally is paid Russian propaganda."  Maddow intended to—and did—imply there was more to the story than reported by *The Daily Beast*.  Specifically, Maddow implied that there was an actual connection between OAN's news content and Russia, which is absolutely false.  (*Id.* ¶ 44.)

Further, Maddow's statement is "not protected as opinion based on accurate, complete facts, because [she] gave a skewed and incomplete picture of the facts." *Mann*, 150 A.3d at 1247.  For example, Maddow did not tell her audience that Rouz was merely a freelancer for Sputnik News who wrote articles on international finance (with topics and viewpoints of his own choosing) for about $40 an article. (Compl. ¶¶ 24-25.)  Nor did she tell her audience that Rouz has no decision-making authority with respect to the content that is aired on OAN.  (*Id.*)  Maddow, instead, gave an incomplete, skewed picture so that she could falsely portray Rouz as some kind of Russian agent disseminating pro-Russia "propaganda" on OAN.  Thus, Maddow's statement is not protected.  *See Mann*, 150 A.3d at 1247 (article that left out facts in charging scientist with misconduct was not protected opinion); *Milkovich*, 497 U.S. at 18-19 (opinion not protected if "facts are either incorrect or incomplete" or the "assessment of them is erroneous").

The authorities relied upon by Defendants do not support their position.  In *Gardner v. Martino*, a radio talk show host listened to an extended story from a caller about her problems with a jet ski dealer.  563 F.3d 981, 984-85 (9th Cir. 2009).  At one point, the host responded, "Yeah, they're just, yeah, they're just lying to you."  *Id.* at 984.  The Ninth Circuit concluded the host's statement was an

MILLER BARONDESS, LLP
ATTORNEYS AT LAW
1999 AVENUE OF THE STARS, SUITE 1000  LOS ANGELES, CALIFORNIA 90067
TEL: (310) 552-4400    FAX: (310) 552-8400

opinion because the audience understood that the host had "no independent knowledge of the [caller's] complaint." *Id.* at 988.

Maddow's show is entirely different than the format of the call-in show in *Gardner*.  Maddow was not commenting on what one of her listeners told her (nor does Maddow even take calls from viewers).  Maddow was purporting to deliver factual news about OAN directly to her millions of viewers.  As set forth above, Maddow views her show as providing "useful information" and "good, true stories" to her audience.  (Siegel Decl. Ex. E at 20, 25.)  Unlike in *Gardner*, a reasonable viewer would not assume that Maddow had no knowledge regarding what she was reporting.

Defendants' reliance on *Cochran v. NYP Holdings, Inc.*, 58 F. Supp. 2d 1113 (C.D. Cal. 1998), is also misplaced.  In *Cochran*, an opinion columnist stated: "history reveals that [Johnnie Cochran] will say or do just about anything to win, typically at the expense of the truth."  *Id.* at 1116.  All parties conceded that "history," as used in the column, referred only to Cochran's defense in the O.J. Simpson trial.  *Id.* at 1116-17; *see also id.* at 1122.  The court concluded that the statement was opinion because the O.J. Simpson trial "was televised live to the public, widely viewed, and has been thoroughly critiqued and debated in the public arena" and that, "[a]s a result, there exists a shared public knowledge of the trial . . . ."  *Id.* at 1122-23.  In that context, readers would understand that the statement in the recognizable opinion column was not reporting any new, independent facts about the trial, but only providing the *opinion columnist's opinion* based on the highly-publicized O.J. Simpson trial.  *Id.*

This case is very different.  Maddow was not commenting on some shared public experience in an opinion column.  Maddow was purporting to tell her viewers something they did not already know about OAN—i.e., "paid Russian propaganda"—that was false and defamatory.  Worse, she used true facts from *The Daily Beast* to make her false statement look like the truth and to imply other

MILLER BARONDESS, LLP
ATTORNEYS AT LAW
1999 AVENUE OF THE STARS, SUITE 1000   LOS ANGELES, CALIFORNIA 90067
TEL: (310) 552-4400   FAX: (310) 552-8400

1 | nefarious facts against OAN.

### B. Maddow's Comment Is Not Only Capable Of A Defamatory Meaning, It Is Affirmatively Defamatory

Defendants argue that Maddow's statement "is not susceptible to 'the defamatory meaning [plaintiff] ascribes to it.'" (Mem. at 18:22-23.) This argument, however, is merely a recasting of Defendants' assertion that Maddow's statement could only have been understood as hyperbole. The argument fails for the same reasons as set forth above.

"The existence of a defamatory meaning is generally a question of fact for the jury." *Church of Scientology of Cal. v. Flynn*, 744 F.2d 694, 696 (9th Cir. 1984) (reversing district court's order granting a motion to dismiss). Dismissal is thus improper if "by reasonable implication a defamatory meaning may be found in the communication." *Id.* (citation omitted). Courts "must refrain from a 'hair-splitting analysis' of what is said . . . to find an innocent meaning." *Id.* (citation omitted).

Defendants argue that the "context" and "rhetorical nature" of Maddow's comment preclude any defamatory meaning and that "'no reasonable reader could understand the sentence, when read in context,' to mean Russia owned or funded OAN." (Mem. at 19:13-20:26.) Except Maddow *said* that OAN "really literally is paid Russian propaganda." (Compl. ¶ 38.) An average viewer could hardly be faulted for taking Maddow at her word—that OAN is "paid" by Russia for favorable content.

Defendants' reliance on *Troy Group, Inc. v. Tilson*, 364 F. Supp. 2d 1149 (C.D. Cal. 2005), actually undercuts their position. There, the court emphasized that the defendant's use of the word "crooks" was not capable of a defamatory meaning because the statement was couched in "non-literal" language. *Id.* at 1156. The court distinguished two prior California opinions that held that calling someone a "crook" was defamatory because, in those cases, "the defaming parties affirmatively asserted that the plaintiffs were, *in literal terms*, crooks, whereas here, [the

MILLER BARONDESS, LLP
ATTORNEYS AT LAW
1999 AVENUE OF THE STARS, SUITE 1000  LOS ANGELES, CALIFORNIA 90067
TEL: (310) 552-4400   FAX: (310) 552-8400

1  defendant] used the word 'crooks' in a clearly exaggerated rhetorical question that
2  does not lend itself to a literal interpretation by the average reader." *Id.* (emphasis
3  added).

4      Defendants' citation to *Knievel v. ESPN*, 393 F.3d 1068 (9th Cir. 2005), is
5  equally unavailing because there, too, the court was guided by "the overwhelming
6  presence of . . . non-literal language." *Id.* at 1077.  Similarly, in *Wynn v. Chanos*, 75
7  F. Supp. 3d 1228 (N.D. Cal. 2014), the speaker couched his comments about a
8  company in "vague" language, saying he was "nervous," "concerned" and not
9  "comfortable" with the company's actions. *Id.* at 1237.

10      Here, Maddow used the most "literal terms" imaginable—the words "really"
11  and "literally."  A reasonable factfinder could certainly find that her comments were
12  defamatory or, at the very least, reasonably susceptible of a defamatory meaning.
13  Defendants' motion should therefore be denied.

14      **C.    Defendants' "Substantial Truth" Argument Lacks Merit**

15      Defendants' "substantial truth" defense lacks merit.  Whether a statement is
16  substantially true is a factual determination for the jury.  *Bently Reserve LP v.*
17  *Papaliolios*, 218 Cal. App. 4th 418, 435 (2013) ("[W]hether a statement is true or
18  substantially true is normally considered to be a factual one." (citation omitted)).
19  The defense applies only where "the substance of the charge be proved true,
20  irrespective of *slight* inaccuracy in the details."  *Masson v. New Yorker Magazine,*
21  *Inc.*, 501 U.S. 496, 516-17 (1991) (emphasis added) (citation omitted); *see also*
22  *Hughes v. Hughes*, 122 Cal. App. 4th 931, 936 (2004) (statement "Our dad's a
23  pimp" was susceptible to the defense of substantial truth because the dad was,
24  previously, a pimp).

25      Maddow's assertion that OAN "really literally is paid Russian propaganda" is
26  not a slight inaccuracy nor is it partially true.  It is wholly false.  OAN has never
27  received money from Russia or the Russian government, and none of OAN's
28  content is influenced by Russians or the Russian government.  (Compl. ¶ 39; C.

MILLER BARONDESS, LLP
ATTORNEYS AT LAW
1999 AVENUE OF THE STARS, SUITE 1000  LOS ANGELES, CALIFORNIA 90067
TEL: (310) 552-4400    FAX: (310) 552-8400

Herring Decl. ¶ 5.)

Defendants note that Rouz is employed by OAN and also wrote articles for Sputnik News.  (Mem. at 21:27-22:3.)  But this fact does not make it substantially true that OAN, the network, "really literally is paid Russian propaganda."  Nor is Maddow immune to liability because *some* of her segment contained facts.  It "is no defense that merely a part of a publication is true."  *Shumate v. Johnson Publ'g Co.*, 139 Cal. App. 2d 121, 132 (1956); *see Masson*, 501 U.S. at 510 ("[T]he test of libel is not quantitative; a single sentence may be the basis for an action in libel . . . ." (alteration in original) (citation omitted)).

Defendants argue this case is similar to *Campanelli v. Regents of University of California*, 44 Cal. App. 4th 572 (1996), but the facts there were very different. In *Campanelli*, Berkeley's athletic director explained his firing of the basketball coach by saying, "the players were beaten down and in trouble psychologically." *Id.* at 576.  However, because the coach admitted he "engaged in temper tantrums directed at his players which included verbally abusive and profane remarks of a personal nature, to the extent that seven members of the team wanted to transfer unless he was fired," the court concluded that the coach had "admitted the essential accuracy of" the statement.  *Id.* at 582.

Here, Plaintiff has not admitted the essential accuracy of Maddow's statement that OAN is "paid Russian propaganda."  Plaintiff only admitted that, unbeknownst to it, Rouz wrote articles for Sputnik News.  Plaintiff has not been paid by the Russian government; and its content is not, in any way, influenced by Russians or the Russian government.  (Compl. ¶ 39; C. Herring Decl. ¶ 5.)

A trier of fact could easily conclude that Maddow's statement was not substantially true.  Therefore, Defendants cannot win on their substantial truth defense as a matter of law, and Plaintiff's claim for defamation should not be stricken.  *See Bently Reserve*, 218 Cal. App. 4th at 435 (denying anti-SLAPP motion because "trier of fact might conclude [defamatory statement] was not substantially

MILLER BARONDESS, LLP
ATTORNEYS AT LAW
1999 AVENUE OF THE STARS, SUITE 1000   LOS ANGELES, CALIFORNIA 90067
TEL: (310) 552-4400   FAX: (310) 552-8400

1  true and was defamatory").

2  **D.  At A Minimum, Discovery Should Be Permitted**

3  As set forth above, Herring has made a prima facie showing for its

4  defamation claim, and Defendants' opinion argument does not succeed as a matter

5  of law.  To the extent the Court disagrees, it should permit discovery.  This lawsuit

6  should not be terminated before Plaintiff has had adequate discovery into the context

7  of Maddow's statement, including the journalistic practices of The Rachel Maddow

8  Show and how Maddow's viewers reasonably understood her statement.

9  Another district court allowed discovery on this very issue.  *See Woodbridge*

10  *Structured Funding, LLC v. Sovereign Funding*, No. MJG-11-3421, 2012 WL

11  13006189, at *4 (D. Md. June 21, 2012) (deferring summary judgment motion to

12  allow discovery on issue of whether statement was one of fact or opinion).  The

13  Siegel Declaration sets forth the discovery Herring would seek if afforded the

14  opportunity.  (*See* Siegel Decl. ¶¶ 6-7.)

15  **V.  CONCLUSION**

16  The Court should deny Defendants' motion.

17

18  DATED:  December 2, 2019          MILLER BARONDESS, LLP

19

20

21  By:

22          AMNON Z. SIEGEL

23          Attorneys for Plaintiff Herring Networks,

          Inc.

24

25

26

27

28

MILLER BARONDESS, LLP
ATTORNEYS AT LAW
1999 AVENUE OF THE STARS, SUITE 1000  LOS ANGELES, CALIFORNIA 90067
TEL: (310) 552-4400    FAX: (310) 552-8400

1  LOUIS R. MILLER (State Bar No. 54141)
   smiller@millerbarondess.com
2  AMNON Z. SIEGEL (State Bar No. 234981)
   asiegel@millerbarondess.com
3  COLIN H. ROLFS (State Bar No. 280654)
   crolfs@millerbarondess.com
4  JUSTIN P. MCCARTHY (State Bar No. 317169)
   jmccarthy@millerbarondess.com
5  MILLER BARONDESS, LLP
   1999 Avenue of the Stars, Suite 1000
6  Los Angeles, California 90067
   Telephone:  (310) 552-4400
7  Facsimile:  (310) 552-8400

8  Attorneys for Plaintiff Herring Networks, Inc.

9

10

11            UNITED STATES DISTRICT COURT

12          SOUTHERN DISTRICT OF CALIFORNIA

13

14  HERRING NETWORKS, INC.,          **CASE NO. 3:19-cv-01713-BAS-BGS**

15            Plaintiff,              Assigned for All Purposes to:
                                      Hon. Cynthia Bashant
16        v.
                                      **DECLARATION OF CHARLES
17  RACHEL MADDOW; COMCAST           HERRING IN SUPPORT OF
    CORPORATION; NBC UNIVERSAL       PLAINTIFF'S OPPOSITION TO
18  MEDIA, LLC; AND MSNBC CABLE      DEFENDANTS' SPECIAL MOTION
    LLC.                             TO STRIKE**
19
            Defendants.              *[Filed Concurrently with Declaration of
20                                   Charles Herring; Declaration of
                                     Professor Stefan Th. Gries and
21                                   Declaration of Amnon Z. Siegel]*

22
                                     Action Filed:  September 9, 2019
23                                   Hearing Date:  December 16, 2019
                                     Trial Date:    None
24

25

26

27

28

MILLER BARONDESS, LLP
ATTORNEYS AT LAW
1999 AVENUE OF THE STARS, SUITE 1000  LOS ANGELES, CALIFORNIA 90067
TEL:(310) 552-4400   FAX:(310) 552-8400

444501.2

1                              Case No. 3:19-cv-01713-BAS-BGS
DECLARATION OF CHARLES HERRING IN SUPPORT OF PLAINTIFF'S OPPOSITION TO DEFENDANTS'
SPECIAL MOTION TO STRIKE

## DECLARATION OF CHARLES HERRING

I, Charles Herring, declare as follows:

1.  I am the President of Herring Networks, Inc. ("Herring Networks"). I have personal knowledge of the facts set forth herein. If called as a witness, I could and would competently testify to the matters stated herein. I make this declaration in support of Plaintiff's Opposition to Defendants' Special Motion to Strike.

2.  One America News Network ("OAN") is an American news network owned and operated by Herring Networks, a company owned and financed by myself, my brother, Bobby Herring, and my father, Robert Herring Sr. (the "Herring Family"). Herring Networks, which is headquartered in San Diego, California, launched OAN on July 4, 2013 to deliver timely national and international news 24 hours a day. OAN is also headquartered in San Diego and operates a news bureau in Washington, D.C. and New York City.

3.  One of OAN's employees is a young man named Kristian Rouz ("Rouz"). Rouz collects and analyzes articles from other sources and writes articles based on those sources for OAN. Rouz's articles go through OAN's editorial process before they are published. Rouz does not have decision-making authority with respect to the content that is aired on OAN. Prior to the article in *The Daily Beast*, Herring Networks did not know that Rouz also wrote articles for Sputnik News.

4.  On July 22, 2019, Rachel Maddow ("Maddow") opened her show, The Rachel Maddow Show, with a segment about OAN. Neither Maddow nor anyone from Comcast Corporation, NBCUniversal Media, LLC, or MNSBC Cable LLC contacted OAN or Herring Networks prior to televising the segment.

5.  Maddow's claim during her segment that OAN "really literally is paid Russian propaganda" is false. Neither OAN nor Herring Networks has ever received money from Russia or the Russian government, and none of OAN's content is influenced by Russians or the Russian government. In fact, Herring Networks is exclusively financed by the Herring Family and has never received outside investment.

MILLER BARONDESS, LLP
ATTORNEYS AT LAW
1999 AVENUE OF THE STARS, SUITE 1000  LOS ANGELES, CALIFORNIA 90067
TEL: (310) 552-4400    FAX: (310) 552-8400

1      6.      On the same day that Maddow's segment aired, OAN received a message through

2  its website from an individual expressing shock that OAN is "a propaganda tool for Russian

3  oligarchs."  A true and correct copy of that message is attached hereto as **Exhibit A**.

4      I declare under penalty of perjury under the laws of the State of California and the United

5  States of America that the foregoing is true and correct.

6      Executed on this 1st day of December, 2019, at San Diego, California.

7

8                                                    _____

9                                                    Charles Herring

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

MILLER BARONDESS, LLP
ATTORNEYS AT LAW
1999 AVENUE OF THE STARS, SUITE 1000  LOS ANGELES, CALIFORNIA 90067
TEL: (310) 552-4400   FAX: (310) 552-8400

## INDEX OF EXHIBITS TO THE DECLARATION OF HERRING NETWORK

| Exhibit No. | Description | Pg. No. |
|---|---|---|
| A. | July 22, 2019 Email from Word Press email to One America News Network | 4-5 |

MILLER BARONDESS, LLP
ATTORNEYS AT LAW
1999 AVENUE OF THE STARS, SUITE 1000   LOS ANGELES, CALIFORNIA 90067
TEL: (310) 552-4400   FAX: (310) 552-8400

# EXHIBIT A
## (Personal Information Redacted)

**Subject:** One America News Network Contact Form
**Date:** Monday, July 22, 2019 at 7:55:19 PM Pacific Daylight Time
**From:** Word Press
**To:** Contact

To:
One America News Network

Name:
███████

Email:
████████████████

City:
Kettering

State/Province/Region:
Ohio

Zip/Postal Code:
█████

Age:
35-49

Sex:
Male

Service Provider:
DIRECTV

Income:
Prefer not to disclose.

Message:
You are a propaganda tool for Russian oligarchs. True justice would be
for everyone at OANN to be sent to the Russian gulag for 20 years.

Akismet Spam Check: passed
Sent from (ip address): ████████████
████████████████████████

Date/Time: July 22, 2019 7:55 pm
Coming from (referer): https://www.oann.com/contact/
Using (user agent): Mozilla/5.0 (Macintosh; Intel Mac OS X 10_12_6)
AppleWebKit/603.3.8 (KHTML, like Gecko) Version/10.1.2 Safari/603.3.8

1 | LOUIS R. MILLER (State Bar No. 54141)
smiller@millerbarondess.com
2 | AMNON Z. SIEGEL (State Bar No. 234981)
asiegel@millerbarondess.com
3 | COLIN H. ROLFS (State Bar No. 280654)
crolfs@millerbarondess.com
4 | JUSTIN P. MCCARTHY (State Bar No. 317169)
jmccarthy@millerbarondess.com
5 | MILLER BARONDESS, LLP
1999 Avenue of the Stars, Suite 1000
6 | Los Angeles, California 90067
Telephone:  (310) 552-4400
7 | Facsimile:   (310) 552-8400

8 | Attorneys for Plaintiff Herring Networks, Inc.

9

10

11 | **UNITED STATES DISTRICT COURT**

12 | **SOUTHERN DISTRICT OF CALIFORNIA**

13

**MILLER BARONDESS, LLP**
ATTORNEYS AT LAW
1999 AVENUE OF THE STARS, SUITE 1000  LOS ANGELES, CALIFORNIA 90067
TEL: (310) 552-4400   FAX: (310) 552-8400

| | |
|---|---|
| 14  HERRING NETWORKS, INC., | **CASE NO. 3:19-cv-01713-BAS-BGS** |
| 15          Plaintiff, | Assigned for All Purposes to: Hon. Cynthia Bashant |
| 16          v. | **DECLARATION OF PROFESSOR STEFAN TH. GRIES IN SUPPORT OF HERRING NETWORK INC'S OPPOSITION TO DEFENDANTS' MOTION TO STRIKE** |
| 17  RACHEL MADDOW; COMCAST CORPORATION; NBC UNIVERSAL 18  MEDIA, LLC; AND MSNBC CABLE LLC. 19 | |
| 20          Defendants. | *[Filed Concurrently with Opposition; Declaration of Charles Herring; and Declaration of Amnon Z. Siegel]* |
| 21 | |
| 22 | |
| 23 | Action Filed:   September 9, 2019 Hearing Date: December 16, 2019 |
| 24 | Trial Date:     None |

25

26

27

28

1

## <u>DECLARATION OF PROFESSOR STEFAN TH. GRIES</u>

2    I, Professor Stefan Th. Gries, declare as follows:

3    1.    I have been retained by Plaintiff Herring Networks, Inc. ("Plaintiff") to

4  provide an expert opinion.  If called as a witness, I could and would competently

5  testify to the matters stated herein.

6    2.    I am a tenured Professor of Linguistics at the University of California,

7  Santa Barbara.  I am also Chair of English Linguistics at Justus-Liebig-Universität

8  Giessen (the University of Giessen), a large public research university in Germany.

9    3.    I have authored more than 200 publications and other written

10  contributions in the area of corpus linguistics (which is the study of language

11  samples of real world text) and statistical methods in linguistics in many of the

12  leading journals of my field.  I am the general editor and co-founder of the journal

13  *Corpus Linguistics and Linguistic Theory*.  I am also the co-editor of the *Journal of*

14  *Research Design and Statistics in Linguistics and Communication*.

15    4.    I am the second most widely-cited cognitive linguist and sixth most

16  widely-cited living corpus linguist.  The field of cognitive linguistics draws from

17  both linguistics and psychology and studies how language interacts with cognition.

18    5.    A true and correct copy of my Curriculum Vitae is attached hereto as

19  **Exhibit A**.

20    6.    I have reviewed the July 22, 2019 segment of The Rachel Maddow

21  Show concerning One America News Network, as well as certain other segments of

22  The Rachel Maddow Show and the Complaint and Motion to Strike filed in this

23  matter.

24

25

26

27

28

MILLER BARONDESS, LLP
ATTORNEYS AT LAW
1999 AVENUE OF THE STARS, SUITE 1000   LOS ANGELES, CALIFORNIA 90067
TEL: (310) 552-4400   FAX: (310) 552-8400

7.     Based upon my review, I have prepared a report containing my analysis and conclusions, which is attached hereto as **Exhibit B**.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed on this _1_ day of December, 2019, at Los Angeles, California.

Professor Stefan Th. Gries

MILLER BARONDESS, LLP
ATTORNEYS AT LAW
1999 AVENUE OF THE STARS, SUITE 1000   LOS ANGELES, CALIFORNIA 90067
TEL: (310) 552-4400   FAX: (310) 552-8400

# EXHIBIT A

# Curriculum Vitae

### Stefan Th. Gries, Ph.D.

| | |
|---|---|
| Home: | 973 Miramonte Drive #2<br>Santa Barbara, CA 93109<br>U.S.A. |
| University: | Department of Linguistics<br>University of California, Santa Barbara<br>Santa Barbara, CA 93109-3100<br>U.S.A. |
| Email / www | stgries@gmail.com          http://www.stgries.info |

**Work history** (current: highlighted in bold)

| | |
|---|---|
| **April 2018 -** | **25% appointment as a salaried (Full/W3) Chair of English Linguistics (Corpus Linguistics with a focus on quantitative methods)**<br>**Dept of English, Justus-Liebig-Universität Giessen** |
| March 2012 - | Affiliated faculty<br>Dept of Spanish and Portuguese, UC Santa Barbara |
| **July 2010 -** | **(Full) Professor of Linguistics (tenured, currently VII O/S, third highest level of 20 levels in the UC system although I have been there only 14 years)**<br>**Dept of Linguistics, UC Santa Barbara** |
| July 2007 - June 2010 | Associate Professor of Linguistics (tenured)<br>Dept of Linguistics, UC, Santa Barbara |
| Nov 2005 - June 2007 | Assistant Professor of Linguistics<br>Dept of Linguistics, UC Santa Barbara |
| Feb 2005 - Oct 2005 | Visiting researcher with scholarship<br>Dept of Developmental and Comparative Psychology<br>Max Planck Institute for Evolutionary Anthropology |
| May 2002 - July 2005 | Associate Professor of English (tenured)<br>Institute of Business Communication and Information Science<br>University of Southern Denmark at Sønderborg |
| Apr 1999 - Apr 2002 | Assistant Professor of English<br>Institute of Business Communication and Information Science<br>University of Southern Denmark at Sønderborg |

1

## Honorary titles and temporary affiliations

| | |
|---|---|
| June/July 2019 | Visiting Professor at the Linguistic Soc. of America Institute<br>University of California, Davis |
| April - September 2017 | Honorary Leibniz Professor<br>Research Academy, University of Leipzig, Germany |
| Sept 2011 - | Honorary Liebig Professor<br>Justus Liebig University Giessen, Germany |
| July 2015 | Visiting Professor at the Linguistic Soc. of America Institute<br>University of Chicago |
| June/July 2013 | Visiting Professor at the Linguistic Soc. of America Institute<br>University of Michigan, Ann Arbor |
| July 2011 | Visiting Professor at the Linguistic Soc. of America Institute<br>University of Colorado, Boulder |
| July 2007 | Visiting Professor at the Linguistic Soc. of America Institute<br>Stanford University |

## Relevant legal scholarship and consulting

Amicus curiae to James Heilpern & Gene C. Schaerr's 2018 amicus brief with the U.S. Supreme Court in the case Lucia & Lucia Companies, Inc. v. Securities and Exchange Commission (On Writ of Certiorari to the United States Court of Appeals for the D.C. Circuit.)

Amicus curiae to James Heilpern & Gene C. Schaerr's 2018 amicus brief with the U.S. Supreme Court in the case Rimini Street, Inc. & Seth Ravin v. Oracle USA, Inc, Oracle America, Inc., & Oracle International Corporation (On Writ of Certiorari to the United States Court of Appeals for the 9th Circuit.)

Baron, Dennis E. Alison L. LaCroix, Stefan Th. Gries, & Jason Merchant. 2019. Amicus brief with the U.S. Supreme Court in the case New York State Rifle & Pistol Association Inc., Rommolo Colantone, Efrain Alvarez, & Jose Anthony Irizarry v. The City of New York and the NYPD License Division (On Writ of Certiorari to the United States Court of Appeals for the 2nd Circuit.)

Gries, Stefan Th. & Brian G. Slocum. 2017. Ordinary meaning and corpus linguistics. *Brigham Young University Law Review* 6. 1417-1472.

Slocum, Brian G., Stefan Th. Gries, & Lawrence Solan. 2019. Amicus brief with the U.S. Supreme Court in the case Gerald Lynn Bostock v. Clayton County, GA (On Writs of Certiorari to the United States Courts of Appeals for the 11th, 2nd, and 6th Circuits.)

| | |
|---|---|
| Fall 2019 | Advising the law practice of Anthony T. Schneider (Newport Beach, CA) |

2

| | |
|---|---|
| | regarding an authorship attribution case; testimony was scheduled for 12 Nov but then not admitted by the judge |
| Oct 2019 | Preliminary data analysis for the law firm Simpson Thatcher and the Southern Poverty Law Center with regard to their lawsuit challenging Mississippi's criminal disenfranchising scheme (in particular with regard to interpreting Section 2 of the 14th Amendment of the U.S. Constitution); ultimately, we declined to write an amicus brief for lack of empirical evidence |
| April 2012 | Advising the law practice Andrea Hurd (Santa Barbara, CA) regarding the interpretation of the phrase "four or fewer" in the Harbors and Navigations Code, Section 6565.2; case was settled before trial |

### Research and relevant experience: overview

− more than 200 publications and other written contributions in the area of quantitative corpus linguistics and statistical methods in linguistics in many of the leading journals of my fields (including 20 published or to appear books and edited volumes; selection: see below)
− general editor and co-founder of the journal *Corpus Linguistics and Linguistic Theory*
− co-editor of the *Journal of Research Design and Statistics in Linguistics and Communication*
− member of the board of all major corpus linguistics and cognitive linguistics journals and others (>10 journals and 5 book series)
− more than 370 talks and invited workshops, (plenary/keynote) lectures; I am regularly teaching invited paid week-long bootcamps on statistical methods in linguistics and corpus linguistics all over four continents; part of what I teach in these bootcamps are corpus-linguistic methods of the type used here in testimony
− 6th most widely-cited living corpus linguist (according to Google Scholar, most ahead of me are retired and/or 15-20 years older)
− 2nd most widely-cited cognitive linguist (according to Google Scholar, the most widely-cited person is counted wrong because of publications of other authors with the same name, as can be seen when one checks the initials of the listed publications)
− only corpus linguist having published introductions to corpus linguistics (2 editions) and to statistical methods in linguistics (2 editions)
− reviewer and editor for at least 500 journal, book, grant proposal, and other submissions in the last 10-12 years

### Teaching experience relevant to the current case: overview

On the theoretical side of things, I have been the main instructor of undergraduate and graduate semantics in my department over the last 14 years. On the methodological side of things, I have been teaching quantitative corpus linguistics and statistical methods in linguistics – both relevant to studies of authorship attribution – for the last 15 years at dozens of universities in Northern America (USA and Canada), Europe, Asia, and South America.

3

**Scientific presentations and workshops:** over 350 since 2000
(see http://www.stgries.info/research/overview-research.html for a complete list)


**Scientific publications (last five years only)**
(see http://www.stgries.info/research/overview-research.html for a complete list)


to appear

Deshors, Sandra C. & Stefan Th. Gries. Comparing learner corpora. In Nicole Tracy-Ventura & Magali Paquot (eds.), Routledge Handbook of SLA and Corpora. New York & London: Routledge.

Deshors, Sandra C. & Stefan Th. Gries. Mandative subjunctive vs. should in world Englishes: A new take on an old alternation. Corpora 15(2).

Gries, Stefan Th. Priming of syntactic alternations by learners of English: an analysis of sentence-completion and collostructional results. In Jesse A. Egbert & Paul Baker (eds.), Using corpus methods to triangulate linguistic analysis, 219-238. New York & London: Routledge.

Gries, Stefan Th. Analyzing dispersion. In Magali Paquot & Stefan Th. Gries (eds.). Practical handbook of corpus linguistics. Berlin & New York: Springer.

Gries, Stefan Th. R scripts for L. Anthony's chapter 'Programming for Corpus Linguistics'. In Magali Paquot & Stefan Th. Gries (eds.). Practical handbook of corpus linguistics. Berlin & New York: Springer.

Gries, Stefan Th. Polysemy. In Ewa Dąbrowska & Dagmar S. Divjak (eds.), Handbook of Cognitive Linguistics, 472-490. Berlin & Boston: De Gruyter Mouton. [reprint of 2015e]

Gries, Stefan Th. Ten lectures on corpus-linguistic approaches in cognitive linguistics: Applications for usage-based and psycholinguistic research. Leiden & Boston: Brill. [cover]

Gries, Stefan Th. Corpus linguistics: quantitative methods. In Carol A. Chapelle (ed.), The concise encyclopedia of applied linguistics. Oxford: Wiley-Blackwell.

Gries, Stefan Th. On, or against?, (just) frequency. In Hans C. Boas (ed.), Applications of cognitive linguistics. Boston & Berlin: De Gruyter Mouton.

Gries, Stefan Th. The discriminatory power of lexical context for alternations: an information-theoretic exploration. Journal of Research Design and Statistics in Linguistics and Communication Science.

Gries, Stefan Th. Managing synchronic corpus data with the British National Corpus (BNC). In Andrea L. Berez-Kroeker, Brad McDonnell, Eve Koller, & Lauren Collister (eds.), MIT Open Handbook of Linguistic Data Management. Cambridge, MA: The MIT Press.

Gries, Stefan Th. Corpus approaches to ordinary meaning in legal interpretation. In Malcolm Coulthard, Alison May, & Rui Sousa-Silva (eds.), The Routledge Handbook of Forensic Linguistics. 2nd ed. New York & London: Routledge.

Gries, Stefan Th. & Sandra C. Deshors. Statistical analyses of learner corpus data. In Nicole Tracy-Ventura & Magali Paquot (eds.), Routledge Handbook of SLA and Corpora. New York & London: Routledge.

Gries, Stefan Th. & Sandra C. Deshors. There's more to alternations than the main diagonal of a 2×2 confusion matrix: improvements of MuPDAR and other classificatory alternation

4

studies. ICAME Journal 44.

Gries, Stefan Th. & Philip Durrant. Analyzing co-occurrence data. In Magali Paquot & Stefan Th. Gries (eds.). Practical handbook of corpus linguistics. Berlin & New York: Springer.

Gries, Stefan Th., Benedikt Heller, & Nina Sophie Funke. The role of gender in postcolonial syntactic choice-making: evidence from the genitive alternation in British and Sri Lankan English. In Tobias J. Bernaisch (ed.), Gender in World Englishes. Cambridge: Cambridge University Press.

Gries, Stefan Th., Marlies Jansegers, & Viola G. Miglio. Quantitative methods for corpus-based contrastive linguistics. In Renata Enghels, Bart Defrancq, & Marlies Jansegers (eds.), New approaches to contrastive linguistics: empirical and methodological challenges. Berlin & Boston: De Gruyter.

Gries, Stefan Th. & Magali Paquot. Writing up a corpus-linguistic paper. In Magali Paquot & Stefan Th. Gries (eds.). Practical handbook of corpus linguistics. Berlin & New York: Springer.

Jansegers, Marlies & Stefan Th. Gries. Towards a dynamic behavioral profile: a diachronic study of polysemous sentir in Spanish. Corpus Linguistics and Linguistic Theory.

Miglio, Viola G. & Stefan Th. Gries. Construcciones verbales con verbos de emoción en español: cohesión interna de la clase semántica de los predicados con sujeto experimentador.

Paquot, Magali & Stefan Th. Gries (eds.). Practical handbook of corpus linguistics. Berlin & New York: Springer.

Paquot, Magali, Hubert Naets, & Stefan Th. Gries. Using syntactic co-occurrences to trace phraseological development in learner writing: verb + object structures in LONGDALE. In Bert Le Bruyn & Magali Paquot (eds.), Learner corpora and second language acquisition research. Cambridge: Cambridge University Press.

Rühlemann, Christoph & Stefan Th. Gries. How do speakers and hearers disambiguate the pragmatic and syntactic functions of words? The case of well. Functions of Language.

Wahl, Alexander & Stefan Th. Gries. Computational extraction of formulaic sequences from corpora: Two case studies of a new extraction algorithm. In Gloria Corpas Pastor & Jean-Pierre Colson (eds.), Computational and corpus-based phraseology. Amsterdam & Philadelphia: John Benjamins.

Wulff, Stefanie & Stefan Th. Gries. Explaining individual variation in learner corpus research: some methodological suggestions. In Bert Le Bruyn & Magali Paquot (eds.), Learner corpora and second language acquisition research. Cambridge: Cambridge University Press.

2019

Baron, Dennis E. Alison L. LaCroix, Stefan Th. Gries, & Jason Merchant. Amicus brief with the U.S. Supreme Court in the case New York State Rifle & Pistol Association Inc., Rommolo Colantone, Efrain Alvarez, & Jose Anthony Irizarry v. The City of New York and the NYPD License Division (On Writ of Certiorari to the United States Court of Appeals for the 2nd Circuit.)

Carrasco Ortíz, Elia Haydee, Mark Amengual, & Stefan Th. Gries. Cross-language effects of phonological and orthographic similarity in cognate word recognition: the role of language dominance. Linguistic Approaches to Bilingualism.

Gries, Stefan Th. Estatística com R para a linguística: uma introdução prática. (a Portuguese translation of 2013c, translated by Heliana R. Mello, Crysttian Arantes Paixão, Andre L.

5

Souza, & Jûlia Zara). Belo Horizonte, Brasil: Editora FALE-UFMG.

Gries, Stefan Th. 15 years of collostructions: some long overdue additions/corrections (to/of actually all sorts of corpus-linguistics measures). International Journal of Corpus Linguistics 24(3). 385-412.

Gries, Stefan Th. On classification trees and random forests in corpus linguistics: some words of caution and suggestions for improvement. Corpus Linguistics and Linguistic Theory.

Slocum, Brian G., Stefan Th. Gries, & Lawrence Solan. Amicus brief with the U.S. Supreme Court in the case Gerald Lynn Bostock v. Clayton County, GA (On Writs of Certiorari to the United States Courts of Appeals for the 11th, 2nd, and 6th Circuits.)

Wulff, Stefanie & Stefan Th. Gries. Particle placement in learner English: Measuring effects of context, first language, and individual variation. Language Learning 69(4). 873-910.

Wulff, Stefanie & Stefan Th. Gries. Improving on observational blends research: regression modeling in the study of experimentally-elicited blends. Lexis 14.


2018


Adamou, Evangelia, Matthew Gordon, & Stefan Th. Gries. Prosodic and morphological focus marking in Ixcatec (Otomanguean). In Evangelia Adamou, Katharina Haude, & Martine Vanhove (eds.), Information structure in lesser-described languages: Studies in prosody and syntax, 51-83. Amsterdam & Philadelphia: John Benjamins.

Gries, Stefan Th. Operationalizations of domain-general mechanisms cognitive linguists often rely on: a perspective from quantitative corpus linguistics. In Stefan Engelberg, Henning Lobin, Kathrin Steyer, & Sascha Wolfer (eds.), Wortschätze: Dynamik, Muster, Komplexität, 75-90. Berlin & Boston: De Gruyter.

Gries, Stefan Th. Syntactic alternation research: taking stock and some suggestions for the future. Belgian Journal of Linguistics 31(1). 8-29

Gries, Stefan Th. Korpuslinguistik und ihr Potential für die (amerikanische) Rechtssprechung. In Marc Kupietz & Thomas Schmidt (eds.), Korpuslinguistik (Germanistische Sprachwissenschaft um 2020, Volume 5), 81-94. Berlin & Boston: De Gruyter.

Gries, Stefan Th. Zur Identifikation von Mehrwortausdrücken: ein Algorithmus, seine Validierung und weiterführende Überlegungen. In Angelika Wöllstein, Peter Gallmann, Mechthild Habermann, & Manfred Krifka (eds.), Grammatiktheorie und Empirie in der germanistischen Linguistik (Germanistische Sprachwissenschaft um 2020, Volume 1), 225-239. Boston & Berlin: De Gruyter.

Gries, Stefan Th. On over- and underuse in learner corpus research and multifactoriality in corpus linguistics more generally. Journal of Second Language Studies 1(2). 276-308.

Gries, Stefan Th. 语言研究中的统计学：R 软件应用入门. Chinese translation of Statistics for linguistics with R (2nd rev. and ext. ed.). Beijing: Commercial Press.

Gries, Stefan Th. Mechanistic formal approaches to language acquisition: yes, but at the right level(s) of resolution. A response to Yang. Linguistic Approaches to Bilingualism. 8(6). 733-737

Gries, Stefan Th., Tobias J. Bernaisch, & Benedikt Heller. A corpus-linguistic account of the history of the genitive alternation in Singapore English. In Sandra C. Deshors (ed.), Modeling World Englishes: Assessing the interplay of emancipation and globalization of ESL varieties, 245-279. Amsterdam & Philadelphia: John Benjamins.

Hampe, Beate & Stefan Th. Gries. Syntax from and for discourse II: More on complex-sentences as meso-constructions. In Beate Hampe & Susanne Flach (eds.), Yearbook of the German Cognitive Linguistics Association (Special Issue: Corpora. Constructions. Cognition),

6

115-142. Boston & Berlin: De Gruyter.

Wahl, Alexander & Stefan Th. Gries. Multi-word expressions: A novel computational approach to their bottom-up statistical extraction. In Pascual Cantos-Gómez & Moisés Almela-Sánchez (eds.), Lexical collocation analysis: advances and applications, 85-109. Berlin & New York: Springer.

Wulff, Stefanie, Stefan Th. Gries, & Nicholas A. Lester. Optional that in complementation by German and Spanish learners. In Andrea Tyler, Lihong Huan, & Hana Jan (eds.), What is Applied Cognitive Linguistics? Answers from current SLA research, 99-120. Berlin & Boston: De Gruyter Mouton.

## 2017

Gries, Stefan Th. Ten lectures on quantitative approaches in cognitive linguistics: Corpus-linguistic, experimental, and statistical applications. Leiden & Boston: Brill, pp. 211. [internationally republished version of 2016e; cover and supplementary materials (audio and slides) here or here]

Gries, Stefan Th. Corpus approaches. In Barbara Dancygier (eds.), Cambridge Handbook of Cognitive Linguistics, 590-606. Cambridge: Cambridge University Press.

Gries, Stefan Th. & Andrea L. Berez. Linguistic annotation in/for corpus linguistics. In Nancy Ide & James Pustejovsky (eds.), Handbook of Linguistic Annotation, 379-409. Berlin & New York: Springer.

Gries, Stefan Th. & Gerrit Jan Kootstra. Structural priming within and across languages: a corpus-based perspective. Bilingualism: Language and Cognition 20(2). 235-250.

Heller, Benedikt, Tobias Bernaisch, & Stefan Th. Gries. Empirical perspectives on two potential epicenters: The genitive alternation in Asian Englishes. ICAME Journal 41. 111-144.

Lester, Nicholas A., John W. Du Bois, Stefan Th. Gries, & Fermín Moscoso del Prado Martín. Considering experimental and observational evidence of priming together, syntax doesn't look so autonomous. Behavioral and Brain Sciences 40. 33-34.

Miglio, Viola G. & Stefan Th. Gries. Readers' reaction to tense switching in Hrafnkels saga freysgoða: combining corpus-linguistic and experimental methods. International Journal of Literary Linguistics 6(1). 1-26.

## 2016

Deshors, Sandra C. & Stefan Th. Gries. Profiling verb complementation constructions across New Englishes: A two-step random forests analysis to ing vs. to complements. International Journal of Corpus Linguistics 21(2). 192-218.

Gries, Stefan Th. Variationist analysis: variability due to random effects and autocorrelation. In Paul Baker & Jesse A. Egbert (eds.), Triangulating methodological approaches in corpus linguistic research, 108-123. New York: Routledge, Taylor and Francis.

Gries, Stefan Th. Towards a corpus-based identification of prototypical instances of constructions. In Masa-aki Yamanashi (ed.), Cognitive Linguistics, Vol. 3 Cognitive grammar and syntax. London & Thousand Oaks, CA: Sage Publications. [reprint of 2003d]

Gries, Stefan Th. Quantitative corpus linguistics with R. 2nd rev. & ext. ed. London & New York: Routledge, Taylor & Francis Group, pp. 274. [cover with endorsements and a review in Digital Scholarship in the Humanities]

Gries, Stefan Th. Ten lectures on quantitative approaches in cognitive linguistics: Corpus-

7

linguistic, experimental, and statistical applications. Beijing: Foreign Language Teaching and Research Press.

Gries, Stefan Th. & Tobias J. Bernaisch. Exploring epicenters empirically: Focus on South Asian Englishes. English World-Wide 37(1). 1-25.

Hilpert, Martin & Stefan Th. Gries. Quantitative approaches to diachronic corpus linguistics. In Merja Kytö & Päivi Pahta (eds.), The Cambridge Handbook of English Historical Linguistics, 36-53. Cambridge: Cambridge University Press.

Stefanowitsch, Anatol & Stefan Th. Gries. Collostructions: investigating the interaction between words and constructions. In Masa-aki Yamanashi (ed.), Cognitive Linguistics, Vol. 3 Cognitive grammar and syntax. London & Thousand Oaks, CA: Sage Publications. [reprint of 2003e]

Yoon, Jiyoung & Stefan Th. Gries (eds.), Corpus-based approaches to Construction Grammar. Amsterdam & Philadelphia: John Benjamins, pp. 268.

Yoon, Jiyoung & Stefan Th. Gries. Introduction. In Jiyoung Yoon & Stefan Th. Gries (eds.), Corpus-based approaches to Construction Grammar. Amsterdam & Philadelphia: John Benjamins.

2015

Gries, Stefan Th. Some current quantitative problems in corpus linguistics and a sketch of some solutions. Language and Linguistics 16(1). 93-117. [official link]

Gries, Stefan Th. Структурный прайминг: корпусное исследование и узуальные/экземплярные подходы/'Structural priming: a perspective from observational data and usage-/exemplar-based approaches'. In Andrej A. Kibrik, Alexey D. Koshelev, Aexander V. Kravchenko, Julia V. Mazurova, & Olga V. Fedorova (eds.), Язык и мысль: Современная когнитивная лингвистика/'Language and thought: Contemporary cognitive linguistics', 721-754. Moscow: Languages of Slavic Culture.

Gries, Stefan Th. The most underused statistical method in corpus linguistics: Multi-level (and mixed-effects) models. Corpora 10(1). 95-125.

Gries, Stefan Th. Quantitative linguistics. In James D. Wright (ed.), International Encyclopedia of the Social and Behavioral Sciences. 2nd ed., Vol. 19, 725-732. Amsterdam: Elsevier.

Gries, Stefan Th. Polysemy. In Ewa Dąbrowska & Dagmar S. Divjak (eds.), Handbook of Cognitive Linguistics, 472-490. Berlin & Boston: De Gruyter Mouton.

Gries, Stefan Th. 50-something years of work on collocations: what is or should be next … In Sebastian Hoffmann, Bettina Fischer-Starcke, & Andrea Sand (eds.), Current issues in phraseology, 135-164. Amsterdam & Philadelphia: John Benjamins. [reprint of 2013d]

Gries, Stefan Th. Quantitative designs and statistical techniques. In Douglas Biber & Randi Reppen (eds.), The Cambridge Handbook of English Corpus Linguistics, 50-71. Cambridge: Cambridge University Press.

Gries, Stefan Th. More (old and new) misunderstandings of collostructional analysis: on Schmid & Küchenhoff (2013). Cognitive Linguistics 26(3). 505-536.

Gries, Stefan Th. Statistical methods in learner corpus research. In Gaëtanelle Gilquin, Sylviane Granger, & Fanny Meunier (eds.), The Cambridge Handbook of Learner Corpus Research, 159-181. Cambridge: Cambridge University Press.

Gries, Stefan Th. The role of quantitative methods in Cognitive Linguistics: corpus and experimental data on (relative) frequency and contingency of words and constructions. In Jocelyne Daems, Eline Zenner, Kris Heylen, Dirk Speelman, & Hubert Cuyckens (eds.), Change of paradigms - new paradoxes: recontextualizing language and linguistics, 311-

8

325. Berlin & New York: De Gruyter Mouton.

Gries, Stefan Th. & Sandra C. Deshors. EFL and/vs. ESL? A multi-level regression modeling perspective on bridging the paradigm gap. International Journal of Learner Corpus Research 1(1). 130-159.

Gries, Stefan Th. & Nick C. Ellis. Statistical measures for usage-based linguistics. Language Learning 65 (Supplement 1). 1-28.

Harris, Michael J., Stefan Th. Gries, & Viola G. Miglio. Prosody and its application to forensic linguistics. Linguistic Evidence in Security, Law and Intelligence 2(2). 11-29.

Harris, Michael J. Viola G. Miglio, & Stefan Th. Gries. Mexican & Chicano Spanish prosody: Differences related to information structure. In John Levis, Rania Mohamed, Manman Qian, & Ziwei Zhou (eds.), Proceedings of the 6th Pronunciation in Second Language Learning and Teaching Conference, 38-48. Ames, IA: Iowa State University.

Miglio, Viola G. & Stefan Th. Gries. Heritage speakers' Spanish in California: How unbalanced bilingualism affects reverse constructions of the gustar-type. In Sandro Sessarego & Melvin González-Rivera (eds.), New Perspectives on Hispanic Contact Linguistics in the Americas, 405-435. Frankfurt & Madrid: Iberoamericana/Vervuert.

Rühlemann, Christoph & Stefan Th. Gries. Turn order and turn distribution in multi-party storytelling. Journal of Pragmatics 87(10). 171-191.

Wulff, Stefanie & Stefan Th. Gries. Prenominal adjective order preferences in Chinese and German L2 English: a multifactorial corpus study. Linguistic Approaches to Bilingualism 5(1). 122-150.


2014


Bernaisch, Tobias, Stefan Th. Gries, & Joybrato Mukherjee. The dative alternation in South Asian English(es): Modelling predictors and predicting prototypes. English World-Wide 35(1). 7-31.

Deshors, Sandra C. & Stefan Th. Gries. A case for the multifactorial assessment of learner language: the uses of may and can in French-English interlanguage. In Dylan Glynn & Justyna Robinson (eds.), Corpus methods for semantics: quantitative studies in polysemy and synonymy, 179-204. Amsterdam & Philadelphia: John Benjamins.

Doğruöz, A. Seza & Stefan Th. Gries. Spread of on-going changes in an immigrant language: Turkish in the Netherlands. In Martin Pütz, Justyna Robinson, & Monika Reif (eds.), Cognitive sociolinguistics: social and cultural variation on cognition and language use, 161-185. Amsterdam & Philadelphia: John Benjamins. [reprint of 2012b]

Gries, Stefan Th. Corpus and quantitative methods. In John Taylor & Jeanette Littlemore (eds.), The Bloomsbury Companion to Cognitive Linguistics, 279-300. London & New York: Bloomsbury.

Gries, Stefan Th. Don't let anybody learn one color but give the whole set of colors together. Interview in The English Teachers' Magazine, July 2014, p. 48-49.

Gries, Stefan Th. Frequencies, probabilities, association measures in usage-/exemplar-based linguistics: some necessary clarifications. In Nikolas Gisborne & Willem Hollmann (eds.), Theory and data in cognitive linguistics, 15-48. Amsterdam & Philadelphia: John Benjamins. [reprint of 2012g]

Gries, Stefan Th. Frequency tables, effect sizes, and explorations. In Dylan Glynn & Justyna Robinson (eds.), Corpus methods for semantics: quantitative studies in polysemy and synonymy, 365-389. Amsterdam & Philadelphia: John Benjamins.

Gries, Stefan Th. Quantitative corpus approaches to linguistic analysis: seven or eight levels of

9

resolution and the lessons they teach us. In Irma Taavitsainen, Merja Kytö, Claudia Claridge, & Jeremy Smith (eds.), Developments in English: expanding electronic evidence, 29-47. Cambridge: Cambridge University Press.

Gries, Stefan Th. Coll.analysis 3.5. A script for R to compute perform collostructional analyses (major update to handle larger corpora/frequencies).

Gries, Stefan Th. & Allison S. Adelman. Subject realization in Japanese conversation by native and non-native speakers: exemplifying a new paradigm for learner corpus research. In Jesús Romero-Trillo (ed.), Yearbook of Corpus Linguistics and Pragmatics 2014: New empirical and theoretical paradigms, 35-54. Cham: Springer.

Gries, Stefan Th. & Sandra C. Deshors. Using regressions to explore deviations between corpus data and a standard/target: two suggestions. Corpora 9(1). 109-136.

Gries, Stefan Th. & Viola G. Miglio. New information in naturalistic data is also signaled by pitch movement: an analysis from monolingual English/Spanish and bilingual Spanish speakers. Complutense Journal of English Studies 22. 11-33.

# EXHIBIT B

**Report on the interpretation of a sentence**
**in the 22 July 2019 installment of The Rachel Maddow Show**

*Prof. Stefan Th. Gries*
*University of California, Santa Barbara & Justus Liebig University Giessen*

## 0.      Introduction and overview

This report is concerned with the following sentence/utterance (in its context) produced by Rachel Maddow (henceforth Maddow) in her 22 July 2019 show:

*In this case, the most obsequiously pro-Trump right wing news outlet in America really literally is paid Russian propaganda.*

[sentence 20 in the opening segment, see Table 1 in the appendix for a sentence-by-sentence breakdown]

I focus exclusively on **the <u>linguistic question</u> of whether an average or reasonable/ordinary viewer/hearer of the sentence would regard the above sentence as a statement of opinion** or as statement of fact. This report does not address whether the facts are accurate; it also does not address whether the statement in question is a "protected opinion" in the legal sense (as defined by courts in previous cases).[1] This report is structured as follows:

Section 1:    On the basis of a variety of contextual (broad and specific) and linguistic characteristics, I conclude that it is very **unlikely** that an average or reasonable/ordinary viewer would consider the sentence in question to be a statement of opinion.

<u>1.1</u>     General introduction
<u>1.2</u>     Broad/overall context of the sentence/utterance in question
<u>1.3</u>     Linguistic characteristics of the sentence/utterance in question
1.3.1   Exploring the factual-information vs. opinion contrast in a top-down fashion
1.3.2   Exploring the factual-information vs. opinion contrast in a bottom-up fashion
1.3.3   The immediate context and Maddow's own sign-posting of linguistic function

---

[1]     In what follows, I am employing the following notational conventions: Italics are used to quote/mention, but not use, words, as in this sentence: "This statement is largely about the word *fewer*." Single quotes are used to represent meanings as in *kill* means 'cause to die.' Bold type and/or underlining is used for highlighting/emphasis. Parenthesized numbers such as (1) or (12) refer to the numbered sentences provided and discussed in this brief.

1

Section 2:      On the basis of the use of *literally* in reference works, linguistic research, and empirical data, I conclude that Maddow's use of *really literally* in fact strongly commits her to the truth of the rest of the sentence.

2.1     General introduction
2.2     The meaning and use of *literally* in general
2.2.1   The meaning and use of *literally* in reference works
2.2.2   The meaning and use of *literally* in linguistic research
2.2.3   The meaning and use of *really literally* in contemporary American English talk shows
2.3     The use of *literally* in the show and problems of AW's/TB's defense
2.3.1   Which sense of *literally* did Maddow use?
2.3.2   How is *literally* actually used and what does this imply?
2.3.3   What did Maddow actually say?

Section 3      I summarize and conclude.

Appendix and references

## 1      Is Rachel Maddow's statement's likely to be understood as a statement of opinion rather than a statement of fact?

### *1.1     General introduction*

It is necessary to begin with the variety of sources of information that linguists know language comprehenders rely on – consciously, but mostly unconsciously – to decide what to consider facts and what to consider opinions. The study of such matters in linguistics belongs to, broadly speaking, the fields of semantics and pragmatics, and, within semantics, in particular the research areas of epistemicity and evidentiality.

The area of **epistemicity** "involves [a] speaker's or writer's evaluation, judgment and degree of commitment attached to the truth-value of a piece of information" (González et al. 2017:68) whereas the area of **evidentiality** "involves the speaker's or writer's assertion of the source and kind of evidence at their disposal" (González et al. 2017:68). As comprehenders encounter, process, and hopefully comprehend linguistic input, they can also process it in terms of the speaker's epistemic stance (how much is the speaker committed to the truth of what he just said?) and the speaker's evidential stance (how does the speaker know what he just said?). These determinations utilize various sources of information that involve the broad/overall utterance context, but also more specifically many different levels of linguistic analysis.

As for the first kind of criterion, **broad/overall context**, factors that comprehenders rely on include, among others, the following: Is the speaker introduced as, or otherwise perceived to be, an expert on the subject matter? What are circumstances of production of the utterance (e.g., informal chit-chat commits speakers less to the objective veracity of what they are saying than does an academic lecture than does a statement in court under oath)? Who is the speaker, who

2

are the addressees, and what is their relation to each other?

As for the second kind of criterion, **specific linguistic characteristics of the utterance**, relevant factors include the following:

**lexical choices bearing on epistemicity**: does a speaker use modal verbs (e.g., *could*, *may*, *might*, *must*, *would* …) that indicate he is committing less than 100% to the truthfulness of the proposition he uttered? Does a speaker qualify his statements with, for instance, adverbs (e.g., *conceivably*, *maybe*, *possibly*, …) that indicate he is committing less than 100% to the truthfulness of the proposition he uttered or is he using expressions that do the opposite, i.e. express a strong commitment to the truthfulness of that proposition (e.g., *clearly*, *definitely*, *obviously*, *really*, …)?

**lexical choices bearing on evidentiality**: does a speaker use expressions (e.g., *allegedly*, *I hear*, *it is said*, *reportedly*, …) that indicate that the proposition he uttered is based on (possibly uncertain) hearsay or that that proposition is his own inference (e.g., *I conclude*, *I figure*, *I guess*, *I think*, *it appears (to me)*, *it seems (to me)*, …)?

**grammatical choices** such as modal verbs and the grammatical constructions they require (see above, but also note the difference between *It's going to rain* (less certainty) and *It will rain* (more certainty)), grammatical mood (something that English does not really have), …;

**intonational contours**: does a speaker use a declarative-sentence/assertion kind of intonation contour or an intonation contour that represents a lack of commitment or uncertainty regarding the proposition they produced or even an intonation contour that marks that the speaker actually means the opposite of what was literally said (i.e. irony/sarcasm)?

**lexical context**: do the speaker's or other people's utterances around the utterance in question provide clues as to the epistemicity and/or evidentiality of the utterance in question (e.g., did an interlocutor just say *Please tell me only the facts!* or *But this is only your impression, right?*)?

The following section will discuss Maddow's relevant utterance from these perspectives; I will begin with the first criterion, the broad/overall context, before I turn to the other, linguistic features.

*1.2    Broad/overall context of the sentence/utterance in question*

There is recent compelling evidence that ordinary Americans are generally not particularly good at distinguishing between fact and opinion in news reporting.

For instance, in 2018, the Pew Research Center conducted a study with 5035 participants (Mitchell et al. 2018) to explore "whether members of the public can recognize **news as factual** – something that's capable of being proved or disproved by objective evidence – or as an

3

**opinion** that reflects the beliefs and values of whoever expressed it". This study was not concerned with testing accurate knowledge of news but "intended to explore whether the public sees distinctions between news that is based upon objective evidence and news that is not," a distinction relevant to the question at hand. The results revealed that:

i.  on the whole, while "a majority of Americans correctly identified at least three of the five statements that in each set […], this result is only a little better than random guesses" (p. 4);

ii. "members of each political party were more likely to label both factual and opinion statements as factual when they appealed more to their political side" (p. 4);

iii. finally, "[w]hen Americans see a news statement as factual, they overwhelmingly also believe it to be accurate" (p. 10).

In other words, even in a laboratory setting, in which subjects are presented with written statements which they know can be facts or opinions and are asked to categorize them as news facts or opinions, the results indicated "that even this basic task presents a challenge" (p. 3). Critically, whether a subject's political persuasions align with the speaker's influences the understanding of a sentence as factual or opinion.

*1.3    Linguistic characteristics of the sentence/utterance in question*
1.3.1  Exploring the factual-information vs. opinion contrast in a top-down fashion

In order to determine whether a statement would qualify as one of fact or one of opinion for an average comprehender, a linguistic analysis needs to take into consideration the above-mentioned linguistic characteristics of the sentence in question, but also those of the immediate context (both preceding and subsequent).

The relevant part of the show/transcript begins at sentence 10 (again, see Table 1 in the appendix for the complete transcript), listed below as (1) with annotation added to highlight the beginnings and ends of the main functional parts of this sentence: a suspense-raising introductory statement, a mention of the source of the info to be mentioned, an aside, whose rhetorical function is most likely evaluative, and, the actual factual information at the end (as is typical in English):

(1)   **[intro:beg]** But I have to tell you, perhaps the single most perfectly formed story of the day, the single most like sparkly story of the entire day is this scoop **[intro:end] [source:beg]** from reporter Kevin Paulson [sic] at "The Daily Beast" **[source:end] [aside:beg]** who has sussed out that Trump's favorite more Trumpier than Fox TV network, the one that the president has been promoting and telling everyone they should watch and is better than Fox **[aside:end]**, turns out **[factualinfo:beg] that network has a full time on air reporter who covers U.S. politics who is simultaneously on the payroll of the Kremlin** [factualinfo:end].

The part annotated above as factual information is also characterized as such in the

4

defendants' memorandum and meets the Pew Research Center's operationalization of factual statements, namely it is a statement about "something that's capable of being proved or disproved by objective evidence" (Mitchell et al. 2018:3), but, importantly, "regardless of whether it was accurate or inaccurate" (Mitchell et al. 2018:6): Provided that the required information is accessible, any person can verify or falsify that claim.

While this is not the main sentence on which the complaint is focusing, it is instructive to examine it because it contains the highlighted factual-information part, which the defendants' memorandum also characterizes as factual. This sentence therefore provides a useful point or comparison for inspection of the sentence at issue, 20. As I explain more fully later, sentence (1) (which is uncontroversially factual) shares many linguistic characteristics with the sentence at issue, 20, which evidences that sentence 20 would also be understood as factual.

Sentence (1) as a whole contains evidentiality information ("scoop from reporter Kevin Paulson [sic] at 'The Daily Beast'") but it does not contain any epistemic information whose function would be to indicate a less-than-100% commitment to the truth value of the reported proposition ('OAN has a full time on air reporter who covers U.S. politics who is simultaneously on the payroll of the Kremlin'): The reported proposition:

> is not offered with any particular lexical choices (such as modal verbs or adverbs) indicating the speaker's lack of full commitment to it;

> is not expressed using grammatical choices indicating the speaker's lack of full commitment to it;

> is not produced with an intonation contour that communicates lack of commitment to it.

To determine its intonation contour, following standard linguistic research practice, (i) I converted the video segment into audio (using the open-source software SoundConverter, <https://soundconverter.org/>), (ii) extracted the part of the audio file that represents that sentence (using the open-source software FFmpeg, <https://www.ffmpeg.org/>), and then used the sound-processing tool Praat (<http://www.fon.hum.uva.nl/praat/>), which is the most widely-used software for these purposes in linguistics, to plot Maddow's pitch against time and zoom into *on the payroll of the Kremlin*.

The analysis reveals that Maddow's pitch is falling over the 2.2 seconds as shown on the right of the bottom panel of Figure 1; this would not be expected for an utterance that was supposed to intonationally mark epistemic uncertainty and is more characteristic of a declarative sentence with the illocutionary/communicative force of an assertion.

I now turn to the sentences that follow and lead up to the sentence at issue. These sentences show Maddow using linguistic indicators to switch between factual information and evaluative sentences. Sentence 11 of the transcript is a one-word utterance, used as an incredulity marker to prepare and invite the hearer to experience incredulity at the upcoming material as well:



Figure 1:    Plotting pitch (blue line on lower *y*-axis) against time (*x*-axis); relevant part is to the right of the red vertical line

(2)    *What?*

        Sentences 12 (see (3) below), 13 (see (4) below), 14 (see (5) below), 15 (see (6) below), and 16 (see (7) below) mostly repeat aspects of the factual information presented in sentence 10 (in (1) above) or provide additional information. More precisely, sentences 12 to 14 (see (3) to (5) below) focus on verifiable/falsifiable factual information; sentences; sentence 15 (see (6) below) resets the narration for rhetorical emphasis and enriches it with expressions communicating an evaluative and ironic stance, but – crucially – also provides an epistemic and evidential assessment (*actual news*) of the main proposition, one that again serves to commit Maddow to the truth of that proposition, which is then stated in sentence 16 (see (7) below) and essentially amounts to a recap of sentence 10 (in (1) above).

(3)    **[factualinfo:beg]** Because at the same time he works for Trump's favorite One America News team, he is also being paid by the Russian government to produce government-funded pro-Putin propaganda for a Russian government funded propaganda outfit called Sputnik.

(4)    Sputnik, of course, had a key role in the Russian government's intervention in the 2016 election to help Trump, according to the intelligence committee's assessment of that attack.

(5)    Sputnik has also formally registered with the U.S. Justice Department as an agent of a foreign power. **[factualinfo:end]**

(6)    **[intro/trans:beg] I mean**, there is a lot of news today, but among the giblets the news gods dropped off their plates for us to eat off the floor today is the **actual news** that this super right wing news outlet that the president has repeatedly endorsed as a preferable alternative to Fox News, because he thinks Fox is insufficiently pro-Trump, so now he likes this is other outlet better **[intro/trans:end]**

(7)    **[factualinfo:beg]** We **literally** learned today that that outlet the president is promoting shares staff with the Kremlin. **[factualinfo:end]**

Sentences 17 (see (8) below), 18 (see (9) below), and 19 (see (10) below) serve an audience-engaging, or interacting/bonding-with-audience function: Just like sentence 11 (*What?*), they do not communicate factual (verifiable/falsifiable) information, but have a (negative) evaluative stance based on, in the language of the Pew Research Center, "the values and beliefs of the journalist" (Mitchell et al. 2018:6) and are clearly marked as such (with discourse markers such as *I mean*, interactive particles such as *Hey*, and by intonation):

(8)     **[interaction/eval:beg]** I mean, what?
(9)     **I mean**, it's an easy thing to throw out, you know, like an [epithet] in the Trump era, right?
(10)    **Hey**, that looks like Russian propaganda. **[interaction/eval:end]**

The narration then continues, and **we arrive at the sentence at issue**, sentence 20 repeated below as (11), which in turn is followed by sentence 21 (shown in (12)) and 22 (shown in (13)):

(11)    **[factualinfo:beg]** In this case, the most obsequiously pro-Trump right wing news outlet in America **really literally** is paid Russian propaganda.
(12)    [Their] on air U.S. politics reporter is paid by the Russian government to produce propaganda for that government. **[factualinfo:end]**
(13)    **[interaction/eval:beg]** I mean, this is the kind of news **we are supposed to** take in stride these days. **[interaction/eval:end]**

Applying the criteria from linguistic research and the Pew Research Center already listed above makes it very unlikely that an average or reasonable/ordinary viewer of this segment would consider these sentences as opinions rather than facts: Just like the uncontroversial factual-information part of sentence 10 (shown in (1) above), sentence 20 (shown in (12)):

was not offered with any particular lexical choices (such as modal verbs or adverbs) indicating the speaker's lack of full commitment to it – on the contrary, Maddow used two epistemic adverbs (*really* and *literally*), minimally the former of which already implies a strong commitment to the veracity of what follows (see Section 2 for a discussion of AW's claims re *really literally*);

were not expressed using grammatical choices indicating the speaker's lack of full commitment to it – on the contrary, Maddow again used simple present tense, the default tense/aspect combination in English of declarative sentences reporting a state of affairs;

was not produced with an intonation contour that communicates lack of commitment to it.

As to the intonation contour of the sentence, plotting Maddow's pitch against time reveals that her pitch on the final word *propaganda* is falling; as above, this would not be expected for an utterance that was supposed to intonationally mark epistemic uncertainty. This is shown on the right of Figure 2:

7



Figure 2:    Plotting pitch (blue line on lower *y*-axis) against time (*x*-axis); relevant part is the rightmost decline of the blue line corresponding to *-ganda* of *paid Russian propaganda*

In addition and to reiterate from above, given the findings of the Pew Research Center, The Rachel Maddow Show's audience is particularly likely to interpret sentences 20 as a factual, rather than opinion, statement because it is more likely than other audiences to find it appealing or, minimally, compatible with their own political beliefs and, thus, more likely to view these statements as accurate.

### 1.3.2 Exploring the factual-information vs. opinion contrast in a bottom-up fashion

While the above line of reasoning was informed by a top-down approach – from general/theoretically-motivated features to the concrete example here – these results are also supported by a bottom-up approach. Specifically, linguistic research over the last 30-40 years on register variation provides an instructive perspective. The most influential empirical research in this domain has been conducted by Douglas Biber[2].

In a series of groundbreaking (as operationalized by citations) publications, Biber developed a method called Multidimensional Analysis (MDA) to determine/quantify the linguistic dimensions along which different texts (used broadly to cover both speech and writing) vary systematically and what the textual/rhetorical functions of these dimensions are. This analysis is usually applied to large collections of text, so called corpora (singular: *corpus*) and involves a multivariate statistical analysis called factor analysis; its main output is (i) a list of dimensions of variations that can be interpreted by researchers for their communicative function(s) and (ii) a list of features that are positively or negatively correlated with these dimensions. While the nature of an MDA does not permit it being applied to the sometimes even

---

[2]    (Northern Arizona University, according to Google Scholar the most widely-cited living corpus linguist: <https://scholar.google.com/citations?hl=en&user=mdWIU4MAAAAJ>, accessed 24 November 2019)

8

only sentence-sized relevant parts of the transcript of The Rachel Maddow Show discussed here, it is the list of linguistic features characterizing a certain dimension that is pertinent to the present case.

One of the main dimensions of variation in English (discussed comprehensively in Biber 1988:101-108) is a dimension, or continuum, of "high informational density and exact informational content versus affective, interactional, and generalized content" (Biber 1988:107). The following is a selection of features that are indicative of each of the ends of this continuum:

(14)   a.   the informational side: nouns, long words, prepositional phrases, attributive adjectives

       b.   the affective/interactional side: private verbs (e.g., *think*, *feel*, …), *that*-deletion, contractions, present tense verbs, second person pronouns, *do* as pro-verbs, analytic negation, demonstrative pronouns, general emphatics.

If one checks which of these features are attested in sentence 20 (and 21), it is clear that these two sentences score highly on the informational side of the continuum and much less so on the affective/interactional side of the continuum: The sentences

contain many nouns (*case*, *news outlet*, Ameri*ca*, *propaganda*, *U.S. politics reporter*, *government*, *propaganda*, *government* again) and many long words (and exact binomial tests indicate that the average numbers of characters of the words in these sentences are high enough to be statistically significantly longer than those of the other utterances: $p_{\text{sent20}}$<0.0001 and $p_{\text{sent21}}$<0.01);

contain several prepositional phrases (*in this case*, *in America*, *by the Russian government*, *for that government*); and attributive adjectives or similarly-behaving modifiers (*pro-Trump right wing*, *Russian propaganda*, *on air U.S. politics reporter*, *Russian government*);

contain no instances of private verbs, *that*-deletion, contractions first or second person pronouns, *do* as pro-verbs, analytic negation or demonstrative pronouns – the only features of the affective/interactional side they contain are (i) present tense marking and (ii) one or two emphasizing adverbs (*really literally*, to be discussed below).

> **Interim conclusion(s)**: Sentence 20 exhibits many more features characteristic of the informational register than of the affective/interactional register, making it ever less likely that an ordinary viewer would categorize it as opinion rather than factual information.

1.3.3   The immediate context and Maddow's own sign-posting of linguistic function

A final, particularly striking aspect of this show's transcript points in the same direction. The fact of the matter is that Maddow provided very explicit sign-posting/marking of linguistic function. For instance, sentence 10 ended with a factual-information part, as discussed above. It was followed by sentence 11, which consisted of just the word *what* with an incredulity

intonation; in other words, the hearer/viewer could not help but notice the clear separation of the factual-information part that is sentence 10 with and the evaluative/opinion utterance that is sentence 11.

Crucially, this patterning continues. After sentence 11, sentences 12 to 14 went back to reporting factual information, but after that sequence, Maddow again clearly highlighted the switch from factual information (in sentences 12 to 14) to opining (in sentence 15) with an explicit epistemic marker (*I mean*). When she then ended sentence 15 and returned to factual information in sentence 16, she **again** prefixed every single part of the then following interactional/evaluative interlude (sentences 17-19) with an expression that is a clear invitation to an ordinary viewer to interpret what follows as commentary:

> *I mean, what?* in sentence 17;

> *I mean* in sentence 18; and

> *Hey* plus irony intonation in sentence 19.

Revealingly, sentence 20 (the sentence in question) and sentence 21 did not receive any such marking precisely because, according to all the criteria from above, **they reverted to factual-information reporting**. What is more, this analysis is supported by the fact that the very next sentence after 21 – sentence 22 – did indeed feature another marker (*I mean* again) representing another reversal to opinion statements.

In other words, both before and after the sentence in question, Maddow used both discourse markers (mostly *I mean*) and intonation to repeatedly indicate the beginning of an opining part after a factual-information part, and she also later used other epistemic and evidential markers (*I guess*, *we expect* (multiple times), and another *I mean*). However, (i) she did not do that precisely before the sentence in question and (ii) all linguistic characteristics of that sentence in question are compatible with the function of imparting factual-information rather than with that of opining. In a highly-structured and transparent way, Maddow separates informational/factual reporting and opining in a way that strongly suggests sentence 20 is factual.

---

**Interim conclusion(s)**: Hardly any features of the linguistic context that we know language comprehenders use to differentiate between factual-information and opinion statements support the claim that sentence 20 is an opinion statement. On the contrary: (i) there are virtually no lexical, grammatical, or intonational characteristics both from a theory-driven top-down approach as well as from a data-driven bottom-up approach that would lead speakers to categorize sentence 20 (and 21) to be statements of opinion and (ii) Maddow's own sign-posting of her opening monolog does in fact mark many (parts/sequences of) sentences as opinions, but – crucially – not sentence 20 (or 21).

---

The following and final major section is concerned with the defendants' claim that the use of the word *literally* connotes opinion.

10

## 2      Does Rachel Maddow's use of *literally* mark the following as not literally true?

### 2.1     General introduction

The defendants contend that *literally* connotes opinion. To evaluate this contention, one needs to consider the meaning of *literally*, how it is used in general, and how it is used in the show in question – both within sentence 20 but also before.

The issue under investigation is ultimately one of ordinary meaning, namely, here, the question of how an average or reasonable/ordinary viewer would understand sentence 20. For a very long time, ordinary meaning was only approached with dictionaries, etymologies, and legal practitioners' intuitions. However, as demonstrated in detail by Mouritsen (2010) or Lee & Mouritsen (2018), relying on these sources to address questions of ordinary meaning – i.e. how an ordinary speaker/listener would use/comprehend an expression – is extremely problematic.

Dictionaries can be a suitable tool to identify **possible or permitted meanings** of a word, but they actually have very little to offer when it comes to determining the **ordinary meaning** that a word would have in a certain context, i.e. exactly what is at issue here. This is due to many things, including that dictionaries were actually never intended to document ordinary use and that dictionaries are commercial endeavors whose space constraints do not even permit exhaustive coverage of ordinary meanings.

For such reasons, experts in language and linguistic meaning have for the last 50 to 60 years more and more relied on different kinds of data to discuss matters of (ordinary) meaning: (i) collections of examples of expressions used in authentic/natural speech situations and (ii) large databases of texts produced in authentic/natural speech situations, which were above introduced as *corpora*. This is because, in a nutshell, if one wants to determine how ordinary viewers/readers would understand an expression, what's better than using the meanings or functions ordinary viewers/readers see these expression having most often/reliably?

This methodological development – the emergence of corpus linguistics as one of the currently most widespread linguistic methods – has also led to a growing use of corpus-linguistic methods in legal scholarship and practice. Many District, Federal, and Appellate Courts and even the Supreme Court of the United States have now been offered or even requested corpus-linguistic testimony, and many corpus-linguistically informed amicus briefs have been submitted to various courts in the country; see Appendix 2 for a selective list of cases using or discussing corpus-based linguistic analysis and amicus briefs.

Given the fundamental shortcomings of using dictionaries to address questions of ordinary, not just possible, meaning, and the growing acceptance of corpus methods in legal application, the current analysis of expressions involving *literally* and its ordinary meaning will therefore include dictionary information as only one part, but also rely on linguistic research based on ordinary uses of *literally* in authentic settings.

11

*2.2     The meaning and use of literally in general*
2.2.1   The meaning and use of *literally* in reference works

Looking up both *literal* and *literally* in Merriam-Webster's (2004) *The Merriam-Webster Dictionary* as well as looking up *literally* at <https://www.merriam-webster.com/> (retrieved 24 November 2019) suggests that the defendants' representation of *literally*'s meaning and use is incomplete.

(15)    Merriam-Webster's (2004) dictionary, s.v. *literal*:

lit·er·al \ˈli-tə-rəl\ *adj*  **1** : adhering to fact or to the ordinary or usual meaning (as of a word)  **2** : UNADORNED; *also* : PROSA- IC  **3** : VERBATIM

(16)    Merriam-Webster's (2004) dictionary, s.v. *literally*:

lit·er·al·ly \ˈli-tə-rə-lē, ˈli-trə-\ *adv*  **1** : AC- TUALLY ⟨was ∼ insane⟩  **2** : VIRTUALLY ⟨∼ poured out new ideas⟩

(17)    Merriam-Webster's online version, s.v. *literally*:

# literally  adverb

🔖 Save Word

lit·er·al·ly  |  \ ˈli-tə-rə-lē 🔊 , ˈli-trə-lē, ˈli-tər-lē \

**Definition of *literally***

**1**  : in a literal sense or manner: such as

   **a**  : in a way that uses the ordinary or primary meaning of a term or expression
      // He took the remark *literally*.
      // a word that can be used both *literally* and figuratively

   **b**  —used to emphasize the truth and accuracy of a statement or description
      // The party was attended by *literally* hundreds of people.

   **c**  : with exact equivalence : with the meaning of each individual word given exactly
      // The term "Mardi Gras" *literally* means "Fat Tuesday" in French.

   **d**  : in a completely accurate way
      // a story that is basically true even if not *literally* true

**2**  : in effect : VIRTUALLY —used in an exaggerated way to emphasize a statement or description that is not literally true or possible
      // will *literally* turn the world upside down to combat cruelty or injustice
      — Norman Cousins

The defendants' memorandum quotes only one definition of *literally* (sense 2, 'in effect') and, ignores sense 1; more importantly, this ignores the uses of *literally* described in senses 1b ('in a literal sense or manner', "used to emphasize the truth and accuracy of a statement or description") and 1d ('in a literal sense or manner', "in a completely accurate way").

2.2.2   The meaning and use of *literally* in linguistic research

What does linguistic research have to say about the meaning and uses of *literally*? The most sophisticated study of *literally* to date is Israel (2002), whose data consist of an *ad hoc*

12

collection of examples from various sources and two well-known corpora of American English (the Brown and the Switchboard corpora). Among his observations relevant to the current task, he points out one essential characteristic of *literally*: According to the famous set of Gricean maxims (after philosopher H.P. Grice), communication in general is assumed to be cooperative. That means, in the absence of evidence to the contrary, interlocutors are assumed to make statements that are true, as informative as is required, relevant, and perspicuous. That in turn means that using *literally* should only ever be required if it is necessary to indicate to the comprehender that a possible figurative meaning is not the intended one.

However, over the last 250 years or so, *literally* has also assumed a variety of other functions and the way it is doing so is in fact comparable to that of words like *very*, *really*, *truly*, or *genuinely*, whose historical developments into intensifier adverbs has been completed. While native speakers are of course usually not aware of how the meaning of an expression changes over hundreds of years, the fact of the matter is that, since *literally*'s historical development is not yet complete, at this point in time, it has multiple functions that speakers need to grapple with as they decide what to say.

Crucially for the present task, Israel shows that, currently, *literally* has a variety of different features and functions:

> Among other things, the use of orthodox *literally* may suggest: (i) that the speaker considers what is being said especially remarkable; **(ii) that the speaker is committed to the strongest possible interpretation of his or her words**; (iii) that the speaker considers this particular choice of words especially fortuitous; or (iv) that the speaker considers these words the best way of expressing what she has to say. [...] While **all of these inferences** started out as conversational implicatures of *literally*'s orthodox use, they **are, by now, at least loosely associated with the word itself.** (Israel 2002:426)

He goes on to demonstrate that one of *literally*'s central functions now is not so much (anymore) that of "marking a commitment to a narrowly construed sentence meaning" (e.g., by determining which of the senses of a word is intended) but instead marking "the speaker's commitment to the intended utterance meaning". (p. 428). More to the point even, his examples show that **the use of *literally* can be "closely parallel" to uses of *really* and *truly*** (i.e. intensifiers whose historical development is complete) and that, often,

> it makes no difference whether the language used is   gurative or not – the point is that the language used is perfectly suited to express the speaker's meaning, and that **the speaker is strongly committed to the truth of that meaning**. (Israel 2002:429, my emphasis)

Later studies and discussions of *literally* (e.g. Liberman 2011, Park 2016) discuss different aspects of *literally* (e.g., its co-occurrence with *almost* or different historical data), but neither alter, nor add substantively to, the inventory of functions *literally* serves.

13

2.2.3   The meaning and use of *really literally* in contemporary American English talk shows

Given that the sentence in question does not just use *literally*, but *really literally*, I conducted a search of examples of this expression in the Corpus of Contemporary American English (<https://www.english-corpora.org/coca/>). The search, conducted on 24 November 2019, resulted in 21 instances, 20 of which were from spoken uses (mostly TV talk shows, i.e. a context of exactly the kind relevant to the current question), with the remaining one being from Harper's Magazine. Interestingly enough, the majority of instances are instances where what *literally* modifies **is** meant literally; the following is a list of representative examples (slightly edited for clarity):

(18)   If you **really literally** need to say "excuse me, where's the pay phone?" […]

(19)   they are making beautiful music together -- […] – but apparently it's **really literally** just music they are making

(20)   We do not want to have a war here that could cause **really literally** hundreds of thousands of casualties

(21)   when you're actually standing over the bomb, and it's **really literally** impossible to think about anything other than the simple mechanics of diffusing the bomb.

(22)   And that's **really literally** that simple.

> **Interim conclusion(s)**: The way in which an ordinary speaker would understand a word is often not inferrable from dictionary definitions. Research findings show that *literally*'s function often is similar to that of intensifiers such as *really* or *truly* – it often instructs the hearer to adopt the strongest possible interpretation (within a given context) – and its epistemic function is to reflect a high degree of commitment of the speaker to the truth of the utterance. However, when ordinary speakers in TV talk shows use it after *really*, *literally* typically modifies propositions that are supposed to be interpreted literally.

After this long overview, the following will now apply these points and findings.

*2.4*   *The use of* literally *in the show*
2.4.1   Which sense of *literally* did Maddow use?

The way the defense discusses sentence 20, repeated here for convenience, is problematic in many ways:

> In this case, the most obsequiously pro-Trump right wing news outlet in America really **literally** is paid Russian propaganda.

First, the defense quotes the definitions offered by the dictionary selectively: They both leave out senses 1b and 1d, which could theoretically be relevant. As shown above in Section 2.2.2, *literally* can very well be used with things that are literally true, so both dictionary senses

14

of *literally* are possible here. In addition, if one actually looks up *literal*, the adjective from which *literally* is derived and the adjective that *literally*'s dictionary definition relies on, one finds that one of its meanings in turn is 'adhering to fact'. Because of both of the above points, senses 1b ('used to emphasize the truth and accuracy of a statement or description') and 1d ('in a completely accurate way') are relevant to the interpretation and would, if adopted, indicate that Maddow's statement was in fact one "emphasiz[ing] the truth and accuracy of the statement" that "[OAN] is paid Russian propaganda".

Second, even if one accepted the defendants' somewhat selective conclusion that *literally* means 'in effect,' then Maddow's sentence 20 becomes the version in (23) below:

(23)   In this case, the most obsequiously pro-Trump right wing news outlet in America really **in effect** is paid Russian propaganda.

Critically, this reading proposed by the defendants, if accepted, would not negate an average or reasonable/ordinary viewer from understanding this sentence as factual. Take this thought experiment. Imagine Maddow said the following on her show:

(24)   President Trump **literally/in effect** paid Stephanie Clifford (a.k.a. Stormy Daniels) hush money for her silence.

The vast majority of the show's target audience, most of which probably harbor dislike of President Trump, would have no problem whatsoever considering this statement as one that is both factual and accurate. And they would do so in spite of the fact that, as far as one knows (<https://en.wikipedia.org/wiki/Stormy_Daniels#Trump_affair_allegations>), Stephanie Clifford did in fact **not** get paid directly (in the sense of 'receive a personal check signed and handed over') by Donald J. Trump.

Therefore and by analogy, if *literally*'s 'in effect' meaning results in (24) being perfectly acceptable as a factual and accurate statement, then why would the same not apply to Maddow's sentence 20? It would apply, which means that even assuming *literally*'s 'in effect' meaning in (24), this assumption does not justify the conclusion that Maddow's statement was commentary or opinion rather than factual.

2.4.2   How is *literally* actually used and what does this imply?

There are other major problems the defendants' position. We have seen in the hypothetical example (24) above, but also in the linguistic research literature, that *literally*'s function is **not** only to precede and emphasize things that not literally true, which means the mere presence of *literally* does not automatically render what follows something "that is not literally true or possible" and the sentence an opinion. The defendants' position is also severely undermined by Maddow's own linguistic choices. Recall sentence 16 of the transcript:

(7)   **[factualinfo:beg]** We **literally** learned today that that outlet the president is promoting shares staff with the Kremlin. **[factualinfo:end]**

15

In this sentence, the presence of the evidential expression *We [...] learned today* indicates that Maddow is very much committed to the truth of what follows. It is clear that Maddow herself used *literally* above precisely **not** in the way that the defendants claim *literally* is used.

Maddow also has a history of using literally in utterances where she wants the viewer to believe the proposition that *literally* modifies to be true. In other words, Maddow uses *literally* like this regularly; here are a few examples from four randomly selected show transcripts with *literally* highlighted in bold type and the content modified by *literally* underlined:

(25)   You can see there there's **literally** a heading in the document the illegal campaign contribution scheme. [The Rachel Maddow Show, 17 July 2019]

(26)   **Literally,** the neo-Nazis and the white supremacists who did what they did in Charlottesville, not only are they being sued by the people who got hurt there, but those white supremacists have just been ordered by a judge to pay the victims` attorney fees, which means the neo-Nazis are now being ordered by a court to pay for the privilege of themselves being sued and to pay the costs of the attorneys who are suing them. [The Rachel Maddow Show, 9 August 2019]

(27)   [...] they have appointed wildly unquali ed people to try to become federal judges, including some people who are **literally** explicitly rated unquali ed by the American Bar Association. [The Rachel Maddow Show, 15 August 2019]

(28)   You might remember, one of the things that happened right after Trump  red James Comey, **literally** two days after, that was that just by coincidence, there happened to be scheduled a big intelligence hearing, an annual oversight hearing on worldwide threats. [The Rachel Maddow Show, 12 September 2019]

In all these (and other) cases, Maddow clearly does **not** want the viewer to infer from the presence of *literally* that the following underlined material is not literally true. From a psycholinguistic perspective, this means that an average/ordinary viewer could have learned (in the psychological/psycholinguistic sense of 'implicit learning') that, in Maddow's idiolect, *literally* regularly precedes information that **is** to be taken literally, a kind of co-occurrence information, or contingency, that underlies most forms of associative learning in humans and many other species (see Ellis 2006 for contingency learning in language acquisition).

2.4.3   What did Maddow actually say?

To sum up, the relevant expression contains two adverbs, one of which (*really*) only functions as an intensifier, the other one (*literally*) is functioning as a commitment-indicating intensifier. If we return to the empirical data of how other speakers of American English use the phrase *really literall*y in exactly the same context, namely TV shows (see examples (18) to (22) in Section 2.2.3 above), then these data indicate that most of the time the meaning of whatever follows *really literally* can in fact be interpreted literally; again, this means that the defense's argument – *is paid Russian propaganda* in sentence 20 is not meant to be true – is inconsistent with an analysis of ordinary meaning.

16

> **Interim conclusion**: Applying the linguistic analysis and data of *literally* to Maddow's statement reveals that: (i) *literally* does not only precede material that's not literally true and, thus, an opinion; (ii) it makes the sentence's interpretation as factual information more likely; and (iii) independent data show the use of *really literally* in American talk shows regularly precedes statements that are literally true.

## 3      Conclusion

On the basis of all of the above and as indicated at the beginning of this report, I conclude that it is very unlikely that an average or reasonable/ordinary viewer would consider the sentence in question to be a statement of opinion. Rather, all the linguistic evidence suggests that it is much more likely that:

the broad overall and specific context of the utterance and its specific linguistic characteristics would lead an average viewer towards considering the statement a statement of fact;

the way *literally* has developed historically, the way it is used nowadays, and its juxtaposition with *really* would lead an average viewer to (i) adopt the strongest possible interpretation that the context (Maddow's contextualizing remarks) allows for and (ii) accept that as a statement of fact that Maddow emphasizes and to whose truth she strongly commits herself.

### Appendix and references

### Appendix 1  Transcript of the relevant opening monolog of The Rachel Maddow Show

Table 1:      Sentence-by-sentence display of the transcript of the relevant part of the show, with the relevant sentence (20) as well as other expressions relevant to the analysis are highlighted in bold

| # | Sentence |
|---|----------|
| 1 | Thanks to you at home for joining us this hour. |
| 2 | Happy to have you here this Monday night. |
| 3 | If the FOX News Channel is insufficient pro-Trump for you, you may or may not know that there is another boutique little news outlet that is designed specifically for Trump mega fans. |
| 4 | It's called One America – One America News Network. |
| 5 | The Trump White House gave this boutique outfit a hard pass for access to the White House grounds and a permanent seat in the White House briefing room. |
| 6 | Remember when the White House used to hold press briefings? |
| 7 | They had a seat for those. |
| 8 | President Trump also started quoting this little news outlet and frequently telling people that they should be watching them, praising their ratings, which is the highest possible praise from this president, right? |

17

| # | Sentence |
|---|----------|
| 9 | Today has been a more ridiculous than most day in the news and there is a ton going on, and we've got a very busy show. |
| 10 | But I have to tell you, perhaps the single most perfectly formed story of the day, the single most like sparkly [little] story of the entire day is this scoop from reporter Kevin [Poulsen] at "The Daily Beast" who has sussed out that Trump's favorite more Trumpier than Fox TV network, the one that the president has been promoting and telling everyone they should watch and is better than Fox, turns out that [little news] network has a full time on air reporter who covers U.S. politics who is [also] simultaneously on the payroll of the Kremlin. |
| 11 | **What?** |
| 12 | Because at the same time he works for Trump's favorite One America News team, he is also being paid by the Russian government to produce government-funded pro-Putin propaganda for a Russian government funded propaganda outfit called Sputnik. |
| 13 | Sputnik, of course, had a key role in the Russian government's intervention in the 2016 election to help Trump, according to the intelligence committee's assessment of that attack. |
| 14 | Sputnik has also formally registered with the U.S. Justice Department as an agent of a foreign power. |
| 15 | **I mean**, there is a lot of news today, but among the giblets the news gods dropped off their plates for us to eat off the floor today is the **actual news** that this super right wing news outlet that the president has repeatedly endorsed as a preferable alternative to Fox News, because he thinks Fox is insufficiently pro-Trump, so now he likes this is other outlet better. |
| 16 | We **literally** learned today that that outlet the president is promoting shares staff with the Kremlin. |
| 17 | **I mean, what?** |
| 18 | **I mean**, it's an easy thing to throw out, you know, like an [epithet] in the Trump era, right? |
| 19 | **Hey**, that looks like Russian propaganda. |
| 20 | **In this case, the most obsequiously pro-Trump right wing news outlet in America really literally is paid Russian propaganda.** |
| 21 | [Their] on air U.S. politics reporter is paid by the Russian government to produce propaganda for that government. |
| 22 | **I mean**, this is the kind of news we are supposed to take in stride these days. |
| 23 | And we do our best. |
| 24 | That is just one of the things we learned today. |
| 25 | And **I guess** you just swallow that and then you move on. |
| 26 | And **we expect** that they won't fire their Kremlin staffer and **we expect** that the president will keep promoting them, and **we expect** that other right wing news outlets wonder if they should have a Kremlin staffer doing U.S. politics reporting, too. |
| 27 | It probably makes it easier to get the message. |
| 28 | **I mean** – anyway, let's get to it. |
| 29 | As I said, there is a lot going on. |
| 30 | And given all of the drama that's happening right now in Washington and how much more dramatic it's going to get in Washington over the next two days, I actually want to start tonight with something in Washington that was a tremendously solemn |

18

**Appendix 2: Cases and amicus briefs using or discussing corpus-based linguistic analysis**

*Cases using or discussing corpus-based linguistic analysis*

In the Matter of the Adoption of Baby E.Z., 266 P.3d 702, 715-32 (Utah 2011)

State v. Rasabout, 356 P.3d 1258, 1271-90 (Utah 2015)

People v. Harris, 885 N.W.2d 832 (Mich. 2016)

Fire Ins. Exch. v. Oltmanns, 416 P.3d 1148, 1163 n.9 (Utah 2018)

Carpenter v. United States, 138 S.Ct. 2206, 2235, 2238-39 (2018)

Wilson v Safelite Group, Inc., Case No. 18-3408 (6th Cir. July 10, 2019)

Concurring opinion by Judge Amul R. Thapur, slip op. 13-22 ("corpus linguistics is a powerful tool for discerning how the public would have understood a statute's text at the time it was enacted")

Concurring opinion by Judge Jane B. Stranch, slip op. 23-26 ("the use of corpus linguistics is a difficult and complex exercise … I would leave this task to qualified experts, not to untrained judges and lawyers.")

Caesars Entertainment Corp. v. Int'l Union of Operating Engineers, Case No. 18 2465, slip op. at 7-8 (3rd Cir. Aug 1, 2019)

State of Idaho v. Lantis, Docket No. 46171 (Supreme Court of Idaho Aug. 23, 2019)

Richards v. Cox, 2019 UT 57, slip op. at 8-11 (Supreme Court of Utah September 13, 2019)

*Amicus briefs using or discussing corpus-based linguistic analysis I was involved in*

2019. Baron, Dennis E. Alison L. LaCroix, Stefan Th. Gries, & Jason Merchant. Amicus brief with the U.S. Supreme Court in the case New York State Rifle & Pistol Association Inc., Rommolo Colantone, Efrain Alvarez, & Jose Anthony Irizarry v. The City of New York and the NYPD License Division (On Writ of Certiorari to the United States Court of Appeals for the 2nd Circuit.)

2019. Slocum, Brian G., Stefan Th. Gries, & Lawrence Solan. Amicus brief with the U.S. Supreme Court in the case Gerald Lynn Bostock v. Clayton County, GA (On Writs of Certiorari to the United States Courts of Appeals for the 11th, 2nd, and 6th Circuits.)

2018. Amicus curiae to James Heilpern & Gene C. Schaerr's amicus brief with the U.S. Supreme Court in the case Lucia & Lucia Companies, Inc. v. Securities and Exchange Commission (On Writ of Certiorari to the United States Court of Appeals for the D.C. Circuit.)

2018. Amicus curiae to James Heilpern & Gene C. Schaerr's amicus brief with the U.S. Supreme Court in the case Rimini Street, Inc. & Seth Ravin v. Oracle USA, Inc, Oracle America, Inc., & Oracle International Corporation (On Writ of Certiorari to the United States Court of Appeals for the 9th Circuit.)

19

**References**

Biber, Douglas. 1988. *Variation across speech and writing*. Cambridge: Cambridge University Press. (citations are from the 1995 printing)

Ellis, Nick C. 2006. Language acquisition as rational contingency learning. *Applied Linguistics* 27(1). 1-24.

Ferreira, Fernanda, Karl G.D. Bailey, & Vittoria Ferraro. 2002. Good-enough representations in language comprehension. *Current Directions in Psychological Science* 11(1). 11-15.

González, Montserrat, Paolo Roseano, Joan Borràs-Comes, & Pilar Prieto. 2017. Epistemic and evidential marking in discourse: Effects of register and debatability. *Lingua* 186-187(1). 68-87.

Gries, Stefan Th. & Brian G. Slocum. Ordinary meaning and corpus linguistics. *Brigham Young University Law Review* 6. 1417-1472.

Israel, Michael. 2002. *Literally* speaking. *Journal of Pragmatics* 34(4). 423-432.

Lee, Thomas R. & Stephen C. Mouritsen. 2018. Judging ordinary meaning. *The Yale Law Journal* 127. 788-1105.

Mouritsen, Stephen C. 2010. The dictionary is not a fortress: Definitional fallacies and a corpus-based approach to plain meaning. *Brigham Young University Law Review* 1915-1979.

Liberman, Mark. 2011. They almost non-metaphorically never complain about this! Language Log, URL <https://languagelog.ldc.upenn.edu/nll/?p=3007>, retrieved 23 November 2019.

Maddow, Rachel. 2019. *Blowout: Corrupted democracy, Rogue State Russia, and the richest, most destructive industry on Earth*. Crown Publishers.

Merriam-Webster. 2004. *The Merriam-Webster Dictionary*. Springfield, MA: Merriam-Webster, Inc.

Merriam-Webster online dictionary. URL <https://www.merriam-webster.com/>, accessed 24 November 2019.

Mitchell, Amy, Jeffrey Gottfried, Michael Barthel, & Nami Sumida. 2018. Distinguishing between factual and opinion statements in the news. Pew Research Center, URL: <https://www.journalism.org/2018/06/18/distinguishing-between-factual-and-opinion-statements-in-the-news/>, retrieved 23 November 2019.

Park, Semi. 2016. Literally does not always mean lite*rally: a c*orpus- based diachronic study on *literally* as an intensifier. *SNU Working Papers in English Linguistics and Language* 14. 124-142.

1  LOUIS R. MILLER (State Bar No. 54141)
   smiller@millerbarondess.com
2  AMNON Z. SIEGEL (State Bar No. 234981)
   asiegel@millerbarondess.com
3  COLIN H. ROLFS (State Bar No. 280654)
   crolfs@millerbarondess.com
4  JUSTIN P. MCCARTHY (State Bar No. 317169)
   jmccarthy@millerbarondess.com
5  MILLER BARONDESS, LLP
   1999 Avenue of the Stars, Suite 1000
6  Los Angeles, California 90067
   Telephone:   (310) 552-4400
7  Facsimile:   (310) 552-8400

8  Attorneys for Plaintiff Herring Networks, Inc.

9

10

11              **UNITED STATES DISTRICT COURT**

12           **SOUTHERN DISTRICT OF CALIFORNIA**

13

14  HERRING NETWORKS, INC.,              **CASE NO. 3:19-cv-01713-BAS-BGS**

15           Plaintiff,                  Assigned for All Purposes to:
                                         Hon. Cynthia Bashant
16       v.
                                         **DECLARATION OF AMNON Z.**
17  RACHEL MADDOW; COMCAST               **SIEGEL IN SUPPORT OF**
    CORPORATION; NBC UNIVERSAL           **PLAINTIFF HERRING NETWORK**
18  MEDIA, LLC; AND MSNBC CABLE          **INC.'S OPPOSITION TO**
    LLC.                                 **DEFENDANTS' SPECIAL MOTION**
19                                       **TO STRIKE**
           Defendants.
20                                       *[Filed Concurrently with Opposition;*
                                         *Declaration of Charles Herring and*
21                                       *Declaration of Professor Stefan Th.*
                                         *Gries]*
22

23                                        Action Filed:   September 9, 2019
                                          Hearing Date:   December 16, 2019
24                                        Trial Date:     None

25

26

27

28

*Left margin (vertical):* MILLER BARONDESS, LLP · ATTORNEYS AT LAW · 1999 AVENUE OF THE STARS, SUITE 1000  LOS ANGELES, CALIFORNIA 90067 · TEL: (310) 552-4400   FAX: (310) 552-8400

444499.1

# DECLARATION OF AMNON Z. SIEGEL

I, Amnon Z. Siegel, declare as follows:

1.     I am an attorney duly admitted to practice before this Court.  I am a partner with Miller Barondess, LLP, counsel of record for Plaintiff Herring Networks, Inc. ("Herring").  I have personal knowledge of the facts set forth herein, and if called as a witness, I could and would competently testify to all of said facts. I make this declaration in support of Herring's Opposition to Defendants' Special Motion to Strike.

**Rachel Maddow's Use of the Word "Literally"**

2.     Attached hereto as **Exhibits A-D** are true and correct copies of excerpts from transcripts of The Rachel Maddow Show reflecting Rachel Maddow's ("Maddow") use of the word "literally."

***The New York Times Magazine* Article**

3.     Attached hereto as **Exhibit E** is a true and correct copy of an article from the October 1, 2019 edition of *The New York Times Magazine* entitled, "This Is the Moment Rachel Maddow Has Been Waiting For."

**Discovery Should Be Permitted**

4.     If the Court disagrees that Herring has made a prima facie showing for its defamation claim, Herring would seek discovery regarding the context of Rachel Maddow's statement that OAN "really literally is paid Russian propaganda," including discovery into the journalistic practices of The Rachel Maddow Show and how viewers reasonably understood her statement.

5.     The parties have not yet engaged in a discovery conference pursuant to Rule 26(f) of the Federal Rules of Civil Procedure, and Defendants' counsel has repeatedly declined my request to initiate a conference pursuant to Rule 26(f). Accordingly, no discovery has taken place in this action.

6.     If Plaintiff is able to take discovery, it would seek documents, other written discovery, and deposition testimony from the Defendants concerning:

MILLER BARONDESS, LLP
ATTORNEYS AT LAW
1999 AVENUE OF THE STARS, SUITE 1000  LOS ANGELES, CALIFORNIA 90067
TEL: (310) 552-4400   FAX: (310) 552-8400

1

DECLARATION OF AMNON Z. SIEGEL IN SUPPORT OF PLAINTIFF HERRING NETWORK INC.'S
OPPOSITION TO DEFENDANTS' SPECIAL MOTION TO STRIKE

- The journalistic practices of The Rachel Maddow Show, including any documents and communications reflecting any investigation conducted in connection with the July 22, 2019 segment concerning One America News Network (the "Segment");

- How Maddow's viewers understood her Segment, including any documents and communications Defendants received from viewers in response to the Segment;

- Any documents or communications relating to Defendants' contention that The Rachel Maddow Show is "opinion- or commentary-focused media," as alleged in the Motion to Strike. (Dkt. No. 18-1 ("Mem") at 12:15-16.)

- Any documents or communications supporting or contradicting Defendants' contention that viewers of The Rachel Maddow Show "anticipate efforts by the parties to persuade others to their position by use of epithets, fiery rhetoric, or hyperbole," as alleged in the Motion to Strike. (Mem at 13:3-4.)

7.     The facts resulting from such discovery would relate to the elements of Herring's claim and the merits of Defendants' Motion to Strike.  Among other things, Herring expects that such discovery will reveal that, contrary to the claims made in Defendants' Motion to Strike, The Rachel Maddow Show aims to produce *factual* content, not opinion-based commentary.  Moreover, Plaintiff expects that such discovery will reveal that when Maddow told her viewers that OAN "really literally is paid Russian propaganda," her audience believed that statement to be a fact.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed on this 1st day of December, 2019, at Los Angeles, California.

_____
Amnon Z. Siegel

Miller Barondess, LLP
ATTORNEYS AT LAW
1999 Avenue of The Stars, Suite 1000  Los Angeles, California 90067
Tel: (310) 552-4400    Fax: (310) 552-8400

DECLARATION OF AMNON Z. SIEGEL IN SUPPORT OF PLAINTIFF HERRING NETWORK INC.'S OPPOSITION TO DEFENDANTS' SPECIAL MOTION TO STRIKE

## INDEX OF EXHIBITS TO THE DECLARATION OF AMNON Z. SIEGEL

| Exhibit No. | Description | Pg. No. |
|---|---|---|
| A. | September 11, 2019 MSNBC Rachel Maddow Transcript - "Democratic debate kicks off tomorrow" | 4-7 |
| B. | September 4, 2019 MSNBC Rachel Maddow Transcript – "Britain faces October 31st Brexit deadline" | 8-10 |
| C. | September 6, 2019 MSNBC Rachel Maddow Transcript – "Trump holds up Ukraine military aid" | 11-14 |
| D. | September 5, 2019 MSNBC Rachel Maddow Transcript – "Dorian moving North along Eastern Seaboard" | 15-17 |
| E. | October 2, 2019 New York Times Article – "This Is the Moment Rachel Maddow Has Been Waiting For" | 18-25 |

MILLER BARONDESS, LLP
ATTORNEYS AT LAW
1999 AVENUE OF THE STARS, SUITE 1000  LOS ANGELES, CALIFORNIA 90067
TEL: (310) 552-4400   FAX: (310) 552-8400

444499.1

3

Case No. 3:19-cv-01713-BAS-BGS

DECLARATION OF AMNON Z. SIEGEL IN SUPPORT OF PLAINTIFF HERRING NETWORK INC.'S OPPOSITION TO DEFENDANTS' SPECIAL MOTION TO STRIKE

# EXHIBIT A

 **MSNBC**

**Rachel Maddow Transcripts / Rachel Maddow**

# Democratic debate kicks off tomorrow. TRANSCRIPT: 9/11/19, The Rachel Maddow Show.

09/11/19 09:00 PM

**Guests:**

Maria Isabel Bueso

**Transcript:**

MEGAN TWOHEY, INVESTIGATIVE REPORTER, The NEW YORK TIMES:  We certainly had

no idea what the impact would be.  At "The New York Times", all we know in

2017 is that we were committed to reporting on sexual harassment across a

variety of industries, from the restaurant industry, to Silicon Valley, to

Hollywood, to auto plants.


And our hope, obviously, was they would help bring about change.


ALI VELSH, MSNBC HOST:  Yes.


TWOHEY:  But we couldn`t be sure what was going to have what impact.


VELSHI:  It was the tip of the spear.


Thank you for not only your remarkable reporting, but for this book that

tells us about how it all went down.  Megan Twohey, Jodi Kantor.


And that`s it for ALL IN this evening.


"THE RACHEL MADDOW SHOW" starts right now.

Trump has shed his third national security advisor.

There is certainly no sign yet of who else might come in as Trump`s next national security advisor.  Amid speculation now that maybe President Trump will decide he doesn`t want anyone in that job.  I mean, the national security advisor`s job is to coordinate the whole policy process in the White House when it comes to national security and foreign policy.  They coordinate the whole policy process in the various parts of the White House and the Security Council among various government agencies.

The whole idea is that somebody is running that deliberative process to give the president the best most comprehensive information, right, to make sure that the deliberative process about policy in any presidential administration is very well-informed and very responsible and is full of, you know, subject matter expertise that you`re getting from the most – that is not exactly the tune this presidency has danced to thus far.  That`s not exactly how they work.

And if you think about it – I mean, honestly, if you don`t have a policy process anymore, if the policy process is president want, president get, I mean, if that`s it why bother having someone nominally in charge of the policy process?  Why bother?

Also, it`s the anniversary of the 9/11 attacks.

Meanwhile, today the Trump administration tried to push through one of the most controversial judicial nominee`s of Trump`s time in office.  They

literally nominated him to the job two days ago and then, boom, held his confirmation hearing today. Get it done quick, get it don e before people know it`s happening.

That strategy may not be working.

(BEGIN VIDEO CLIP)

STEVEN MENASHI, JUDICIAL NOMINEE:  After having a dispute with the partners –

(CHANTING)

(END VIDEO CLIP)

MADDOW:  As evidenced by the fact that it was actually hard to hear some of that nominee`s opening statement today because people found out that hearing was happening and there were loud protesters against him just outside the hearing room door.

When the White House first signaled they were going to nominate Steven Menashi to a federal appeals court job, to a lifetime appointment to a court just one level below the Supreme Court, everybody knew it was going to be controversial.  This is somebody who is reportedly part of the immigration working group in the Trump White House that`s led by Stephen Miller.  He has been coming up with their immigration policies.

# EXHIBIT B

 **MSNBC**

**Rachel Maddow Transcripts / Rachel Maddow**

# Britain faces October 31st Brexit deadline. TRANSCRIPT: 9/4/19, The Rachel Maddow Show.

09/04/19 09:00 PM

**Guests:**

Josh Gerstein, Gillian Tett

**Transcript:**

RACHEL MADDOW, MSNBC HOST:  Good evening, Chris.  Thanks, my friend.

HAYES:  You bet.

MADDOW:  Much appreciated.

And thank to you at home for joining us this hour.

Today, as the Bahamas announced the death toll from Hurricane Dorian has climbed in the Bahamas from five as of this weekend to seven as of last night, to 20 as of tonight, the increasingly clear views we are getting of the overwhelming devastation in certain islands in the Bahamas, making it all but a certainty that that death toll will climb even higher than the 20 killed that was described tonight by the Bahamian prime minister.

Tonight, with that same storm now gaining strength again, as it zeros in on the southeastern United States, with both hurricane warnings and storm surge warnings in parts of Florida and Georgia and the Carolinas and Virginia tonight, today, the U.S. government in the midst of that stumbled into a station that we have never seen before.  Honestly, we have never

this inane, muddled absurdity from the White House and the president in

particular has been to tune it out, right?  Seek real information

elsewhere.  Wait for this all to just pass.


And, yes, I think that`s true.  That`s warranted on normal subjects and

normal days, but this really is a life-threatening emergency.  It`s

literally an emergency, a formally declared emergency, although the

president is making stuff up about that, too.


Under U.S. federal law, if a state wants to ask for a federal emergency

declaration, that request has to be made to the federal government by the

top elected official in the state.  The request specifically has to come

from the governor of the state by law.  In the state of North Carolina, the

governor is a Democrat, Roy Cooper.  And his party affiliation is something

that should not matter at all when there is a hurricane looming off the

coast of his state.


But it was Democratic Governor Roy Cooper who on Monday made the formal

request to the federal government to declare an emergency in North Carolina

ahead of this oncoming storm.  It had to be him who made the request.

That`s the law.  The governor is the only public official who can make that

request.


But the White House, the president himself even decided to lie about that,

stating instead that the federal government was making this declaration of

an emergency in North Carolina at the request of not the Democratic

governor there but instead at the request of one of the state`s Republican

**Page 10**

# EXHIBIT C



**Rachel Maddow Transcripts / Rachel Maddow**

# Trump holds up Ukraine military aid. TRANSCRIPT: 9/6/19, The Rachel Maddow Show.

09/06/19 09:00 PM

**Guests:**

Natasha Bertrand, Jared Higgs

**Transcript:**

CHRIS HAYES, MSNBC HOST:  That is "ALL IN" for this evening.

THE RACHEL MADDOW SHOW starts right now.

Good evening, Rachel.

RACHEL MADDOW, MSNBC HOST:  That was spectacular.  So good with the live

audience, with the whole crew.  So good, well done, my friend.  Thank you.

HAYES:  You bet.

MADDOW:  Well-earned.  Well done.

All right.  Thanks to you at home for joining us this hour.  Super happy to

have you here.

I actually want to start with one little matter of business that I want to

attend to right off the bat tonight.  This is not about today's news.  But

it's a thing I promised I would keep you apprised of, so I just want to do

it right away.

**Page 12**

MADDOW:  It is just incredible.

In terms of thinking about the geography – so, you know, Glasgow, obviously, one of the major cities in Scotland, there is a main Glasgow airport which is right next to the city of Glasgow, this other airport that we're talking about is called Glasgow Prestwick airport, and they put in Glasgow in it, it's actually like 30 miles outside town.  It's easy to understand why that airport, which is sort of on the coast away from everything and, certainly away from the center of Glasgow might be in economic distress, and it has been in economic distress for years.

The idea that under Trump, the U.S. military is flying into that little out of the way airport, that is basically otherwise going to close, and spending $11 million in fuel there at that airport to prop it up because that's the airport that services his golf course – I mean, honestly if this were fiction, you would walk out – you would walk out because this is too blunt.  Just incredible.

We'll be right back.

(COMMERCIAL BREAK)

MADDOW:  So politico.com is out, you can see my marked up version of it. This is what happens to news articles when they come out, and I can't believe them.  What?

<mark>Politico.com out with this jaw-dropping scoop tonight about a previously</mark>

**Page 13**

==undisclosed congressional investigation into the U.S. military apparently==

==diverting C17 cargo flights to stop at President Trump's golf course in==

==Scotland, literally to have U.S. airmen stay at his golf resort so that==

==revenue from that goes to President Trump, but also having the C17s fuel up==

==at commercial rates at a struggling nearby airport that Trump needs to stay==

==open if he's going to keep that golf course open.==

These flights, these routine flights from Elmendorf air base in Alaska back

and forth to Kuwait, these supply trips, they always previously refueled at

U.S. military bases, which makes sense, they are military flights.  But

now, apparently, Congress is investigating the fact that in the Trump era,

they have been refueling at Trump's struggling Scottish golf course,

stopping there in both directions to and from Kuwait.  Just astonishing.

So this is our life now, right?  We get this stream of stories every day

now, some more astonishing than others, about the president using his

office for his own personal gain.  Using it to line his profits, using it

to prop up some of the worst-performing parts of his business empire.

Here's another story along the same lines, it's the sort of darker it

ration of it.  It is one thing to use the powers of the presidency to

direct money into your property.  It is even a darker plot to use the

powers of the presidency like this.  This is a story that was broken,

interestingly, today on the editorial page of "Washington Post."

Last night on this program, we talked with California Congressman John

Garamendi about how the Trump administration is raiding U.S. military funds

# EXHIBIT D

 **MSNBC**

**Rachel Maddow Transcripts / Rachel Maddow**

# Dorian moving North along Eastern Seaboard. TRANSCRIPT: 9/5/19, The Rachel Maddow Show.

09/05/19 09:00 PM

**Guests:**

Duane Sands, John Garamendi, Matt Segal

**Transcript:**

CHRIS HAYES, MSNBC HOST:  And we hope that you tune in.

That is ALL IN for this evening.

"THE RACHEL MADDOW SHOW" starts right now.

Good evening, Rachel.

RACHEL MADDOW, MSNBC HOST:  Honestly, as you head into your third one, are

you thinking, whoo, it`s the last one, it`s been so much extra work, it`s

been hard, are you thinking, darn it, it`s the last one, can`t we plan more

of these?

HAYES:  I have – yes.  More of that one honestly, and I have loved doing

it and it`s – you know, I have neither built an airplane nor flown one,

but it`s easy to fly one than build one, if that makes sense.

MADDOW:  Yes, right.

HAYES:  It was hard to get a new thing up on the air.  It was stressful.

**Page 16**

And, again, this is – I mean, this is serious stuff.  This is – you know,

Special Operations forces training facilities and operations facilities in

Estonia, ammunition storage in Poland, air field upgrades in Hungary,

Slovakia, Romania.


So, it`s been interesting to watch this particularly in local newspapers

all around the country, right?  There`s lots of people all over the country

who are starting to get mad about what the president is taking money from

to pay for his wall.


And, I mean, it does include some incredible stuff like day care centers

and elementary schools for the kids of U.S. service members.  They are

literally de-funding the day care center at Andrews Air Force Base, which

is the home of Air Force One.  Enjoy your flight, Mr. President.


But these overseas cuts, the overseas ones, they have a specific message,

to Russia, that everything, all four of these pillars that the United

States set up as its response to Russia for what Russia did over the last

five years, to respond to them invading and seizing another part of a

country, all of that – I mean, the sanctions, kicked out of the G8,

military aid to the country they invaded and now our assistance to our NATO

allies to help them build up their capacity to deter what Russia is doing,

all of that, one, two, three, four, all of it piece by piece dismantled by

the Trump administration.


Yes, but don`t worry.  Russia is clearly back in the box, really cowed and

worried about further bad behavior and what might happen to them

# EXHIBIT E

*The New York Times Magazine*

FEATURE

# This Is the Moment Rachel Maddow Has Been Waiting For

How the MSNBC host staked her show on Trump — and won the largest and most obsessive audience of her career.

By Amanda Hess

Published Oct. 1, 2019   Updated Oct. 2, 2019

Rachel Maddow was trying to get to work. She only had to get from the glass door of her doctor's office to the tinted-windowed S.U.V. that was idling at the curb, waiting to spirit her to 30 Rockefeller Plaza, but there was a hitch. Maddow had torn three ligaments in her left ankle — fishing accident — and one of those ligaments ripped off a piece of her bone, so now she was lumbering toward the sidewalk, her foot strapped into a boot, her lanky body bent over crutches that creaked and boomed with every hit to the sidewalk. In Manhattan, this had the effect of a kind of ritualistic drumbeat, alerting every liberal within earshot to her presence.

A woman with a graying ponytail suddenly wriggled into Maddow's path. "Rachel," she said, extending her phone to secure a selfie for a friend in Oregon who watches her show every single night and was going to bug out when she saw this. Maddow smiled for the camera as a man in long shorts planted himself 20 feet away, holding his own phone up horizontally to film the scene. When he saw Maddow see him, he smiled and waved slowly, as if he were a proud relative capturing a milestone. Farther down the block, a woman screamed something incomprehensible in her direction. As Maddow finally neared the curb, a woman with silver hair and chunky glasses materialized at her side and said with blasé familiarity: "I don't know what happened to you, but I just want to say I love you. Keep up the good work. Can I give you a hug?"

Maddow balanced on her good foot. She spread her crutches out to accommodate the stranger's embrace. "What's your name?" Maddow asked brightly, as if she had hobbled out expressly for the purposes of saying hello. "Emily," she said. She made a perfunctory gesture toward the silent bald man next to her. "This is Ed, my ex-husband."

"Big fan of yours," Ed said, and he went in for a handshake, which Maddow was eager to meet until she discovered, midreach, that her ankle could not make the pivot to a second greeter. "Whoa," Maddow said. "No twisting! Sorry!"

"Be careful with her!" Emily said to Ed, and then, as she saw Maddow breaking away and toward the car, she urgently called out: "So — so what do you think? Elizabeth Warren?"

Finally sealed in the back seat, Maddow propped up the ankle. Then she turned and said, as if I were a friend and not yet another stranger pumping her for information: "That was dangerous! Did you see my twist with Ed?" The gathering swarm of fans — "that sort of thing doesn't happen all the time," she said. "In New York, there are people who are much more famous than me." But Maddow is not just famous. She is the host of "The Rachel Maddow Show," and her fans want something more from her than a star encounter. They want an explanation.

**Unlock more free articles.**
**Create an account or log in**

Maddow has hosted "The Rachel Maddow Show" on MSNBC at 9 p.m. five nights a week for 11 years. But over the past three, her figure has ascended, in the liberal imagination, from beloved cable-news host to a kind of oracle for the age of Trump. If her show started out as a smart, quirky, kind-of-meandering news program focusing on Republican misdeeds in the Obama years, it has become, since the 2016 election, the gathering place for a congregation of liberals hungering for an antidote to President Trump's nihilism and disregard for civic norms.



Maddow in her office after a daily production meeting in September, working on the script for that night's show.  Christopher Lee for The New York Times

Maddow does not administer beat-downs or deliver epic rants. She is not a master of the sound bite. Instead, she carries her viewers along on a wave of verbiage, delivering baroque soliloquies about the Russian state, Trump-administration corruption and American political history. Her show's mantra is "increasing the amount of useful information in the world," though the people who watch it do not exactly turn to it out of a need for more information. They already read the papers and scroll through Twitter all day. What Maddow provides is the exciting rush of chasing a set of facts until a sane vision of the world finally comes into focus.

Maddow's typical fan has been branded (by Kat Stoeffel in The New York Times) as the "MSNBC Mom," a woman who feels that the election has radicalized her; even if she has not moved to the left politically, her liberal sympathies and news consumption have swelled into a suddenly central part of her identity. (The network has monetized this lightly condescending label with a set of MSNBC Mom tote bags and latte mugs.) Molly Jong-Fast, a former novelist who once described her pre-Trump self as "completely selfish and disinterested in politics" and who is now a liberal Twitter influencer and columnist for the Never Trump site The Bulwark, told me that Maddow "made wonkiness cool."

Recently, I went to dinner at the home of Rebecca Kee, a preschool principal in San Francisco who turned to Maddow in her depression and confusion over the 2016 election. I brought a bottle of rosé, and she poured it into glasses decorated with charms that featured Russia-investigation figures on one side and characters from "Star Trek: The Next Generation" on the other. I sipped from the Hope Hicks/Beverly Crusher glass, and we watched Maddow's show over veggie enchiladas. "I think of her as a news doula: You know the news is going to be painful no matter what, so we might as well have someone who helps us survive it," Kee told me. Last year, Kee had a Maddow-themed birthday party, at which her friends and her two young sons put on big black glasses and slicked their hair to the side. Also in attendance was a life-size cardboard cutout of Maddow, which is now in storage so as not to startle guests.

On TV, Maddow appears in slim black blazers over black shirts. She wears smoky eye shadow and subtly glossy lipstick, and her short hair is swept elegantly away from her forehead. The only tell that her business-casual femininity is a mirage created for television is that she has not modified her look for 11 years. It is a uniform she selected for work and steps into every day, so that she never has to make an aesthetic choice that can be picked apart by the commentariat and elevated above what she has to say. When the show is over, she wipes off her makeup, removes her contacts and changes into her civilian clothing.

When I picked her up from rehab, she wore glasses, a denim shirt and jeans, and a vintage belt buckle engraved with the words "Texas Nuclear," signaling one of her obsessions: This month, she publishes her second book, "Blowout," about the political impact of the oil-and-gas industry. She has described herself as "a cross between the jock and the antisocial girl who bit people" in a John Hughes film, and it tracks: She could be the love child of Ally Sheedy and Emilio Estevez.

"This is the hardest part of my day," Maddow said as she approached the nickel-bronze revolving doors of 30 Rockefeller Plaza, before lifting her crutches and hopping easily through the obstacle. Just as she approached the threshold of the secure elevator bank, Maddow was detained by another fan, who pulled her back into the lobby for one more selfie.

"People think I have secret information," Maddow told me. "I definitely get the instant, like, *But what's the real story?*" Recently, she said on air that she expects more Democratic candidates to drop out of the presidential race soon, and she had to instantly clarify that she was not some kind of soothsayer divining answers from the wonk crystal ball that she keeps tucked under the anchor desk. When she told me this, she waved her arms in front of her, as if wielding a pair of orange safety batons on the tarmac of her reputation. Then she mimicked herself desperately trying to ground her viewers: "I don't *know* that any candidate is going to drop out! I am just surmising from publicly available data!"

**At 8:57 on Sept. 23, the night** before Representative Nancy Pelosi would call for an impeachment inquiry into Trump, Maddow limped out onto her show's cavernous soundstage in Adidas sneakers and a black velvet blazer. She dumped her crutches, slid into her anchor chair and used the three minutes before she went on the air to scan a document and type silently into a computer hidden in her desktop. She wore a resting frown. Then, at precisely 9, she looked up into the camera lens, inhaled sharply and, suddenly animated, burst out: "What a time to be alive, right?"

She leaned familiarly toward the lens and put a bright spin on the latest Trump scandal that was swiftly coming into view. "You will always be able to look back at this time in your life and say: 'You know, I was alive during that presidency. I remember how crazy it was,'" she said. Then she segued into her signature move: a 25-minute soliloquy on the convoluted schemes swirling around the Trump-Ukraine incident, burrowing into a dense network of connections among Paul Manafort, Senator Mitch McConnell, Rudy Giuliani, the Russian oligarch Oleg Deripaska, the Ukrainian natural-gas billionaire Dmitry V. Firtash and the former Ukrainian president Viktor Yanukovych. By the time she cut to her first commercial break, she had zoomed out so far that Trump's July 25 phone call with the president of Ukraine appeared to be just one little pushpin on a map of vast global corruption.

If Fox News's biggest star, Sean Hannity, specializes in angry rants, magnifying internet conspiracy theories and coordinating with Trump, Maddow deals in high-toned if sometimes exasperated argumentation. Her mode is sunny rationalism and bemused exuberance — she is a former Rhodes scholar parsing a chaotic world. On her show, the news is "weird," "nuts," "absolutely bonkers" and "a clown car full of crazy." She enlists members of Congress and enlarged images of court documents to underpin her hour. The nerdy details that pop up in the dark landscape of the news delight her.

*[Read about Sean Hannity doubling down on defending Trump.]*

In its first eight years on the air, her show averaged 1.1 million viewers a night, but since Trump's inauguration in 2017, the number has leapt to 2.7 million. Media observers often position MSNBC as a rival of Fox News, but Maddow's success has not sapped Fox of its power. (Hannity's viewership consistently outranks hers.) Instead, she has helped convert a significant number of liberals who may have once seen themselves as readers into the kind of people who watch cable news all day.

Appealing to those viewers means flattering their sense of intellectualism. Maddow's is the rare television news show that requires an active listener. It feels participatory. When Robert Mueller submitted his special-counsel report on the Russia investigation in March, she said that "our job tonight as a country" is "trying to figure out what it means." After Mueller testified before Congress, she gestured at "the paths that we next follow to try to get to the bottom of this still-open scandal." She lends her viewers a cozy sense of mastery over a political situation that feels unmanageable. If today's dominant political recreational metaphor is that of the three-dimensional chess game, Maddow is hunched over in the corner of the rec room, methodically putting together a jigsaw puzzle.

Over the past three years, Maddow has used her hour on television to spin out Russiagate into its own extended universe, and a fandom assembled to step into that world every night. On her program, silent or inscrutable figures — Manafort, Mueller, Trump — were imbued with a kind of interiority. With the help of her storytelling, heavily redacted court documents read more like a novel narrated in the close third person. Ever-more-stunning revelations always seemed to be waiting just on the next page.

Her approach has prompted her fans to boost her as a heroine of the #resistance, and her critics to draw her as a fool. Not just the predictable figures on the right — Hannity, who mirrors her on Fox News at 9 p.m., has nicknamed her "Roswell Rachel Maddow" — but also observers from the center and the left. In 2017, when Maddow secured two pages of Trump's 2005 tax return, she teased the reveal on Twitter and saw a huge audience surge to the show. They then had to endure her extended monologue before she presented the document, which showed that he had paid $38 million in taxes. The Daily Beast called it "overhyping in the cheesy tradition of reality shows." She has been labeled "conspiratorial" (in Slate), a "partisan hack" (by Glenn Greenwald, a former friend), "the queen of collusion" (in The Washington Post) and "much smarter than this" (in The Guardian). As the Mueller investigation limped to its conclusion, Paul Farhi, a media columnist at The Washington Post, rhetorically rolled his eyes at how Maddow "won't let the Mueller probe go."

**Page 21**

"I'm happy to admit that I'm obsessed with Russia," Maddow told me over the summer as — unknown to the public — the whistle-blower saga was quietly unspooling across Washington. "I realize it's controversial, and people give me a lot of grief for focusing on it. But I make no apologies. I think it's absolutely compelling. Still mysterious. Super interesting."

Maddow's persona has expanded beyond the confines of her television hour, and for those who do not regularly tune in, her carefully constructed messages could be seen as fanning the flames of hysteria. Last year, the leftist YouTube show "The Young Turks" circulated a mash-up of Maddow saying "Russia" dozens of times in just one episode, twisting her in-depth approach into a damning obsession. Critics at The Guardian and The Intercept have implied that Maddow leaned into Russia for the ratings. But her stubborn focus also represented a counterweight to the shiny outrage of the day served up by Trump: tweeting "covfefe" or apparently scribbling on a hurricane forecast map with a Sharpie. Even as she dove into domestic matters — for several nights in a row in August, she covered the story of sick immigrant children suddenly marked for deportation before The New York Times did — she always kept one eye on Eastern Europe.

One night in August, Maddow sat in her anchor chair discussing the latest news drip from the trial of Gregory B. Craig, a former White House counsel under President Barack Obama whose dealings with Manafort and Ukraine were uncovered as part of the Russia investigation. She brought the Politico reporter Josh Gerstein on to deliver a play-by-play of the day's "legal drama," a scandal that "seems to be metastasizing all across high-power Washington," as she put it. Maddow asked him if the testimony of Rick Gates, Trump's former deputy campaign manager, caused as much of a stir in the courtroom as it had inside her when she read the reports. "There aren't as many people interested in Greg Craig," Gerstein said, "as there were in Paul Manafort."

When the show cut to commercial, Maddow called out into the vastness of the set: "People don't really care about the Greg Craig trial, Rachel!" And then, softer, to herself: "I do."

Then the whistle-blower story broke. Over the week that Pelosi called for an impeachment inquiry, Maddow's ratings shot up to 3.3 million. On her show, she compared the day's news to a Lazy Susan sitting on the countertop of world affairs. Slowly but surely, all her obsessions were coming back into view — the dirty international energy industry, the scummy Manafort, the American president accused of lobbying a foreign power to influence the outcome of the 2020 election, the Russia connection, the specter of impeachment. (Many of the players she discussed make appearances in "Blowout," itself a sweeping narrative of international corruption looming over American democracy.) This new scandal felt "like a rerun" of Russiagate, she said, all the way down to the same cast of characters, presenting a rare opportunity in political news: a do-over.

**Maddow was born in 1973** in Castro Valley, Calif., to Bob, a former Air Force captain, and Elaine, a school administrator. Maddow doesn't recall reading children's books when she was a kid. Instead, she paged through her dad's law-school books and through stacks of local newspapers. Her father liked to watch sports on television on mute, listening along to the radio commentary instead, and Maddow intuited a media-literacy lesson from his habit: He had found a way to make television smarter. Now they have become MSNBC parents: Her father sends her insights to consider for the show, and her mother gives her notes. Maddow showed me a summer text from Elaine: "Hi hon. Another great show tonight. I hope you don't mind a little fashion advice. I love your velvet jacket but I think it looks better for fall and winter."

Maddow's community was conservative and Catholic; in high school, even before she came out as gay, she was sneaking over to Oakland to volunteer at an AIDS clinic. She played three sports and acquired a collection of crutches. She enrolled at Stanford at 17 and came out almost immediately, in an open letter she posted inside every bathroom stall in her dorm. When the campus newspaper wrote about it, it characterized Maddow as suspicious of "the censoring effect of politically correct attitudes on campus." The piece went on: "Maddow said that she would prefer if people who are against homosexuality felt comfortable enough to express their hostile feelings so that she could address the issue." She found it instructive to interrogate the divide, face to face.

After college, Maddow won a Rhodes scholarship to Oxford, but she didn't stay on campus long. "I wasn't psyched about living in a student-dominated environment," she told me. Instead, she hopped to London, where she worked at another AIDS clinic while she studied, and then on to rural Massachusetts, where she would complete her Oxford dissertation on H.I.V./AIDS health care outcomes in the prison system. She created a Listserv, PrisonPoz, and sent emails to other activists with lines like "Hello AIDSACT and pals (and lurking enemies)." She worked as an unskilled laborer to make money and met her girlfriend of 20 years, the photographer Susan Mikula, when she arrived at Mikula's door to uproot tree stumps and clear thorny thickets from her lawn.

The couple's first real date was at a "Ladies Day on the Range" sponsored by the National Rifle Association (Mikula's sister is a member), at which they shot guns and hurled tomahawks and had a blast. I told Maddow that the one time I fired a handgun — at an indoor range in Los Angeles — I was spooked by how easy it was to hit the target and how emotionally and physically efficient it would be to kill another person with it. "Did it make you curious about other guns?" she asked. No, I said, guessing that shooting one gun and then wanting to shoot every other gun was her kind of thing. "Yes!" she said, mocking herself. " 'What was the first gun?' It's the completist's curse. Musket time!"

Maddow spent her late 20s working as an AIDS and prison-reform activist and playing the sidekick to a wacky Massachusetts radio personality on "Dave in the Morning" before pursuing her own morning slot, "The Big Breakfast," on another station. From there, she snagged a role on the new left-leaning network Air America Radio, where her career as a kind of ideological narrator began in earnest.

Maddow made one of her first television appearances in 2004 alongside G. Gordon Liddy (who had become a pundit after helping orchestrate the burglary of the Democratic National Committee) on CNN's "Paula Zahn Now." Zahn introduced Maddow and Liddy and then set them loose to box over Bush-administration policies like a pair of blue and red Rock 'Em Sock 'Em Robots. But her real break on television came in 2005, when Tucker Carlson launched a show on MSNBC and sought foils for his bowtie-Republican persona. "We were looking for a counterweight to his point of view, but we knew it had to be someone who was not just a partisan mouthpiece," said Bill Wolff, who was Carlson's executive producer and later, for a time, Maddow's. "It had to be someone of intellectual heft." He saw Maddow's audition tape and ran it straight to the president of MSNBC.

It's hard to imagine a time when Carlson and Maddow appeared on the same network, let alone the same show, but 15 years ago, the cable-news environment was a cross-pollinating ecosystem, and the debate format reigned. Soon the debate-show desk would be sliced straight down the middle, its partisan halves sold off to rival networks with polarized ideologies.

Unlike Fox News, which was formed in the gimlet eye of the Republican operative Roger Ailes, MSNBC was not conceived with a political orientation. Over the years it has tried on the costumes of liberalism and conservatism and straight-news-ism. Its ideological reputation arose somewhat accidentally, when Keith Olbermann blew a gasket during Hurricane Katrina and eviscerated President George W. Bush, proving that there was an audience for the scorched-earth liberal rant. At the tail end of the Bush years, after frequently guest-hosting for Olbermann, Maddow got a show of her own, in the time slot right after his, on which she pioneered a more jocular, cerebral approach to opinionating. Today, Maddow is viewed as the central avatar of both her network and her "side," which is the broadly defined left, or at least the slice of it that watches the news on television.

Still, Maddow seeks out the views of her adversaries. At the 2011 Obama White House Christmas party, she struck up a conversation with Ailes. She asked him for tips, and he gave her notes on her angles, her affect, her presentation. He blurbed her first book, "Drift," writing: "People who like Rachel Maddow will love the book. People who don't will get angry, but aggressive debate is good for America."

They did not talk much about politics. "He was a freaking very conspiratorial, very paranoid, very right-wing guy," she said. "That was not an act. That was real." Her interest was in his mastery of cable news and how he molded his talent. "I still think that there is some Roger Ailes special sauce there that nobody has quite figured out and that I used to ask him about all the time," she said. "There's this annoying word, 'authenticity': That's part of it. There's trustworthiness: That's part of it. There's likability: That's part of it. There's humor: That's part of it. There's gravitas: That's part of it," she said. Ailes died in 2017, and, she told me, "I regret that I never figured it out before he passed."

**From the very beginning of her show,** Maddow knew she would never host partisan debate as blood sport. "I spent a long time doing the left-and-right, 'Punch and Judy' thing," she said. "You know, two monkeys tied to each other in a cage." She added, "That's asking people to create the kinetic illusion of conflict so that we enjoy the sparring and nobody learns anything." But she still believed there were insights to be found on the right. In the show's early days, she invited on Pat Buchanan, the paleoconservative three-time presidential candidate who was an MSNBC contributor at the time, for a regular segment called "It's Pat," where she called him her "fake uncle" and drew him into friendly debates.

As her show developed, "I decided that I wouldn't put anybody on TV who I didn't feel like I could honestly and wholeheartedly recommend to my audience that they were worth watching," she said. Only occasionally does she invite partisan pundits on to opinionate; her interview subjects are more typically reporters, politicians and bureaucrats. But Maddow rarely hosts conservatives on the show these days, because the ones she is willing to invite are not willing to come. This dynamic has intensified under the Trump administration. "We definitely went through — not soul searching — but like, a kind of gut check about covering statements from the White House." In late 2016, Maddow had Kellyanne Conway on the show. Conway appealed to Maddow because she was highly professional, kind to the staff, reliable and willing. "Then she'd come on the air, and she would just say stuff that isn't true," Maddow said. "And yet I'm giving her, literally, a microphone attached to her dress so that she can say things to the American people under a banner that says 'The Rachel Maddow Show.'"

Maddow's staff also reassessed whether they should cover the stuff coming out of the president's own mouth. They came up with a new framework for defining their approach: "Watch what they do, not what they say." Trump is rarely quoted or shown onscreen; instead, she interprets his actions.

All this has made her program among the most hermetically sealed on cable television. Nicolle Wallace, who served as George W. Bush's communications director and now hosts her own show on MSNBC, has made a similar calculation and has said she is "triggered by the use of the White House property" for "spewing hate speech" and "lies." While Wallace is motivated by moral outrage, Maddow made the decision reluctantly and against her own impulses. "It pains me," she said. "It makes me mad — still."

Since Trump's inauguration, an anxiety has arisen among the media commentariat over Maddow's role. When NBC selected her to help moderate the first Democratic presidential debate, Farhi raised an eyebrow. The Times distanced its reporters who cover political subjects from her program over what it viewed as a "sharply opinionated" orientation. But these critiques do not track with her sense of self. She

**Page 23**

votes in Massachusetts, where she and Mikula retreat on the weekends, but says she registers a party affiliation only shortly before the primaries and then unregisters shortly afterward. She declined to ask anyone to write a blurb for "Blowout" because she considers the process ethically compromising. It's better, in her business, not to feel as if she owes anyone a favor.

[ "Blowout" was one of the Book Review's 18 most anticipated titles of October. See the full list. ]

She is studiously objective about the outcome of the Democratic primary race: "There's no current in me that I have to swim against in order to do that," she said. Politicking is her subject, not her game. "I'm not trying to get anybody elected. I'm not trying to get any policy passed. I'm not trying to get people to call their member of Congress," she said. "I'm trying to explain what's going on in the world."

**When Maddow's old** debate partner Tucker Carlson, who hosts the 8 p.m. hour over on Fox News, goes off the air, he told me, he often walks out the back of his studio and into his office, where he catches the beginning of Maddow's show. In the TV news business, Maddow is known for her unique approach to the "A block," the opening act of the show before it cuts to commercial break. Rarely does she lead with the news. Instead, she backs into it, charging into a tale of some seemingly unrelated historical anecdote or long-lost news figure that zags unexpectedly toward a news peg. As her show dilates time, it imbues the day's news with a sense of world-historical climax. The day after the sitting president was targeted for impeachment, one of her chyrons read, "LEAD PROSECUTOR IN AGNEW CASE WAS REPUBLICAN GEORGE BEAL."

Recently, as Carlson was taking off his makeup and chatting with producers, they turned the volume up and watched her for 15 minutes, transfixed. "It was a legitimately esoteric story," he told me in a tone of genuine admiration. "It was about Donald Trump's campaign plane or something. I never fully understood the point she was making, but I found it totally compelling."

Maddow essentially delivers an essay every night before moving into interviews and shorter blocks of analyses, all of which she writes with the help of a team of producers. She has called herself "the hermit of Rockefeller Center": While other personalities stalk the halls, seeking influence over network politics, she is holed up in her office writing, pausing only to conduct the daily production meeting, where she and her staff map out the day's show.

On the afternoon of Sept. 23, shortly after the Ukraine story broke, a couple of dozen staff members pooled into a corner of the office and waited for Maddow to emerge. They present as a humble assembly of New York's high-achieving news geeks. "It feels like a library up there," Phil Griffin, the president of MSNBC, told me. "I hate to go up there and disrupt the focus." There are scratchy carpets, piles of books, walls papered with inside jokes. A dusty life-size wax figure of Dwight D. Eisenhower is seated in a fisherman's hat at a receptionist's desk. On the wall is a poster of "Trump Organization Projects and Partners," over which has been tacked the image of Carrie Mathison, the "Homeland" C.I.A. officer known for her paranoid conspiracy walls and unhinged (but often on-point) investigations. Behind a warren of cubicles, a snaking list of dozens of potential topics to cover was carefully written in marker on a large white wall. At 2:45, Maddow crutched in silently, stood with her back to her staff and observed the list, drawing a thick black line next to topics that interested her.

Though this was the day before an announcement of an impeachment inquiry — a moment Maddow had been gesturing toward for several years — she did not dig into the whistle-blower story right away. Instead, she made her way through a pile of unrelated issues: a protest in Kashmir, Elizabeth Warren's electability, changes to the Democratic National Committee's debate thresholds. Even in the meeting, even on that day, she took her time to get to the news.

In this setting, her loose, silly charisma sharpened into a steely deadpan. She operated with an almost Socratic method, quizzing her staff on the sourcing and suppositions undergirding the day's news. As in a classroom, some producers spoke a lot, and others just listened. Maddow moved to Trump and Ukraine 20 minutes in. She wrote a series of letters, A to F, on the wall and began filling out the blocks of the show.

"I think the Ukraine thing is a very big deal," she told her staff. "I don't know how to do it in a way that increases the amount of useful information in the world." And the current twist in the story — the nondenial denials from Trump and Giuliani — "falls under 'Thing president has said.'" Even the biggest story of the Trump presidency would not move her to deviate from the carefully honed standards she had set for herself. But eventually, after weighing their options, Ukraine rose into the A-block slot, and Maddow drifted toward her office. She had five hours to write the thing.

That night, Maddow wove a narrative that capably connected Trump's new scandal to the one he had just shaken off. It would jump-start a week of renewed interest and faith in her show, with viewers sharing popcorn-eating GIFs on Twitter as they tuned in en masse. The New York Times had reconsidered its stance, and its reporter Michael Schmidt went on as a guest two nights in a row. But by the end of her 25-minute monologue, I found myself struggling to keep up with the class. I paged back through my notes, trying to keep all the Ukrainian figures and their Trump links sorted. Later in the program, Maddow brought on Representative Elaine Luria, a moderate Democrat from Virginia who had just co-signed a Washington Post op-ed calling for an impeachment inquiry, and asked her why she was coming out for impeachment now. "This is a clear and concise instance that the American people can understand where the president of the United States has tried to enlist foreign influence in our election process," Luria said. Then she said it again: "clear and concise."

**After her show** one evening, Maddow and I shared a car to Raoul's, a French bistro in SoHo. She shimmied into a brown leather booth and lamented the time suck of her dumb hurt ankle. Between writing her book, making her show and reporting to physical therapy, she had no time to herself. "I'm realizing now — 10, 11 years into this — that it's fine to work long days," she told me. "But it's not good for you to work incessant long days, five days a week, 50 weeks a year for 10 years."

Early in Trump's presidency, Maddow bumped into Carlson at a gala for the Theodore Roosevelt Conservation Partnership, which supports outdoor recreation. Maddow and Carlson are about the same age — she's 46, he's 50 — and they each go fly-fishing to wipe the news from their brains. "It turned out we had both thrown our backs out within one week of each other, with neither of us having ever had a back problem ever before in our entire lives," she said. "I had the gift of a very human-to-human, eye-contact moment with him, like: 'We're both doing this thing that's killing us, and killing us at the same pace.' "

But also, I said, it's almost as if she and Carlson are parallel-universe versions of each other, so that if he strains his back, hers hurts, too. She laughed and said, "Exactly."

Cable news in 2019 feels a little like the Hieronymus Bosch painting "The Garden of Earthly Delights." On one channel, Trump presides over a landscape of harmonious abundance. On the other, he is leading American democracy into a miserable hellscape. (Betwixt them is a scene of sordid copulation: No matter where you stand in the cable-news wars, Trump is a lucrative story.)

Even as Maddow was unspooling the Ukraine story on her show, Hannity was just a remote click away, weaving his own narrative about "sleepy, creepy, crazy Uncle Joe" and his son Hunter Biden. "We are going to go chapter and verse very slowly," Hannity said. "You will understand it. It gets a little complicated, but we've got the timeline down perfectly. The story they won't tell you in the media." As Maddow's ratings rose, his did too.

The worlds of Fox News and MSNBC don't operate under the same logic, or even speak the same language. Hannity has mounted the president's podium at a rally, and he has the president's ear. Last week, Trump tweeted out a Hannity clip as self-defense that featured a scrolling list of "PRESIDENT TRUMP'S ACCOMPLISHMENTS." But Maddow is uninterested in cultivating such power relationships. She does not see herself as a leader of the left or an adversary of Trump in any way.

If Fox News anchors style themselves as generals in the culture wars, Maddow views herself as an observer peering in on the action. And while Fox News enlists its audience to join the fight, she moves her viewers to see themselves as storytellers, too. "I hope that if you watch my show," she told me, you'll acquire a set of "good, true stories about what's going on and why it matters."

After Rebecca Kee bought her Maddow cardboard cutout, she got a Robert Mueller one, too. For a time she would sit him in her front window, posing him near speech bubbles that she wrote herself. But after the real Mueller filed his report and failed to step into the role she had imagined for him, she tucked him away in the closet with Maddow. Now her car is decorated with Elizabeth Warren bumper stickers.

This summer, in the calm before the storm, I sat with Maddow in her office, and we discussed the perception, from both her fans and her critics, that she is a player in all this drama. "If anyone's counting on me to make anything happen in the world," she told me, "I am a bad thing to count on."