1                   United States District Court

2              for the Southern District of California

3                                    )
4    HERRING NETWORKS, INC.,         )
                                     )   No. 19cv1713
5         Plaintiff,                 )
                                     )   May 19, 2020
6              v.                    )
                                     )   San Diego, California
7    RACHEL MADDOW, et al.,          )
                                     )
8         Defendants.                )
                                     )

9

10              TRANSCRIPT OF MOTION HEARING
             BEFORE THE HONORABLE CYNTHIA BASHANT
11                United States District Judge

12   APPEARANCES:

13   For the Plaintiff:      MILLER BARDONDESS, LLP
                                 LOUIS MILLER
14                               AMNON ZVI SIEGEL
                                 Attorneys at Law

15   For the Defendant:      GIBSON, DUNN & CRUTCHER LLP
16                               THEODORE JOSEPH BOUTROUS, JR.
                                 SCOTT ALAN EDELMAN
17                               THEANE E. KAPUR
                                 Attorneys at Law

18

19

20

21   Court Reporter:        Dana Peabody, RDR, CRR
                             District Court Clerk's Office
22                           333 West Broadway, Suite 420
                             San Diego, California 92101
23                           DanaPeabodyCSR@gmail.com

24

25

1              San Diego, California, May 19, 2020

2                        *   *   *

3         THE CLERK:  Good morning, Judge.

4      This is Stephanie, the judge's court clerk.  I'm going to

5    go ahead and give a brief admonishment regarding the

6    proceedings today.

7      Just so you know, the normal rules of courtroom decorum

8    apply, and only counsel is able to provide argument.

9      We ask that any members of the public or media mute their

10   phones and that they remain muted.

11     No recordings of the proceedings are permitted, and if you

12   would like a copy of the transcript, you may contact

13   Dana Peabody, who is our wonderful court reporter, who is on

14   the line, and you may contact her for any transcript of the

15   hearing.

16     And, counsel, if you can also after I call the case, if you

17   could state your name and your appearance slowly for the

18   record, and each time before you speak if you could state your

19   name as well just because our court reporter can't see you.

20     With that, I'm calling matter Number 1, 19cv1713, Herring

21   Networks, Inc., versus Maddow, et al., on calendar for motion

22   hearing.

23         THE COURT:  Counsel, state your appearances for the

24   record, please.

25         MR. MILLER:  Sure, Your Honor.  Good morning.  This is

1  Skip Miller.  I'm representing the plaintiff, Herring Networks,

2  along with my partner, Amnon Siegel, who's going to be doing

3  the argument this morning.

4          MR. SIEGEL:  Good morning, Your Honor.  This is

5  Amnon Siegel.

6          THE COURT:  Good morning.

7          MR. BOUTROUS:  And good morning, Your Honor.

8  Theodore Boutrous for the defendants, and appearing with me

9  today are my partners, Scott Edelman and Theane Evangelis.

10         THE COURT:  Good morning.  I should make it even

11 clearer, I think, than my courtroom deputy did.  I am ordering

12 that everyone else on the line other than the lawyers mute

13 their phones.  I appreciate everyone appearing by phone.  We're

14 kind of in unprecedented territory here, so we're doing these

15 hearings by phone, and if you don't have muted background for

16 the rest of you, then we get dogs barking and radios playing,

17 and it makes it difficult for all of us to hear.  So I am

18 ordering that all of you mute your phones so I can hear the

19 lawyers in this case.

20     Just so you know, I've read the defense's motion and the

21 plaintiff's response as well as the defendants' reply.

22     I don't think there's any question that the contested

23 statement was one arising from protected activity.  It was

24 First Amendment free speech, so the burden shifts to the

25 plaintiff to establish a probability of prevailing on the

1   claim.

2       My understanding is that plaintiff does not take issue with

3   most of what Rachel Maddow said during the broadcast.

4   Kristian Rouz is paid by Sputnik, which is a kremlin-owned news

5   wire.  Mr. Rouz also reports for OAN.

6       The only statement challenged by the plaintiff is Maddow's

7   statement at the end of the segment that, quote, the most

8   obsequiously pro-Trump right-wing news outlet in America really

9   literally is paid Russian propaganda.

10      And my understanding is OAN says this is false, it is not

11  paid Russian propaganda, even if it does have a staff reporter

12  who writes simultaneously for Sputnik.

13      And the real question I have is whether this was a

14  statement of opinion given the whole context of the statements

15  or one of fact.

16      So I think I would like to hear -- since it's defendants'

17  motion, I think I'd like to hear from the defendant first.

18          MR. BOUTROUS:  Thank you very much, Your Honor.  This

19  is Theodore Boutrous for the defendants.

20      And you've laid it out exactly right I think in terms of

21  the posture of the case.

22      And we believe the Court should grant the motion to strike

23  and dismiss the case because this is exactly the kind of

24  legally baseless defamation lawsuit targeting truthful speech

25  and opinion about a public issue that California defamation law

1  in its First Amendment and the anti-SLAPP statute forbid, and

2  the six-word phrase, as the Court noted, is the only contested

3  statement in the piece.  It was both true, and it's a classic

4  example of nonactionable opinion based on truthful disclosed

5  facts.

6      And I don't think I've seen a case where there has been

7  more Ninth Circuit decisions that directly support us that the

8  other side has not grappled with.

9      The Partington versus Bugliosi, the Dodds case, Yagman,

10 Gardner, Knievel all make clear that where this -- someone is

11 making -- is commenting and making assessment about truthful

12 facts that are disclosed, then, that is protected by the First

13 Amendment, and that's --

14         THE COURT:  Let me interrupt you for a minute.  If

15 it's susceptible to different constructions, does that mean

16 it's a jury question, and is this statement susceptible to

17 different constructions?

18         MR. BOUTROUS:  No, Your Honor, it is not, in the sense

19 that it is commentary and opinion, but it's also based on

20 disclosed facts.

21     And so first of all, the article, the Daily Beast article

22 itself, which is not being challenged here, says literally,

23 Your Honor, and I'm using "literally," "Kremlin propaganda

24 sometimes sneaks into Rouz's segments on unrelated matters in

25 the OAN broadcast."

1    And then the article itself says that there's Kremlin

2  propaganda in his stories.  And that's the article that was the

3  subject of the story.

4    And so here the key, Your Honor, that I think is

5  the -- there are many fatal flaws in this claim.  One, it was

6  absolutely clear this was a story and a commentary and

7  Ms. Maddow's take on this Daily Beast story.  So that's what

8  the whole segment was about.

9    And I'm sure the Court has watched the videos as well as

10  read the transcript, and she's giving her take in a

11  entertaining, somewhat critical of both President Trump, of the

12  network, and the key here is context.  That's the thing that

13  the plaintiff is ignoring.  And the Ninth Circuit has said it

14  over and over again that context is key.

15    And we hammered, as the Court probably noticed, that before

16  that statement and after that statement, multiple times,

17  Ms. Maddow said exactly what she was talking about.  She

18  said -- right before the statement about "literally paid

19  Russian propaganda," she says, "We literally learned today that

20  the outlet that the president is promoting shares staff with

21  the Kremlin."  And then she goes on, and she's kind of

22  chuckling while she's talking about it because, as she said,

23  it's a ridiculous, astonishing story.  So she's expressing her

24  opinion and her view.  And then she makes the statement about

25  paid Russian propaganda as the introductory statement to the

1    following statement, which plaintiff never addresses.   She

2    says, "Their on-air U.S. politics reporter is paid by the

3    Russian government to produce propaganda for that government."

4    She doesn't say for OAN.   She doesn't say they committed

5    treason.   She says exactly what she's talking about when she

6    made the "paid Russian propaganda" statement.   So I don't think

7    it's open to more than one interpretation.

8         And as for the jury question, again, the Ninth Circuit made

9    very clear, the supreme court has made clear, this is the pure

10   legal question under the First Amendment and under California

11   law.   Is this capable of defamatory meaning when looked at in

12   context?   And context is key.   Plaintiffs don't address the

13   fact that she says repeatedly what the story is about, what

14   she's referring to, this remarkable situation where you have

15   the reporter for OAN using Russian propaganda on the air, as

16   the Daily Beast reported, being paid by Sputnik, which, as the

17   Court knows, and as Ms. Maddow reported, and the Daily Beast

18   reported, was deemed to have participated in the interference

19   by Russia using propaganda in the election in 2016 and was

20   required to register as a foreign agent of the government, an

21   obviously important public issue, so the network

22   President Trump has pointed to and told people to watch, so

23   she's giving her take.

24        And I think it's completely accurate and truthful, her

25   take, and if people disagree with it, and that's the thing

1   about the opinion doctrine, Your Honor, as the Ninth Circuit

2   has said, that, you know, where you have commentators who lay

3   out the facts that they're relying on to make their assessment,

4   then others can agree or disagree with it because they know the

5   full facts, which they did here, and they hear what the

6   commentator's views are of those facts.

7        And again, the Knievel case is a good example on the jury

8   question, that they made the same argument there, that this

9   should go to the jury, and the Court said no, we've looked at

10  the context, this is a legal issue, it's a First Amendment

11  issue, and we can rule on this based on 12(b)(6).

12             THE COURT:  Okay.  Thank you.

13             MR. BOUTROUS:  If I could just amplify on two

14  questions and maybe just address a couple of the plaintiff's

15  arguments and then turn it over.

16        On the context point, I want to go back to this.

17  Plaintiff's brief doesn't talk about any of the other

18  statements or the whole overall program, and again, the

19  Ninth Circuit in the Norse case said that the defamatory --

20  alleged defamatory statement must be judged not in isolation

21  but within the context in which it is made.  That's a quote.

22        Then Judge Kennedy in the Koch case, soon to be

23  Justice Kennedy, said, "Context does resolve the matter when

24  we're looking at commentary and political debate and

25  discussion."

1    The Information Control case said, "The Court must consider
2    all the reviews, not merely a particular phrase or sentence."
3        And the Knievel case said, "Context is paramount in our
4    analysis."
5        The plaintiffs do not address that.  They ignore the
6    context, and they focus on the six words.
7        They submitted this expert report, which I think shows the
8    desperation here, an 18-page, single-spaced analysis of six
9    words, basically.  It's impermissible, as we argued, because
10   this is a motion to dismiss.
11       Planned Parenthood says that this is viewed under the
12   12(b)(6) standards, and so that should not be considered, but
13   even it's irrelevant, and this is a legal question for the
14   Court, so that expert is invading the province of this Court if
15   you were to consider it.
16       And then on the use of the word "literally," Your Honor,
17   what she said, as we argue, it's true.  It's characterizing
18   what is in the Daily Beast article.
19       And, as I said, the article itself not only made the
20   statement I mentioned about propaganda sneaking into Mr. Rouz's
21   pieces for OAN, but it quotes an FBI agent who said that this
22   completes the merger between the Kremlin's official propaganda
23   outlet -- excuse me -- completes the merger between Russian
24   state-sponsored propaganda in American conservative media.
25       So Ms. Maddow was giving her take on the disclosed facts of

1    the Daily Beast article, which is not challenged here, and all

2    those cases I mentioned say that's protected.

3         And then finally, Your Honor, what the plaintiffs are

4    trying to do is put words in Ms. Maddow's mouth.  She did not

5    say that they committed treason.  Even if she had, it's in a

6    rhetorical, hyperbolic way.  Under cases like Letter Carriers

7    and Knievel, Letter Carriers it was traitor, and the supreme

8    court says, well, everyone knows that's not what they meant

9    when they used that word.  But she didn't use that word.  She

10   didn't say that Russia owned OAN.  She just repeated what the

11   Daily Beast said.  They employ the same person, which is a

12   remarkable fact.  And she didn't say that he was being paid for

13   stories on OAN by Russia.  She reported exactly what the

14   Daily Beast said, that they both employed or paid the same

15   person, and that's the gist of the story.  It was all laid out,

16   and she was offering commentary about this important political

17   and policy issue.

18        So we believe it's fully protected speech, important

19   speech, and the Court should grant our motion.

20            THE COURT:  Okay.  Thank you.

21        Mr. Siegel.

22            MR. SIEGEL:  Thank you, Your Honor.

23        I think the primary argument that we're hearing from the

24   defendant is that this was opinion based on disclosed facts.

25   And I think the problem with that argument is that -- and we

1    see this out of the D.C. Circuit in Competitive Entertainment

2    Industries versus Mann, that recent decision, that if the

3    statement itself is factual and not opinion or can be

4    reasonably interpreted as factual and not opinion, then you

5    don't get into this it's-opinion-based-on-fact analysis because

6    the statement could be interpreted as fact.  And we believe

7    that to be the case here.  This is a statement that certainly

8    is provably false, that can reasonably be interpreted as a

9    statement of fact and not as opinion, and I think the problem

10   with putting this statement in between other disclosed facts

11   doesn't make it less likely for people to believe it to be

12   fact, but in fact, makes it more likely for a reasonable viewer

13   to interpret the statement as being one of fact.

14          THE COURT:  What about the overall context of it?  I

15   mean, it's clearly her show, she's stating fact and then giving

16   her opinions about those facts.  The way she does it, I mean,

17   she kind of laughs through it, and, "This is a sparkly story,"

18   and she's -- what about the overall context where she outlines

19   what the facts are before she gives an opinion about them?

20          MR. SIEGEL:  I think the fundamental problem is that

21   she does not make it clear that she's giving an opinion when

22   she states very clearly and very firmly that One America News

23   is really literally paid Russian propaganda.  That's not an

24   equivocal statement.  That's not a statement -- it's not

25   couched in any way.  It's not framed in any way.

1        In fact, when she wants to give her opinion or assessment,

2   she knows how to do it, and throughout this very segment, she

3   does so.  She does rhetorical questions like, "What?"  Or, "I

4   mean," she'll start off sentences with "I mean" or "we expect,"

5   she says it three times, "we expect," which makes it a little

6   more clear that she's providing her assessment or her opinion.

7   She says in another place, "You know, I guess," which is

8   another way to do it.  And these opinion markers are important,

9   and they matter.

10        In fact, in the Dickinson versus Cosby case out of the

11  California Court of Appeal, we see the Court analyzing is there

12  a way for a reasonable viewer or a reasonable listener to be

13  able to distinguish between when the person is providing stats

14  and opinions?  Do they use -- do they couch their phrases?  Do

15  they use those opinion markers or not?  And here we don't see

16  any of that.  Instead, the statement is made very firmly, and

17  it's made in between other factual statements, as I said,

18  making it more likely for a reasonable viewer to interpreter it

19  as fact.

20        And I would point out that even if the -- even if

21  the -- even if it was opinion for a moment, even if we were to

22  indulge that, that it was opinion based on disclosed fact, the

23  supreme court in the Milkovich case says -- and this is a

24  direct quote from Milkovich.  It's 497 U.S. 1 at page 18 to 19,

25  1990 case.  Quote, even if the speaker states the facts upon

1   which he bases his opinion, if those facts are either incorrect

2   or incomplete or if his assessment of them is erroneous, the

3   statement may still imply a false assertion of fact.

4       So I don't think that the statement is one of opinion, and

5   I think we submitted enough to satisfy the legal standard that

6   a reasonable juror could potentially interpret this one, this

7   statement, as a statement of fact.

8       But even if it were, her opinion is clearly erroneous, and

9   there's absolutely no evidence to support it, and that's not

10  what the Daily Beast article was about.  Ms. Maddow went well

11  beyond what the Daily Beast article was about.

12      As to Professor Gries' opinion, the linguist, you know,

13  using corporate linguistics and using actually a technology --

14          THE COURT:  I have to tell you, I don't really find

15  the expert's opinion very helpful.  I mean, first of all, I

16  don't think it's appropriate for me to consider it at this

17  stage the motion to dismiss; and second of all, you know, it's

18  my call on this issue, and I found the expert's statements to

19  be largely irrelevant, frankly.  But you can make your pitch,

20  but I don't find it necessarily helpful.

21          MR. SIEGEL:  I would like to respond to your point

22  about whether you can consider it or other evidence at this

23  point.

24      I think there's an improper cobbling together by my

25  opponent of what the law is on these anti-SLAPP motions and

1   where the collision is.  And I think they've misstated the

2   standard, and they've gone too far.  And I will explain to you

3   why I think that is.

4       In Planned Parenthood, the Ninth Circuit in 2018 said that,

5   "When an anti-SLAPP motion is brought challenging just the

6   legal sufficiency of the pleadings and not the factual

7   sufficiency, a plaintiff is not required," and the Court uses

8   "required" in numerous places -- "plaintiff is not required to

9   submit evidence."  And the reason why the Court made that

10  decision, the conflict or the collision with the Federal Rules

11  of Civil Procedure is that requiring a plaintiff to present

12  evidence without accompanying discovery in this early motion to

13  strike, the anti-SLAPP motion, would essentially transform the

14  motion into a motion for summary judgment without providing any

15  of the procedural safeguards that have been firmly established

16  by the Federal Rules of Civil Procedure; namely, Rule 56.

17      And that was the collision the Court was worried about.

18  The Court was worried about protecting plaintiff whose cases

19  might be dismissed and ensuring those plaintiffs had certain

20  procedural safeguards that the Federal Rules of Civil Procedure

21  provided.

22      I do not believe, and I don't think it's reasonable to

23  interpret that case as saying, that a plaintiff is prohibited

24  from submitting evidence in opposition to an anti-SLAPP motion,

25  and as the Court knows.

1     So I don't think there's any conflict here, and I don't

2    think it's improper for the Court to consider evidence.  I

3    think, in fact, it would be improper to not consider or strike

4    the evidence at this point.

5     And then, as the Court knows, even if we treat this as a

6    12(b)(6) motion, if the Court does consider evidence, it

7    converts the motion into -- or can convert the motion into a

8    motion for summary judgment.

9     So I do believe the evidence is properly before the Court

10    and can be considered.  That's my pitch on that.

11     I won't go into the details of professor Gries because I

12    think your court has expressed -- you've expressed your opinion

13    on that.

14         THE COURT:  My opinion.

15         MR. SIEGEL:  One point on Professor Gries' statement

16    because I do think corporate linguistics does go beyond some of

17    the exercises that we're going through because he's able to

18    look, and what he did look at was how the term "really

19    literally" is used in other American talk shows.  And he says

20    that the term "really literally" based on his research almost

21    always precedes an actually true statement.  And I think that's

22    important.  I do think that's something that's a little bit

23    different than the analysis the Court is undertaking, though I

24    do agree that it's certainly your call at the end of the day.

25     But again, the Court has a limited gatekeeper function in

1   these cases.  The gatekeeper function is to determine whether

2   the statement unambiguously constitutes a statement of opinion.

3   But whereas here, we believe the statement could have been

4   understood by the average listener as having been one of fact,

5   and the issue has to be left up to the jury's determination.

6   And those cases are up and down the federal and state courts.

7   In fact, we have many cases which are reversing trial court

8   grants of directed verdicts and motions to dismiss and

9   anti-SLAPP motions and summary judgment motions on this very

10  issue.  And we even have courts of appeal saying things like,

11  maybe the trial court's right that a reasonable interpretation

12  of this statement is that it was opinion.  But it's also

13  possible that a reasonable viewer would interpret it as a

14  statement of fact, and because of that, we have to leave this

15  up to the factfinder.

16      So it is a question of law in the initial sense unless

17  there's any ambiguity.

18      And so there are lots of examples of this up and down the

19  federal and state courts.  The Ninth Circuit in Manufactured

20  Home Communities have reversed the district court, granted a

21  SLAPP motion for this reason.  Unelko versus Rooney.

22  Andy Rooney, a very famous political commentator and satirist,

23  did a 60 Minutes piece, and the Ninth Circuit found, reversing

24  the grant of a motion for summary judgment, that it could be

25  interpreted as a statement of fact notwithstanding the humorous

1    and satirical nature of the rest of the piece.

2         So just because the rest of the piece may have some humor,

3    some satire, some over-the-type hyperbole, does not immunize

4    the defendant from potential liability from defamation.

5              MR. BOUTROUS:  Your Honor, may I briefly address a few

6    of those points?

7              THE COURT:  Sure.

8              MR. BOUTROUS:  This is Mr. Boutrous.

9         First, let me start with the Rooney case.  There the

10   statement that was challenged was a purely factual one, that he

11   had tried a product and the product didn't work, and the Court

12   said he was making a factual statement, so it's nothing like

13   this case.

14        Second, Mr. Siegel's suggestion that because there was a

15   factual element to Ms. Maddow's statement that the opinion

16   doctrine doesn't apply, that's just incorrect.  All of the

17   opinion cases involve a factual statement -- a statement

18   of -- that conveys an assessment of the facts, so that someone

19   was a traitor, that Evel Knievel was a pimp, that the author in

20   the Norse case was unpublished, so that's always part of the

21   inquiry.

22        The question is, what did the facts -- the surrounding

23   context tell us?  And you're right, Your Honor, the context of

24   this program, it's a program that does convey news and

25   Ms. Maddow's assessment and commentary on the news.  And you

1   put your finger on it.  Her entire tone.  She's chuckling,

2   she's, you know, mocking the whole situation for its absurdity

3   in a sense.

4        And again, the Ninth Circuit cases, it's a line of

5   authority that we've relied on, is overwhelming, and they state

6   the same.  The Dodds case versus ABC said -- and, again, states

7   the general rule:  "An opinion based on an implication arising

8   from disclosed facts is not actionable, and the disclosed facts

9   themselves are not actionable."  And Mr. Siegel said

10  Ms. Maddow -- he criticized her for not framing her -- I think

11  were the words he used -- not framing her statement.  She

12  absolutely framed it with the exact language from the

13  Daily Beast article that states that the point she's making

14  when she says this is literally -- "really literally paid

15  Russian propaganda," that's introducing the next sentence that

16  says, "They're employing a guy who works for Sputnik to produce

17  Russian propaganda for that government."  So it's absolutely

18  clear.

19       On the 12(b)(6) standard, I think Mr. Siegel, respectfully,

20  is just misreading it.  The Court said -- the Ninth Circuit

21  said, "The defendant has the option of invoking an anti-SLAPP

22  statute in federal court at a motion to dismiss challenging the

23  legal sufficiency of the complaint," which is what we're doing,

24  and these are legal questions, all those Ninth Circuit cases,

25  including the Cochran case with Judge Wardlaw, which was then

1    adopted by the Ninth Circuit, the plaintiff can't convert it
2    into a summary judgment motion.  That would mean the defendants
3    could never file a motion to dismiss.  The defendant can -- if
4    they cite things outside the record, can.

5        And so the Ninth Circuit said that there's a pleading
6    challenge, which is what we are making here, and there's
7    just -- there's no legal basis for this claim.

8        And I think I heard Mr. Siegel say that even if it was
9    opinion, it could be wrong.  Well, that really is a problem
10   because, as the supreme court has said, you know, there's no
11   such -- once we're into the opinion world, and Girks, I think
12   it was, the Court said, you know, there's no such thing as a
13   false opinion.  And I mention that the language from -- you
14   know, I think the Yagman case, maybe I didn't mention it --
15   where the Court said that the way to respond is that the reader
16   or viewer can make their own assessment.

17       I disagree with that.  I don't think that is paid Russian
18   propaganda.  It was all laid out.  We -- and the Court clearly
19   watched the broadcast, but we have a screenshot from the video
20   on page 5 of our reply brief.  The pullout, it's the
21   Daily Beast title, "Trump's New Favorite Channel Employs
22   Kremlin-Paid Journalist" and a pullout quote there that says,
23   "One of the on-air reporters at the 24-hour network is a
24   Russian rational on the payroll of the Kremlin's official
25   propaganda outlet."  And if you look at that Daily Beast

1   article, it goes through reports by Mr. Rouz that were just,

2   you know, fabrications that incorporated Russian propaganda.

3        So this is the essence of both truthfully reporting on

4   facts -- none of those facts have been challenged by the

5   plaintiff, and giving her assessment of its remarkable

6   significance in commenting on it in a colorful way and talking

7   about it, as the Court noted, "sparkly stories," "giblets

8   dropped from the gods," and it's all right there.  She does not

9   hint or suggest she did some independent reporting or that she

10  has any other information.  It was a story about the

11  Daily Beast story, and she's crediting the Daily Beast reporter

12  for sussing out this amazing story.  That's all it was.  It was

13  truthful.  It was her assessment of it.

14       And for all those reasons, the Court should grant the

15  motion to strike and dismiss the case and award the defendants

16  their attorney's fees.

17            THE COURT:  Anything further?

18            MR. SIEGEL:  Your Honor, one more point on "really

19  literally."  This is Mr. Siegel.

20       You know, I do think the use of the term "literally," and

21  she uses it earlier in the story as well to mean literally in

22  the literal sense, and the use of the term "really literally"

23  here, especially when we look at how Ms. Maddow normally uses

24  the term "literally" because, again, we have to think about it

25  from the sense of a reasonable viewer that watches her show,

1    and so we provided that evidence of how she uses the term

2    "literally" regularly here, and here she uses "really" to

3    emphasize that she means "literally."  The alternative

4    definition provided and relied on by the defendants here is

5    that "literally" means figuratively or something used in an

6    exaggerated way to emphasize that a statement is not literally

7    true or possible.

8         Well, again -- and the example from Merriam-Webster is kind

9    of telling here, the very definition that the defendants rely

10   on.  The example is, you know, "This is going to turn the world

11   upside down."  "This is literally going to turn the world

12   upside down."  And obviously, that's not literally possible,

13   and it's used as a form of exaggeration, but here saying

14   "really literally paid Russian propaganda," she's not using it

15   to describe something that is not literally possible or

16   impossible by the laws of physical nature.  She's using it in

17   the more traditional and the predominant use of the word, which

18   is "literal, actual, to emphasize the truth or accuracy of the

19   statements."  And she doesn't couch it in any way.

20        And the fact that she follows it with another truthful

21   statement, as I said, does not make it more likely that a

22   viewer is going to think she's just providing her assessment or

23   opinion.  They're going to think it's part of the true

24   information that she's reporting.  So I do think that's

25   important.

1    And then we have one piece of evidence we submitted where

2    one viewer thought it was true, and that was attached as

3    Exhibit A to the declaration of Charles Herring.

4         MR. BOUTROUS:  If I can just address that point very

5    briefly, Your Honor, again, you know, the "really literally"

6    was meant to emphasize and lead into -- yeah, it was her

7    expression of, you know, astonishment, somewhat amusement, the

8    absurdity of the situation.

9         First of all, here's what the Sputnik -- the Daily Beast

10   article begins with this statement:  "If the stories broadcast

11   by the Trump-endorsed One America News Network sometimes look

12   like outtakes from a Kremlin trolling operation, there may be a

13   reason.  One of their on-air reporters at the 24-hour network

14   is a Russian national on the payroll of the Kremlin's official

15   propaganda outlet, Sputnik."  And by saying "really literally,"

16   Ms. Maddow is saying she -- this is basically Russian

17   propaganda that's, you know, by a reporter.  So I think that

18   was her view, that was her assessment, and I believe that she

19   was relying on truthful facts from the Daily Beast article that

20   haven't been challenged, and the Ninth Circuit makes very clear

21   that viewers can make their own assessment.  Do they agree with

22   her?  Do they disagree with her?  She disclosed all the facts.

23   And again, that sentence, that phrase, those six words, was

24   simply a lead-in.  She said -- she immediately, and, again,

25   Mr. Siegel doesn't even address it, even now.  I mean, I

1    called -- we've called him on this repeatedly, that the very

2    next sentence states specifically what she's referring to, that

3    he's being paid by Sputnik to produce propaganda for the

4    Russians.

5         Thank you very much.

6              MR. SIEGEL:  Can I make one more point?

7              THE COURT:  Rerererebuttal, but go ahead, Counsel.

8              MR. SIEGEL:  This is Mr. Siegel again.  I appreciate

9    it.

10        Just on the last point, the fact that we're having this

11   conversation, and then I hear Mr. Boutrous in his rebuttal or

12   rerebuttal, whatever number it was, mention the fact that,

13   well, Ms. Maddow, she was using the word "really literally" to

14   emphasize the absurdity of the situation or the remarkableness

15   of the situation, and again, the fact that, you know, the Court

16   cannot rely on the statements of defendants' counsel and

17   defendants' -- and counsel's interpretation, the question is

18   could a reasonable juror, could the Court, assess the truth or

19   falsity of the statement?  Can the truth or falsity of this

20   statement be proven, you know, to a jury?  And the answer is

21   absolutely, yes, it can be.  And it can be proven false.  And I

22   think the fact that we can go on and on having this discussion

23   of what she really meant and how she really meant it leads to

24   the inevitable conclusion that it has to be left up to the

25   factfinder.

```
 1        That's it, Your Honor.
 2            THE COURT:  Okay.  Thank you.
 3        The matter's taken under submission, and I will issue a
 4    written order, I hope, in the not-too-distant future.
 5        Thank you very much.
 6            MR. BOUTROUS:  Thank you very much.
 7            MR. MILLER:  Thank you.
 8            MR. SIEGEL:  Thank you.
 9                            ---oOo---
10
11                    C-E-R-T-I-F-I-C-A-T-I-O-N
12
13        I certify that the foregoing is a correct transcript from
14    the record of proceedings in the above-entitled matter.
15
16    Dated May 19, 2020, at San Diego, California.
17
18
19                        /Dana Peabody/
                          Dana Peabody,
20                        Registered Diplomate Reporter
                          Certified Realtime Reporter
21
22
23
24
25
```