THEODORE J. BOUTROUS JR., SBN 132099
  tboutrous@gibsondunn.com
THEANE EVANGELIS, SBN 243570
  tevangelis@gibsondunn.com
NATHANIEL L. BACH, SBN 246518
  nbach@gibsondunn.com
MARISSA B. MOSHELL, SBN 319734
  mmoshell@gibsondunn.com
GIBSON, DUNN & CRUTCHER LLP
333 South Grand Avenue
Los Angeles, CA 90071-3197
Telephone:  213.229.7000
Facsimile:   213.229.7520

SCOTT A. EDELMAN, SBN 116927
  sedelman@gibsondunn.com
GIBSON, DUNN & CRUTCHER LLP
2029 Century Park East, Suite 4000
Los Angeles, CA 90067-3026
Telephone:  310.552.8500
Facsimile:   310.551.8741

Attorneys for Defendants Rachel Maddow,
MSNBC Cable L.L.C., NBCUniversal Media,
LLC, and Comcast Corporation

UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| HERRING NETWORKS, INC., <br><br>      Plaintiff, <br><br>     v. <br><br> RACHEL MADDOW; COMCAST CORPORATION; NBCUNIVERSAL MEDIA, LLC; and MSNBC CABLE L.L.C., <br><br>      Defendants. | CASE NO. 19-cv-1713-BAS-AHG <br><br> **REPLY IN SUPPORT OF DEFENDANTS' MOTION FOR ATTORNEYS' FEES AND COSTS (Cal. Civ. Proc. Code § 425.16(c)(1))** <br><br><br> Action Filed:  September 9, 2019 <br><br> Judge:  Hon. Cynthia Bashant <br> Magistrate Judge: Hon. Allison Goddard <br> Courtroom 3B |

REPLY IN SUPPORT OF DEFENDANTS' MOTION FOR ATTORNEYS' FEES
AND COSTS

## I.   INTRODUCTION

Plaintiff Herring Networks, Inc. took a bet—it filed a defamation claim seeking more than $10 million in compensatory damages, plus punitive damages, against Rachel Maddow, MSNBC Cable L.L.C., NBCUniversal Media, LLC, and Comcast Corporation ("Defendants"), Compl. at 10—and lost.  Plaintiff did so knowing full well that its claim would be subject to an anti-SLAPP motion to strike that, if granted, would subject it to mandatory fees and costs pursuant to California Code of Civil Procedure section 425.16(c)(1).  Defendants prevailed, and now seek the fees to which they are statutorily entitled, in the amount of $347,244 in fees and $10,724.36 in costs, which pales in comparison to the significant monetary liability Plaintiff sought to impose.

In opposing Defendants' Anti-SLAPP Motion, Plaintiff spared no expense—it hired a linguistics expert to prepare a 17-page (single-spaced) report; submitted an *Ex Parte* Application to Supplement the Record; and filed over 100 pages of briefing, declarations, and exhibits.  Yet, Plaintiff nonetheless questions Defendants' efficacy, judgment, and strategy in prosecuting their Anti-SLAPP Motion.  Defendants employed the resources necessary to vindicate their First Amendment rights—and California's anti-SLAPP statute, including its fee provisions, were enacted for this very purpose—to help "secure the role of the press in a free society."  *Paterno v. Super. Ct.*, 163 Cal. App. 4th 1342, 1353 (2008).  Plaintiff cannot now avoid responsibility for the fees the anti-SLAPP statute plainly prescribes.

Unsuccessful oppositions to anti-SLAPP motions carry well-known consequences, consequences of which Plaintiff is well aware.  As Plaintiff's owner Mr. Herring himself acknowledged in response to the instant Motion for Attorneys' Fees and Costs, "No one wants to spend [this] kind of money [paying Defendants' fees], *but it is just a part of business*."  Declaration of Scott A. Edelman ("Edelman Decl."), Ex. A at 3 (emphasis added).  Defendants are entitled to recover their full fees and costs.

## II.   ARGUMENT

### 1.   Defendants' Counsel Devoted a Reasonable Number of Hours to This Dispositive Anti-SLAPP Motion.

Defendants seek recovery of fees for the 384.28 hours spent working on their Anti-SLAPP Motion, Motion for Attorneys' Fees and Costs, and related tasks.[1]   Courts broadly construe the recovery of fees deemed related to an anti-SLAPP motion to strike. *See, e.g.*, *Christie v. Lester*, No. 14-08993, 2015 WL 13439821, at *2 (C.D. Cal. June 15, 2015) (noting the hours deemed "expended in pursuit of an anti-SLAPP motion" are "broadly construed").   Where, as here, Defendants brought their anti-SLAPP motion as their first challenge to the complaint, all their attorneys' fees and costs incurred in connection with the case are deemed to have been incurred in relation to the anti-SLAPP motion.  *See Zwebner v. Coughlin*, No. 5-cv-1263, 2006 WL 8455423, at *2 (S.D. Cal. Jan. 25, 2006) ("In this case, granting the special motion to strike . . . dismissed all of plaintiffs' claims against defendant.  Thus, the entire lawsuit here is subject to the anti-SLAPP motion and, therefore *all attorneys' fees and costs expended in this case 'occurred in the context of, and were inextricably intertwined with, the anti-SLAPP motion.'*" (emphasis added) (quoting *Metabolife Int'l, Inc. v. Wornick*, 213 F. Supp. 2d 1220, 1223 (S.D. Cal. 2002)).[2]

Defendants' counsel immediately recognized Plaintiff's lawsuit as an unambiguous assault on Ms. Maddow's First Amendment rights, but that does not mean disposing of it took little time, or that Defendants were not entitled to put on their best defense to illustrate for the Court exactly why Plaintiff's suit fails.  Defendants' Anti-SLAPP

---

[1]  This figure now takes into account the 28.78 hours spent working on the Attorneys' Fees Motion and Reply in Support of Defendants' Motion for Attorneys' Fees and Costs from June 5 to the present.  The time spent working on this Reply is explained more fully in the Declaration of Scott A. Edelman.  *See* Edelman Decl. ¶¶ 5-8.

[2]  Plaintiff cites no support for its suggestion that Defendants should have tabled their fee motion—which they were invited by the Court to bring—until the conclusion of Plaintiff's appeal.  Of course, should Plaintiff pursue its appeal and if the Court's Order granting Defendants' Motion to Strike is upheld, Defendants will be entitled to seek their attorneys' fees and costs incurred in connection with the appeal.

Motion to Strike raised several pertinent and independent arguments, which each required substantial research.  This is evidenced by the enormous body of case law speaking to these issues.  Defendants' initial memorandum alone cites over 45 cases covering the subjects of protected opinion, defamatory meaning, and substantially true speech, pertaining to multiple different but interconnected defamation defenses and arguments.  Dkt. 18-1 at 3–5.  As Defendants' counsel Mr. Boutrous explained during the hearing on the Anti-SLAPP Motion, he has never "'seen a case where there has been more Ninth Circuit decisions that directly support Defendants' position.'"  Opp. at 4 (quoting the transcript of the May 19, 2020 hearing).  Plaintiff attempts to paint this quote as a concession that the hours Defendants devoted to the Anti-SLAPP Motion were unreasonable, but Mr. Boutrous' statement only underscores that the volume of research here was necessarily time-consuming.  Plaintiff may have preferred that Defendants cited fewer cases or made fewer arguments, but that self-serving statement is irrelevant to the present motion.  The substantial body of First Amendment, anti-SLAPP, and related defamation case law made defending Plaintiff's lawsuit more laborious, not less so.

The time spent working on the Anti-SLAPP Motion was only compounded by Plaintiff's improper submissions and distracting yet irrelevant arguments, all of which Defendants had to respond to.  Plaintiff spent extensive portions of its Opposition arguing about Ms. Maddow's education, analyzing her use of the word "literally" in irrelevant contexts, and studying Ms. Maddow's intonation and "markers."  *See* Dkt. 19 at 15, 18. It submitted three declarations, including an improper 17-page report from a professor proffered as a linguistics expert.  *See* Dkts. 19-1, 19-3, 19-6.  Defendants' counsel then had to respond to these various arguments and submissions in their Reply—all of which required additional research.  Plaintiff then made additional work for Defendants by filing an *Ex Parte* Application to Supplement the Record, which the Court rejected.  Dkt. 30 at 6.  Now that Plaintiff will be liable for the fees its lawsuit generated, it is trying to downplay the necessity of the work that lawsuit (with its significant monetary threat) caused.  Plaintiff cannot have it both ways.

Plaintiff's arguments trying to downplay the necessity of Gibson Dunn's work—which are supported and described in detail in the Declaration of Scott A. Edelman, Dkt. 35-2—bear no weight.[3]  Plaintiff complains Gibson Dunn's hours should be reduced because of the way it structured its team, and because of the unremarkable fact that the more junior attorneys on the team devoted the most time to working on the briefs.  Opp. at 10-11.  But Plaintiff's claims about Gibson Dunn's team structure show a fundamental, and curious, misunderstanding about how law firms work—the most junior attorneys on a team almost *always* spend substantial time researching and writing, and more senior attorneys then write, revise, and fine-tune those arguments.  Of course, if Gibson Dunn's most senior attorneys performed all of the work, its fees would have been higher.

Plaintiff's grievances about duplicative time entries are also meritless.  That multiple attorneys researched issues in relation to the Anti-SLAPP Motion does not mean they researched the same subjects or reviewed the same cases.  The detailed time entries submitted by Defendants' counsel, in addition to the case law cited in their briefing, show Defendants have met their burden to show the time expended was reasonable.[4]  *Premier Med. Mgmt. Systs., Inc. v. Cal. Ins. Guarantee Ass'n*, 163 Cal. App. 4th 550, 560 (2008) (holding 345 hours spent by counsel working on a joint motion to strike was reasonable); *Open Source Security, Inc. v. Perens*, No. 17-cv-04002, 2018 WL 2762637, at *7 (N.D. Cal. June 9, 2018) (granting reasonable fees for 446 hours, including for motions to strike).

---

[3]  Plaintiff's Evidentiary Objections to the Declaration of Scott A. Edelman, Dkt. 37-4, lack merit and are nothing more than a collateral (but baseless) attack on Defendants' Motion for Attorneys' Fees and Costs.  The facts and observations set forth in Mr. Edelman's declaration are based on his personal knowledge, experience, and relate directly to this motion.  As a result, Plaintiff's objections should be overruled.

[4]  Plaintiff chastises Defendants for citing a series of cases it says do not directly support the 355-hour figure in Defendants' initial motion, Opp. at 9, but Defendants' counsel never cited those cases to support the number of hours worked. Yet, Plaintiff fails to address the cases Defendants *do* cite to support the hours expended.

REPLY IN SUPPORT OF DEFENDANTS' MOTION FOR ATTORNEYS' FEES AND COSTS

### 2.   The Requested Attorney Billing Rates Are Reasonable in the Southern District and Comparable Districts in Light of Counsel's Reputation and Experience.

To determine a reasonable hourly rate, courts must look to the rate prevailing in the community for similar work done by attorneys of "comparable skill, experience, and reputation." *Chalmers v. City of Los Angeles*, 796 F.2d 1205, 1211 (9th Cir. 1986); *see also Lobaton v. City of San Diego*, No. 15-cv-1416, 2017 WL 3622248, at *3 (S.D. Cal. Aug. 22, 2017) (noting courts should take into account the "experience, reputation, and ability of the attorney" in determining reasonable rates).  Here, Plaintiff sued Ms. Maddow and three other companies for over ten million dollars, in addition to seeking punitive damages.  Defendants rightly retained experienced litigation counsel to defend their First Amendment rights against that monetary threat, and against what Plaintiff promised would be efforts at invasive discovery.  Plaintiff cannot now penalize Defendants for exercising their right to choose their counsel.[5]  *See Cuviello v. Feld Enmt.*, *Inc.*, No. 13-cv-04951, 2015 WL 154197, at *2 (N.D. Cal. Jan. 12, 2015) (rejecting claim that defendants should have hired less expensive counsel because parties "'have the right to counsel of their choice'" (citing *Cole v. United States Dist. Ct.*, 366 F.3d 813, 817 (9th Cir. 2004)).

Because of Gibson Dunn's reputation and experience, its rates, including the rates of the *exact same* paralegals and researchers at issue in this Motion, have been approved by other California district courts.  *See ScripsAmerica, Inc. v. Ironridge Global LLC*, No. 14-03962, 2016 WL 6871280, at *4-5 (C.D. Cal. Jan. 12, 2016) (approving Gibson Dunn's fees, *four years ago*, at rates of $700 per hour for associates, $350 per hour for paralegals and $200 for researchers, including Lolita Gadberry and Erin Kurinsky, a paralegal and researcher who are timekeepers in the instant case).  Gibson Dunn's rates are also comparable to the standard billing rates of Plaintiff's counsel.  In opposing Defendants' motion for fees, Plaintiff's counsel was notably silent about their own

---

[5]  This choice extends to the specific attorneys Defendants wanted staffed on the matter—if Defendants wanted Mr. Boutrous and Mr. Edelman on this case, then that is their right.

REPLY IN SUPPORT OF DEFENDANTS' MOTION FOR ATTORNEYS' FEES AND COSTS

standard hourly rates.  But in another litigation in 2014, *six years ago*, Mr. Miller disclosed that his standard rate was $1,095 per hour.  Edelman Decl., Ex. B at 7.  And the standard rates for certain Miller Barondess associates were nearly $600 per hour.  *Id.* That same year, the standard billing rates of Mr. Edelman and Mr. Boutrous, $1,060 per hour and $1,080 per hour, respectively, were actually *lower* than Mr. Miller's standard rate. *Id.* ¶ 6.  While Defendants do not know Mr. Miller's current rates or those of other members of his firm, because Plaintiff did not disclose them, Plaintiff's effort to call Gibson Dunn's rates "market-shattering" is disingenuous.  Opp. at 2.

While the Southern District of California is the focus of the reasonable rate inquiry, southern district courts may and have previously considered attorney rates and fee approvals from neighboring districts, where courts have approved rates similar to those requested here.  *See, e.g.*, *Hartless v. Clorox Co.*, 273 F.R.D. 630, 644 (S.D. Cal. 2011) (taking into account rates in the Northern and Central Districts of California in determining reasonable hourly rates); *Iler v. Berryhill*, No. 14-cv-2026, 2018 WL 3969182, at *2 (S.D. Cal. Aug. 20, 2018) (considering rates affirmed in the Ninth Circuit out of the Central District of California); *Deanda v. Savings Investment, Inc.*, No. 5-cv-0139, 2006 WL 8443522, at *4 (S.D. Cal. June 8, 2006) (looking to rates accepted in the Central District of California in determining what was reasonable in the southern district).

However, even if one focuses solely on the Southern District of California, there is ample support that the rates Defendants' counsel seeks to recover are reasonable. Plaintiff's claim that Defendants "cherry-pick[ed] the highest rate they could identify," and that an $800 per hour rate is an "exception" is not true and an effort to escape paying the fees that they owe.  Opp. at 6.  Numerous courts in the southern district have found reasonable rates comparable to Gibson Dunn's.  *See, e.g.*:

- *Medina v. Metropolitan Interpreters and Translators, Inc.*, 139 F. Supp. 3d 1170, 1179 (S.D. Cal. 2015) (holding $850 per hour for a senior attorney reasonable *five years ago*);

REPLY IN SUPPORT OF DEFENDANTS' MOTION FOR ATTORNEYS' FEES AND COSTS

1 · *Kikkert v. Berryhill*, No. 14-cv-1725, 2018 WL 3617268, at *2 (S.D. Cal. July 30,

2   2018) (finding $943 per hour reasonable two years ago because "fees within this

3   general range have been approved by courts in similar cases, *including this Court*"

4   (emphasis added));

5 · *Makaeff v. Trump Univ., LLC*, No. 10-cv-940, 2015 WL 1579000, at *5 (S.D. Cal.

6   Apr. 9, 2015) (approving rates up to $825 per hour as reasonable in the anti-SLAPP

7   context *five years ago*);

8 · *Zest IP Holdings, LLC v. Implant Direct Mfg., LLC*, No. 10-cv-0541, 2014 WL

9   6851612, at *6 (S.D. Cal. Dec. 3, 2014) (explaining that Mayer Brown's rates were

10   "consistent with the hourly rates charged by other multi-state/national law firms" in

11   the district, where the average billing rate for partners went up to $900 per hour,

12   and $622 for associate attorneys, *six years ago*);

13 · *Grant v. Capital Mgmt. Servs., L.P.*, No. 10-cv-2471, 2014 WL 888665, at *6 (S.D.

14   Cal. Mar. 5, 2014) (finding $875 per hour for a senior attorney reasonable *six years*

15   *ago*);

16 · *Brighton Collectibles, Inc. v. Coldwater Creek Inc.*, No. 6-cv-01848, 2009 WL

17   160235, at *4 (S.D. Cal. Jan. 20, 2009) (holding it was reasonable for certain

18   paralegals to charge $210 per hour *eleven years ago*).

19   Plaintiff's effort to cut Gibson Dunn's rates below the above rates—rates which

20   were approved in this district years ago, and rates Plaintiff's counsel themselves

21   charge—lacks merit.  By way of example, Plaintiff asserts Mr. Boutrous's and Mr.

22   Edelman's hourly rates should be cut to $535 per hour, which is almost $400 below the

23   average range of rates in this district *six years ago*.[6]  *See Zest IP Holdings*, 2014 WL

24   6851612, at *6.  Plaintiff's assertion that paralegal and researcher rates should be cut

25   entirely finds no support in the case law; to the contrary, courts *routinely* approve fee

26   awards for paralegals and researchers.  *See Brighton Collectibles*, 2009 WL 160235, at

27   _____

28   [6]  This rate is lower than rates Miller Barondess was charging for *associate* attorneys
     six years ago in 2014.  *See* Edelman Decl., Ex. B at 7.

*4; *see also ScripsAmerica*, 2016 WL 6871280, at *4 (approving similar rates for the very paralegal and researcher, Lolita Gadberry and Erin Kurinsky, at issue here). Defendants' counsel are entitled to their standard hourly rates, and Plaintiff has failed to establish that any discount to those rates is appropriate or warranted in these circumstances.

## III.   CONCLUSION

For the foregoing reasons, Defendants respectfully request that the Court award them their reasonable attorneys' fees and costs in the amount of $357,968.36, *see* Edelman Decl. ¶¶ 8, 10—an amount which now includes the additional fees and costs incurred in connection with preparing the Reply on this motion.

DATED:  July 9, 2020                    Respectfully Submitted,


                                        GIBSON, DUNN & CRUTCHER LLP


                                        By:  /s/ *Scott A. Edelman*          _
                                              Scott A. Edelman

                                        Attorneys for Defendants

REPLY IN SUPPORT OF DEFENDANTS' MOTION FOR ATTORNEYS' FEES
AND COSTS

1   THEODORE J. BOUTROUS JR., SBN 132099
      tboutrous@gibsondunn.com
2   THEANE EVANGELIS, SBN 243570
      tevangelis@gibsondunn.com
3   NATHANIEL L. BACH, SBN 246518
      nbach@gibsondunn.com
4   MARISSA B. MOSHELL, SBN 319734
      mmoshell@gibsondunn.com
5   GIBSON, DUNN & CRUTCHER LLP
    333 South Grand Avenue
6   Los Angeles, CA 90071-3197
    Telephone:  213.229.7000
7   Facsimile:   213.229.7520

8   SCOTT A. EDELMAN, SBN 116927
      sedelman@gibsondunn.com
9   GIBSON, DUNN & CRUTCHER LLP
    2029 Century Park East, Suite 4000
10  Los Angeles, CA 90067-3026
    Telephone:  310.552.8500
11  Facsimile:   310.551.8741

12  Attorneys for Defendants Rachel Maddow,
    MSNBC Cable L.L.C., NBCUniversal Media,
13  LLC, and Comcast Corporation

14                  UNITED STATES DISTRICT COURT

15                SOUTHERN DISTRICT OF CALIFORNIA

16

17

18  HERRING NETWORKS, INC.,            CASE NO. 19-cv-1713-BAS-AHG

          Plaintiff,                   **DECLARATION OF SCOTT A.**
19                                     **EDELMAN IN SUPPORT OF REPLY**
          v.                           **IN SUPPORT OF DEFENDANTS'**
20                                     **MOTION FOR ATTORNEYS' FEES**
    RACHEL MADDOW; COMCAST             **AND COSTS (Cal. Civ. Proc. Code §**
21  CORPORATION; NBCUNIVERSAL          **425.16(c)(1))**
    MEDIA, LLC; and MSNBC CABLE
22  L.L.C.,

          Defendants.                  Action Filed:  September 9, 2019
23

24                                     Judge:  Hon. Cynthia Bashant
                                       Magistrate Judge: Hon. Allison Goddard
25                                     Courtroom 3B

26

27

28

I, Scott A. Edelman, declare as follows:

1.      I am an attorney at law licensed to practice in the State of California.  I am a partner at Gibson, Dunn & Crutcher LLP ("Gibson Dunn") and counsel of record for Defendants Rachel Maddow, Comcast Corporation, NBCUniversal Media, LLC, and MSNBC Cable L.L.C. ("Defendants").  I am one of the supervising partners in charge of the work performed on this case by the attorneys and other professionals at Gibson Dunn.

2.      I submit this declaration in support of the Reply in Support of Defendants' Motion for Attorneys' Fees and Costs pursuant to California Code of Civil Procedure section 425.16(c)(1).  All statements in this declaration are based upon my personal knowledge and, if called upon to testify, I could and would testify to the facts set forth herein.

3.      Defendants filed their Motion for Attorneys' Fees and Costs on June 5, 2020.  The next day, an article was published reporting on the Motion in which Mr. Herring was quoted saying, "No one wants to spend that kind of money [paying Defendants' fees], but it is just a part of business."  A true and correct copy of the article, "Rachel Maddow's Lawyers to Judge: OAN Owner Owes Us $334,000," written by Ken Stone and published in the *Times of San Diego* on June 6, 2020, is attached hereto as **Exhibit A**.

4.      In their initial Motion, Defendants' counsel requested $323,965 in fees and $9,706.28 in costs, "plus any additional fees and costs incurred in connection with preparing a Reply and attending a hearing on this Motion."  Mot. at 1.  Defendants' counsel now seeks the remaining $23,279 in fees and $1,018.08 in costs incurred.

5.      Set forth below are the details of the work completed by the Gibson Dunn attorneys and other professionals from June 5, 2020 through the filing of this Reply[1].  This information is a true and accurate reflection of our timekeeping records:

---

[1] The initial Motion for Attorneys' Fees and supporting declaration sought fees and costs for time billed through June 4, 2020.

1

EDELMAN DECLARATION IN SUPPORT OF REPLY IN SUPPORT OF
DEFENDANTS' MOTION FOR ATTORNEYS' FEES AND COSTS

| Date | Time | Amount Incurred (2020 Rate x Time) | Timekeeper | Task(s) |
|---|---|---|---|---|
| **Researching and drafting the Attorneys' Fees Motion, Reply, and supporting documents** | | | | |
| 6/5/2020 | 4.2 | $3,108 | Moshell, Marissa B. | Revise and finalize motion for attorneys' fees and costs and supporting documents and file. |
| 6/5/2020 | 0.4 | $384 | Bach, Nathaniel L. | Reviewing fee motion, notice of motion, memorandum, supporting declaration prior to filing. |
| 6/5/2020 | 1 | $480 | Gadberry, Lolita C. | Assist M. Moshell with review of memorandum of costs. |
| 6/5/2020 | 0.6 | $915 | Boutrous Jr., Theodore J. | Review final edits, draft of fee motion. |
| 6/5/2020 | 0.3 | $418.50 | Edelman, Scott A. | Work on final details of fees motions. |
| 6/26/2020 | 0.5 | $370 | Moshell, Marissa B. | Review and analyze Plaintiff's opposition to motion for attorneys' fees. |
| 6/26/2020 | 0.8 | $768 | Bach, Nathaniel L. | Analyze Plaintiff's opposition to motion for attorneys' fees. |
| 6/29/2020 | 4.9 | $3,626 | Moshell, Marissa B. | Review and analyze opposition for reply brief (1.3); research and outline for reply brief (3.6). |
| 6/30/2020 | 3.6 | $2,664 | Moshell, Marissa B. | Draft reply in support of motion for attorneys' fees and supporting documents. |

EDELMAN DECLARATION IN SUPPORT OF REPLY IN SUPPORT OF
DEFENDANTS' MOTION FOR ATTORNEYS' FEES AND COSTS

Gibson, Dunn &
Crutcher LLP

| | | | | |
|---|---|---|---|---|
| 7/1/2020 | 0.5 | $370 | Moshell, Marissa B. | Revise reply in support of motion for attorneys' fees. |
| 7/6/2020 | 2.8 | $2,072 | Moshell, Marissa B. | Research for and revise reply in support of motion for attorneys' fees. |
| 7/6/2020 | 0.98 | $264.60 | Kurinsky, Erin E. | Retrieve fee motion documents for M. Moshell. |
| 7/6/2020 | 1.4 | $1,953 | Edelman, Scott A. | Review and revise reply papers in support of motion for attorneys' fees. |
| 7/7/2020 | 0.59 | $566.40 | Bach, Nathaniel L. | Revising reply brief in support of motion for attorneys' fees and costs. |
| 7/7/2020 | 0.7 | $518 | Moshell, Marissa B. | Revise reply in support of motion for attorneys' fees. |
| 7/7/2020 | 0.9 | $1,255.50 | Edelman, Scott A. | Review and revise reply papers in support of motion for attorneys' fees. |
| 7/8/2020 | 2 | $1,480 | Moshell, Marissa B. | Revise and cite check reply in support of motion for attorneys' fees. |
| 7/9/2020 | .61 | $585.60 | Bach, Nathaniel L. | Final review of and edits to reply in support of attorneys' fees motion. |
| 7/9/2020 | 2 | $1,480 | Moshell, Marissa B. | Finalize reply brief in support of fees motion and supporting documents for filing. |
| | **28.78** | **$23,279** | | |
| **Total Hours and Fees** | | | | |
| **Through June 4, 2020** | 355.5 | $323,965 | | |

EDELMAN DECLARATION IN SUPPORT OF REPLY IN SUPPORT OF
DEFENDANTS' MOTION FOR ATTORNEYS' FEES AND COSTS

Gibson, Dunn &
Crutcher LLP

| **June 5, 2020 to Present** | 28.78 | $23,279 |
|---|---|---|
| **TOTAL** | 384.28 | $347,244 |

6.     Gibson Dunn's standard billing rates, which are detailed in my original declaration (Dkt. 35-2), appear to be comparable to those charged by Plaintiff's counsel, Miller Barondess, LLP.  A true and correct copy of a Motion for Attorneys' Fees filed by Miller Barondess in *Margosian v. Bank of the West*, No. 10-vcu-238202 (Sept. 25, 2014), where Mr. Miller's standard billing rates are described, is attached hereto as **Exhibit B**.  Mr. Miller's standard rate referenced therein, $1,095 per hour in 2014, is higher than Mr. Boutrous's and my standard 2014 billing rates, which were $1,080 per hour and $1,060 per hour respectively.

7.     Set forth below are the details of the hours expended by the Gibson Dunn attorneys and other professionals, divided by timekeeper, through the filing of this Reply.  This information is a true and accurate reflection of our records:

| Timekeeper | Hours Worked (Through June 4, 2020) | Hours Worked (June 5, 2020 to Present) |
|---|---|---|
| Theodore J. Boutrous, Jr. (Partner) | 55.8 | .6 |
| Scott A. Edelman (Partner) | 17.5 | 2.6 |
| Nathaniel L. Bach (Senior Associate) | 135.1 | 2.4 |
| Marissa B. Moshell (Mid-Level Associate) | 113.7 | 21.2 |
| Daniel M. Rubin (Mid-Level Associate) | 16.6 | ------------------------------ |
| Lolita C. Gadberry (Paralegal) | 14.7 | 1 |
| Duke Amponsah (Paralegal) | 1.4 | ------------------------------ |
| Erin E. Kurinsky (Researcher) | .6 | .98 |

4

| Carla H. Jones (Researcher) | .1 | ------------------------------ |
|---|---|---|
| | 355.5 | 28.78 |
| **TOTAL HOURS** | 384.28 | |

8.      In sum, through the filing of this Reply, attorneys and other professionals collectively spent 384.28 hours working on this matter, amounting to $347,244 in attorneys' fees.

9.      In addition to the fees for Gibson Dunn attorneys and other professionals, Defendants incurred certain costs.  Set forth below are the details of the costs incurred by Defendants, divided by category, from June 5, 2020 through the filing of this Reply. This information is a true and accurate reflection of our records:

| Date | Cost | Description |
|---|---|---|
| **Courier Costs** | | |
| 6/6/2020 | $28.43 | Delivery of chambers copy of Attorneys' Fees Motion and supporting materials to Judge Goddard. |
| **Document Retrieval Service Costs** | | |
| 6/30/2020 | $20 | Docket tracking charges through May 2020. |
| **Photocopying Costs** | | |
| 6/5/2020 | $2.85 | Printing and photocopying in connection with Attorneys' Fees Motion and chambers copies. |
| 6/5/2020 | $125.60 | Printing and photocopying in connection with Attorneys' Fees Motion and chambers copies. |
| 6/6/2020 | $0.10 | Printing and photocopying in connection with Attorneys' Fees Motion and chambers copies. |
| 6/6/2020 | $0.40 | Printing and photocopying in connection with Attorneys' Fees Motion and chambers copies. |

Gibson, Dunn & Crutcher LLP

EDELMAN DECLARATION IN SUPPORT OF REPLY IN SUPPORT OF DEFENDANTS' MOTION FOR ATTORNEYS' FEES AND COSTS

| 6/6/2020 | $0.20 | Printing and photocopying in connection with Attorneys' Fees Motion and chambers copies. |
| 6/6/2020 | $0.40 | Printing and photocopying in connection with Attorneys' Fees Motion and chambers copies. |
| 6/6/2020 | $0.10 | Printing and photocopying in connection with Attorneys' Fees Motion and chambers copies. |
| **Research Costs** | | |
| 6/29/2020 | $600 | Westlaw research costs. |
| 6/30/2020 | $240 | Westlaw research costs. |
| | **$1,018.08** | |
| **Total Costs** | | |
| **Through June 4, 2020** | $9,706.28 | |
| **From June 5, 2020 to Present** | $1,018.08 | |
| **TOTAL** | $10,724.36 | |

10.     In sum, through the filing of this Reply, Gibson Dunn incurred $10,724.36 in costs.

11.     The total attorneys' fees and costs incurred by Gibson Dunn in this matter, through the filing of this Reply amount to $357,968.36.

12.     I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct, and that this declaration was executed in Los Angeles, California on July 9, 2020.

_____
Scott A. Edelman

EDELMAN DECLARATION IN SUPPORT OF REPLY IN SUPPORT OF
DEFENDANTS' MOTION FOR ATTORNEYS' FEES AND COSTS

Gibson, Dunn & Crutcher LLP

# EXHIBIT A



Support indepe      Become a supporter of San Diego   Powered by  Diego
                                          PressPatron

ABOUT    STAFF    CONTACT    SUPPORT    ADVERTISE    FAQ    PRIVACY POLICY    TERMS OF SERVICE



ALL   POLITICS   CRIME   BUSINESS   SPORTS   EDUCATION   ARTS   MILITARY   TECH   LIFE

Search…

**LATEST NEWS**   UCSD Invites Subjects for Tests of Plasma Treatment to Prevent COV

JOBS!   Search Thousands in San Diego

Home » Business » This Article

# Rachel Maddow's Lawyers to Judge: OAN Owner Owes Us $334,000

POSTED BY KEN STONE ON JUNE 6, 2020 IN BUSINESS | 2793 VIEWS | 5 COMMENTS | LEAVE A COMMENT

Share This Article:

   



Primary lawyers for Rachel Maddow and co-defendants were (from left) Ted Boutrous Jr., Nathaniel Bach, Scott Edelman and Marissa Moshell.

By Ken Stone

When **Rachel Maddow's lawyers** persuaded a downtown federal judge to throw out a $10 million defamation suit by the owners of **One America News**, they knew big bucks were coming their way.

Support Times of San Diego's growth with a small monthly contribution

Become a supporter

On Friday, they specified how much — at least $333,671.28.

According to a 625-page legal filing, **Judge Allison Goddard** must award attorney fees and court costs to Los Angeles-based lawyers for Maddow, Comcast Corp., NBCUniversal Media and MSNBC.

---

GET TIMES OF SAN DIEGO BY EMAIL

Our free newsletter is delivered a.m. daily.

Please enter email address:

SUBSCRIBE

"The only question for the court is whether the fees defendants seek are reasonable," wrote Scott Edelman for Maddow and co-defendants.



**Fee request by Rachel Maddow's lawyers. (PDF)**

That's because Maddow won an anti-SLAPP motion against San Diego-based Herring Networks, which runs the conservative cable network. And state law provides that defendants in such a suit "shall be entitled to recover … attorney's fees and costs."

Edelman said Herring Networks brought a meritless SLAPP suit "primarily to chill the valid exercise" of their constitutional rights of freedom of speech. (**SLAPP** stands for strategic lawsuit against public participation.)

On May 22, U.S. District Judge Cynthia Bashant **dismissed Herring Networks' suit** with prejudice, ruling "there is no set of facts that could support a claim for defamation based on Maddow's statement," made during a July 22, 2019, segment of her show.



(The liberal host that day told her viewers that the Trump-friendly network "really literally is paid Russian propaganda.")

As promised, Herring Networks **filed a notice of appeal** in the 9th U.S. Circuit.

Amnon Siegel of Miller Barondess in Los Angeles, who represents Herring Networks, said in a **statement Wednesday**: "We fully expect to prevail on appeal. The words – "that OAN is really literally paid Russian propaganda" — do not convey an opinion. This is a blatant defamatory falsehood."

Robert Herring Sr., founder and CEO of Herring Networks Inc., added: "We are fully prepared to take this case to the United States Supreme Court if necessary. Maddow has claimed that our family has engaged in treasonous acts. Nothing is further from the truth and her propagated falsehood has hurt our integrity and viewership trust."

FEATURED VIDEOS         Powered by *[primis]*




**Next Democratic Debate to Be Moderated by All-Female Panel**

MOST POPULAR TODAY

 Sight of Nazi Swastika Flag Stuns East County Motorists on I-8 3,210 views

 Nazi Flag Driver Claims of Battery, Vandalism Probed by Alpine Sheriff's Station 2,330 views

 Nazi Flag Driver, an Iraq Combat Veteran, Has Gun Violence Restraining Order 1,990 views

 Video Shows SD Police Warning, Shooting Man With Gun at Downtown Station 1,870 views

 USC Joins Harvard, MIT in Suit Challenging New Restrictions on Foreign Students 1,810 views

Case 3:19-cv-01713-BAS-AHG   Document 38-2   Filed 07/09/20   PageID.1016   Page 4 of 10

Of the Maddow bill, Herring told Times of San Diego on Sunday: "No one wants to spend that kind of money, but it is just a part of business." He said he didn't know about any effort to get the judge to lower that figure.

The San Francisco-based court gave Herring Networks a deadline of Sept. 10, 2020, to file its opening brief and excerpts of record. Maddow's Legal team has until Oct. 13, 2020, to respond.

That will pile up even more billable hours.

Of the third of a million dollars Maddow's team wants so far, $323,965 is in fees to pay Los Angeles-based lawyers who made as much as $1,525 an hour. (The rest is $9,706 in court costs.)

The most expensive day was Dec. 4, 2019, when Nathaniel L. Bach worked 8.6 hours on a draft of a reply in support of a motion to strike.



## Get the Right Amount

Your life insurance policy might not be enough to cover your family's needs. See why.

His bill for the day: $7,869.

"As detailed in the Edelman Declaration, Defendants seek fees for 355.5 hours of work, plus any additional hours of work expended in connection with preparing a reply and attending a hearing on this motion (seeking fees and costs)," the filing said.

Edelman said many of those hours were devoted to research, since the case raised questions related to the legal doctrine of protected opinion.

"It also raised questions concerning the relationship between California's state anti-SLAPP statute and the federal procedural law governing the parties in this district," Edelman wrote.

Edelman quoted case law for why plaintiff Herring Networks must pay Maddow's lawyers:



**Surgeon Tells: This Simple Method Significantly Reduces Neuropathy (It's Genius!)**
Sponsored by NerveShieldPlus

"The dual purpose of this mandatory attorney fee award is to discourage meritless lawsuits and to provide financial relief to the victim of a SLAPP suit by imposing the

litigation costs on the party seeking to chill the valid exercise of the constitutional rights of freedom of speech."

But protecting free speech isn't free.

Edelman noted what the six-member Gibson, Dunn & Crutcher team (including paralegals) had to do to fend off the defamation suit filed last September, including researching and drafting the attorneys' fees motion itself.

The briefing process was prolonged and made more labor-intensive, he said, by having to deal with what he called the filing of irrelevant and improper evidentiary submissions.

He referred to a UC Santa Barbara linguistics expert **who analyzed** Maddow's speech patterns and an application to supplement the record with what former MSNBC host **Chris Matthews said** about OAN in a "Hardball" segment.



**This Leaked Video Could Permanently Shut Down The Democratic Party**
The Catholic Church's biggest secret has been leaked.

Watch The Video                                                🔥 7,222

Promoted Content

The request for fees included long biographies of the lawyers involved, led by **Theodore J. "Ted" Boutrous Jr.**, a 1987 University of San Diego School of Law graduate famed for successfully arguing against California's same-sex marriage ban in the U.S. Supreme Court.

Edelman revealed that his legal team was hired on a $100,000 retainer, which he called a modified contingency fee basis.

"Defendants agreed to pay Gibson Dunn attorneys $100,000 for the filing and argument of the anti-SLAPP motion, and further agreed that if defendants were successful on that motion and recovered from plaintiff, they would pay Gibson Dunn any difference between the $100,000 and the fees Defendants' counsel incurred," he wrote.

Gibson Dunn colleague Boutrous is a partner at the firm whose standard hourly rate in 2019 was $1,450, the filing said. In 2020, it was $1,525 an

| Timekeeper | Standard 2019 Rate/Hour |
|---|---|
| Theodore J. Boutrous, Jr. (Partner) | $1,450 |
| Scott A. Edelman (Partner) | $1,335 |
| Nathaniel L. Bach (Senior Associate) | $915 |
| Marissa B. Moshell (Mid-Level Associate) | $625 |
| Daniel M. Rubin (Mid-Level Associate) | $625 |
| Lolita C. Gadberry | $460 |

| Timekeeper | Standard 2020 Rate/Hour |
|---|---|
| Theodore J. Boutrous, Jr. (Partner) | $1,525 |
| Scott A. Edelman (Partner) | $1,395 |
| Nathaniel L. Bach (Senior Associate) | $960 |
| Marissa B. Moshell (Mid-Level Associate) | $740 |
| Lolita C. Gadberry (Paralegal) | $480 |
| Duke K. Amponsah (Paralegal) | $480 |

**Hourly rates of Rachel Maddow legal team in 2019 and 2020.**



**California Launches New Policy For Cars Used Less Than 50 Miles/Day**



**Major Color Drop - Pink**

Ad · Alo Yoga®

**Rachel Maddow's Super Lawyers are Super…**

timesofsandiego.com

**Equal Pay For Women - Gender Discrimination**

Ad · genieharrisonlaw.com

**OAN's Graham Ledger: 'Would Rather D**

timesofsandie

**Downtown L.A. Law Group**

Ad · Downtown L.A. Law…

**Suspect, 23, Arrested in Vicious…**

timesofsandiego.com

**San Diego Rallies for Newsom Recall Set as…**

timesofsandiego.com

**25-Year-Arrested Mother D**

timesofsandie

Hey check this out, Los Angeles!





hour. He provided invoices.

Goddard, the judge who will decide how much to ding Herring Networks, is a 2000 graduate of the USD School of Law.



Cinq a Sept Sandy Dress

Shop Now

"She was part of the team that obtained a $5 million-plus judgment... against San Diego State University in the firing of women's basketball coach Beth Burns" in 2018, **reported The San Diego Union-Tribune**.

"She was also the lead attorney representing more than 80 women in a recent lawsuit against Sharp Grossmont Hospital in La Mesa that alleged the hospital secretly recorded women during labor and delivery procedures," the profile added.

*Updated at 9:52 a.m. June 7, 2020.*

RACHEL MADDOW'S LAWYERS TO JUDGE: OAN OWNER OWES US $334,000 was last modified: June 8th, 2020 by Ken Stone

**>> Subscribe to Times of San Diego's free daily email newsletter! Click here**

Follow Us:



POSTED IN BUSINESS | TAGGED AMNON SIEGEL, HERRING NETWORKS, JUDGE CYNTHIA BASHANT, ONE AMERICA NEWS, RACHEL MADDOW, ROBERT HERRING SR., SCOTT EDELMAN, TED BOUTROUS JR.



7/9/2020
Case 3:19-cv-01713-BAS-AHG Document 38-2 Filed 07/09/20 PageID.1020 Page 8 of 10
Rachel Maddow's Lawyers to Judge: OAN Owner Owes US $334,000 in Legal Fees – Times of San Diego

powered by saambaa



Advertisement

## Comments (5)

Write a comment

🔍 Search...

Sort by Latest ▾

**Clive Peters** Jun 8

Some overinflated egos in this group of theives.

👍 👎 Share Reply  🚩 • •

**Roger** Jun 7

Hopefully Maddow will lose the appeal but I'm no law expert.
What she did was morally wrong, that much I know.

edited

👍 3 👎 Share Reply  🚩 • •

**DJ**   **Dr Joey** Jun 7

Lawyers pulling down a thousand an hour, the completely unhinged Madcow, blatantly slandering a family and their business and getting away with it..

Man, the lying business is very lucrative these days.

👍 **2**   👎 **1**   Share   Reply      🚩   • •

**MR**   **Marilyn Riley** ↪ Dr Joey Jun 9

The founder and CEO of the lying business is Donald J. Trump.

👍 **1**   👎 **1**   Share   Reply      🚩   • •

**DJ**   **Dr Joey** ↪ Marilyn Riley Jun 9

That's even dummer than your usual comments.

👍 **1**   👎   Share   Reply      🚩   • •

## TALK OF THE TOWN


It's Official: Indoor Dining, Similar Activities Halted for 3 Weeks as Cases Grow - Times of San Die...

10 Comments


Independent San Diego Police Oversight Board Approved for Nov. 3 Ballot - Times of San Diego

6 Comments


San Diego County Reports Record 578 Cases, 12 Deaths as Virus Surge Continues - Times of San Diego

5 Comments


Video Shows SD Police Warning, Shooting Man With Gun at Downtown Station - Times of San Diego

4 Comments


Nazi Flag Driver Claims of Battery, Vandalism Probed by Alpine Sheriff's Station - Times of San Dieg...

3 Comments


As Local Coronavirus Cases Mount, Business Operations Likely to Be Rolled Back - Times of San Diego

3 Comments



County Supervisors Decline To Appeal Ruling On Climate Plan - Times of San Diego

1 Comment


Opinion: Black Lives Matter Protests Herald Generational Shift in Race Consciousness - Times of San ...

1 Comment


Developers Aim for 'Best in Class' Industrial Campus on 30 Acres in Oceanside - Times of San Diego


San Diego County Reports 560 New Coronavirus Cases and 9 More Deaths - Times of San Diego

1 Comment

1 Comment

Advertisement

©®2020 Times of San Diego LLC

About | Staff | Contact | Support | Advertise | FAQ | Privacy Policy | Terms of Service

# EXHIBIT B

Case 3:19-cv-01713-BAS-AHG   Document 38-3   Filed 07/09/20   PageID.1024   Page 2 of 11

Aron MARGOSIAN, an Individual; and Carrie Margosian, an..., 2014 WL 12650937...

2014 WL 12650937 (Cal.Super.) (Trial Motion, Memorandum and Affidavit)
Superior Court of California.
Tulare County

Aron MARGOSIAN, an individual; and Carrie Margosian, an individual, Plaintiffs,

v.

BANK OF THE WEST, a California corporation; Erin Bushell, an individual;, Defendants.

No. 10VCU238202.
September 25, 2014.

And Related Cross-Action.

Dept. 1

[declaration of Brian Procel and [proposed] Order filed Concurrently]

Date: October 20, 2014

Time: 8:30 A.M.

Dept: 1


**Notice of Motion and Motion for Attorneys' Fees; Memorandum of Points and Authorities in Support Thereof**


Louis R. Miller (State Bar No. 54141), smiller@millerbarondess.com, Brian Procel (State Bar No. 218657), bprocel@millerbarondess.com, Miller Barondess, LLP, 1999 Avenue of the Stars, Suite 1000, Los Angeles, California 90067, Telephone: (310) 552-4400, Facsimile: (310) 552-8400, for defendant and cross-complainant Bank of the West and Defendant Erin Bushell.

Assigned to the Honorable Melinda Reed.

## TABLE OF CONTENTS

Preliminary Statement ................................................................................................ 1
Factual and Procedural Background ........................................................................... 1
A. Origin Of The Suit ................................................................................................. 1
B. Foley Bezek Joins The Case .................................................................................. 2
C. Pre-Trial Proceedings ............................................................................................ 3
D. Trial On The Sixth Amended Complaint ............................................................... 4
E. Trial On The Cross-Complaint .............................................................................. 5
Legal Standard ........................................................................................................... 5
Argument .................................................................................................................... 6
I. THE COURT SHOULD AWARD ATTORNEYS' FEES IN THIS CASE ............ 6
A. The Parties' Contract Provides For Attorneys' Fees ............................................ 6
B. The Bank Is The Prevailing Party ......................................................................... 7
C. The Firm's Discounted Rates And Hours Billed Were Reasonable ...................... 7
1. Plaintiffs' Retention of A High-Profile Litigator Required A Commensurate Response ........... 7
2. Plaintiffs Aggressively Litigated the Case From Start to Finish .......................................... 10
3. The Entirety of the Bank's Defense Expenses Are Covered by the Agreement ...................... 11
Conclusion ................................................................................................................. 12

## TABLE OF AUTHORITIES
### CASES

Cates v. Chiang, 213 Cal. App. 4th 791 (2013) ....................................................... 9
Contractors Labor Pool, Inc. v. Westway Contractors, Inc., 53 Cal. App.
4th 152 (1997) ............................................................................................................ 6

*Hsu v. Abarra,* 9 Cal. 4th 863 (1995) .................................................. 7

*Hunt v. Fahnestock,* 220 Cal. App. 3d 628 (1990) ................................. 6

*PLCM Grp., Inc. v. Drexler,* 22 Cal. 4th 1084 (2000) ............................. 5

*Serrano v. Unruh,* 32 Cal. 3d 621 (1982) ............................................... 6

*Sternwest Corp. v. Ash,* 183 Cal. App. 3d 74 (1986) ............................... 6

*Stokus v. Marsh,* 217 Cal. App. 3d 647 (1990) ...................................... 6

*Sumitomo Bank v. Iwasaki,* 70 Cal. 2d 81 (1968) ..................................... 3, 4, 10, 11

STATUTES

California Civil Code

Section 1717 .......................................................................................... 6, 11

Section 1717(a) ..................................................................................... 5

**TO ALL PARTIES AND THEIR ATTORNEYS OF RECORD:**

PLEASE TAKE NOTICE that on October 20, 2014 at 8:30 a.m., or as soon thereafter as counsel may be heard, in Department 1 of the above-captioned Court, the Honorable Melinda Reed presiding, Defendant and Cross-Complainant Bank of the West (the "Bank") will, and hereby does, move this Court for an award of attorneys' fees pursuant to Civil Code section 1717, on the ground that the Guaranty Agreement between the parties provides for recovery of such fees. Having prevailed at trial both on Plaintiffs' Sixth Amended Complaint and on the Bank's Cross-Complaint, the Bank respectfully requests that Plaintiffs Aron and Carrie Margosian (the "Margosians") be ordered to pay $1,230,010 in attorneys' fees.

This motion is based on the attached Memorandum of Points and Authorities, the Declaration of Brian Procel and exhibits thereto, and such argument and authority as may be presented at or before the time of the hearing on the present motion.

DATED: September 25, 2014

Respectfully submitted,

MILLER BARONDESS, LLP

By:

BRTAN PROCEL

Attorneys for Defendant and Cross-Complainant BANK OF THE WEST and Defendant ERIN BUSHELL

**MEMORANDUM OF POINTS AND AUTHORITIES**

**Preliminary Statement**

In June 2010, Plaintiffs Aron and Carrie Margosian sued 11 separate defendants, making numerous allegations of wrongdoing in connection with the financial collapse of a fruit-processing facility they owned. Over the next four years, they dragged these defendants—their accountant; their lawyer; their bookkeeper; investors in their company; their management consultants —through multiple versions of their complaint, changing their allegations as they went. The only common denominator was that the Margosians wanted millions of dollars, from someone. But one by one, their claims were exposed as factually and legally meritless.

Plaintiffs' sprawling case was ultimately reduced, after seven versions of the complaint, to two causes of action against the Bank and one of its loan officers. That case could not withstand scrutiny at trial. The Court found that neither the Bank nor its employee had committed any wrongful conduct and that the Guaranty Agreement at issue was valid and enforceable. The

Case 3:19-cv-01713-BAS-AHG  Document 38-3  Filed 07/09/20  PageID.1026  Page 4 of 11

Aron MARGOSIAN, an Individual; and Carrie Margosian, an..., 2014 WL 12650937...

Court awarded judgment to the Bank, both on the Margosians' complaint and on the Bank's cross-complaint to enforce the Guaranty Agreement.

Having prevailed in this litigation, the Bank now seeks its reasonable attorneys' fees. The Guaranty Agreement at issue expressly provides for an award of attorneys' fees; and the amount incurred is reasonable, as set forth herein, in light of the high stakes of the case and the aggressive and resource-intensive litigation tactics employed by Plaintiffs and their counsel.

### Factual and Procedural Background

#### A. Origin Of The Suit

On September 18, 2008, Aron and Carrie Margosian agreed to personally guarantee the debt of their company, Two Play Properties, LLC, to Bank of the West. (Declaration of Brian Procel ("Procel Decl."), Ex. A.) They signed a Guaranty Agreement to that effect. [1]

On that same day, September 18, 2008, they also signed a Credit Agreement on behalf of their company, Two Play, taking out loans of $370,000 and $1.4 million. Two Play subsequently defaulted on those loans. The Bank notified the Margosians of Two Play's default on July 17, 2009, and demanded payment. The Margosians did not pay.

Instead, on June 10, 2010, the Margosians sued the Bank and 10 other defendants, asserting more than 20 causes of action and telling a story in which everyone they had done business with for the past decade had systematically schemed to steal from them. (Procel Decl., ¶ 5.)

#### B. Foley Bezek Joins The Case

Initially, both parties had local counsel. (Procel Decl., ¶ 6.) But in or about January 2013, Plaintiffs hired a plaintiffs' attorney, Peter Bezek, to take over as lead trial counsel. (Id.) Mr. Bezek, the managing partner of Foley, Bezek, Behle & Curtis, has made a 30-year career of suing banks. On his website, he claims to have recovered more than $2 billion for his clients. (Procel Decl., Ex. B.)

The entry of Foley Bezek into the case raised the stakes dramatically. [2]  The Bank needed a litigation firm of comparable stature and experience. (Procel Decl., ¶ 7.) The Bank hired Miller Barondess that same month. (Id.)

Miller Barondess took over a case that was just five months from going to trial on a Fourth Amended Complaint that charged 11 named defendants with 22 causes of action. (Procel Decl., ¶ 8.) The firm had to quickly get up to speed on a complex case involving more than 25,000 pages of produced documents. (Id.) And Mr. Bezek worked quickly. Within six months of joining the case in January 2013, Mr. Bezek took nine additional depositions of Bank employees and served more than a hundred additional document requests and interrogatories. (Procel Decl., ¶ 9.) He then amended the complaint twice more, added multiple new theories of damages, and hired four different experts to support those theories. (Id.)

#### C. Pre-Trial Proceedings

On March 14, 2013, Miller Barondess filed a motion for judgment on the pleadings as to the causes of action alleged against the Bank in the Fourth Amended Complaint. (Procel Decl., ¶10.) The motion argued that the causes of action against the Bank alleged injuries to Two Play Properties, LLC. (Id.) Under established case law, the owners of LLCs cannot sue individually for injuries to LLCs, and the plaintiffs had not alleged injuries to themselves personally. The Court granted the Bank's Motion for Judgment on the Pleadings. (Id.)

Case 3:19-cv-01713-BAS-AHG   Document 38-3   Filed 07/09/20   PageID.1027   Page 5 of 11

Aron MARGOSIAN, an Individual; and Carrie Margosian, an..., 2014 WL 12650937...

Plaintiffs requested leave to amend their complaint, which they subsequently did, filing their Fifth Amended Complaint on June 10, 2013. (Procel Decl., 11.) The Fifth Amended Complaint named Two Play Properties, LLC as a new named plaintiff and included a new set of factual allegations about an alleged oral agreement between Two Play Properties and the Bank—an agreement that had never been mentioned in any of the previous complaints or in the depositions of the plaintiffs. (Id.)

The Bank filed a demurrer as to the new plaintiff, Two Play, on the grounds that the statute of limitations had expired and the claims did not relate back, (Procel Decl., ¶ 12.) The Bank filed a motion to strike the new allegations as sham pleadings, on the grounds that they were inconsistent with prior pleadings and appeared calculated to plead around the successful demurrer to the Fourth Amended Complaint. (Id.) The Bank also filed a cross-complaint against Plaintiffs for enforcement of the Guaranty Agreement. (Id.)

The demurrer and motion to strike were both granted, and Plaintiffs again requested leave to amend, which they did, filing their Sixth Amended Complaint on September 30, 2014. (Procel Decl., ¶ 13.)

In the Sixth Amended Complaint, Plaintiffs abandoned the other Defendants and focused their attention on the deep pockets of the Bank. (Procel Decl., ¶ 14.) They claimed that the Bank had fraudulently induced them to sign a personal guarantee for one of their own companies and sought rescission of that guarantee and damages for fraud. (Id.)

Both claims were based on the same allegation: that the Bank was obligated under *Sumitomo Bank v. Iwasaki,* 70 Cal. 2d 81 (1968), but failed to provide the Margosians with information and/or analyses of the financial condition of another company, Z&S Fresh, whose debts to the Bank were guaranteed by Two Play. (Procel Decl., ¶ 15.)

After filing the Sixth Amended Complaint, Plaintiffs moved for partial summary adjudication as to the Bank's duty under Sumitomo. (Procel Decl., ¶16.) The scope of the Sumitomo duty is a difficult and nuanced legal question, and there is a relative scarcity of case law on point. The Bank argued that the scope of the Sumitomo duty was at a minimum a question of fact, because it depended, inter alia, on the nature of the relationship between Plaintiffs and their business partner; the management and ownership structure of the businesses at issue; the prior relationship among the & Bank, Plaintiffs and Plaintiffs' businesses; the Bank's reasonable beliefs about the materiality to Plaintiffs of, e.g., the Bank's internal analyses of Z&S's finances; and the details of the colloquy between Plaintiffs and the Bank at the September 18, 2008 meeting. (Id.) The Court denied the motion. (Id.)

### D. Trial On The Sixth Amended Complaint

The case was finally tried in April 2014. As shown at trial, the Margosians were not tricked, duped or bamboozled.

Instead, Two Play failed, because they themselves diverted revenue from Two Play—and from their other companies—into another of their companies, ZM, through which they bought and renovated a fruit processing plant. They hoped to create a vertically integrated produce conglomerate, but the construction costs spiraled out of control, and they fell years behind schedule. To fund the ever-increasing capital costs of the new plant, they diverted operating revenue from their other companies, including Two Play, and they used Z&S as the conduit for that money.

Z&S was owned by the Margosians' longtime friend and business partner, Martin Zaninovich. Zaninovich co-owned several companies with the Margosians. The finances of the various companies co-owned by Zaninovich and the Margosians were closely connected.

Aron Margosian admitted that, when he could not secure financing directly for ZM, he used Z&S to redirect to ZM the proceeds of crop loans that he had obtained for his farming expenses. And he admitted that he intended to do the same thing with the September 18, 2008 loan to Two Play.

The Court, after considering extensive testimonial and documentary evidence, found that the Margosians were well aware of the financial condition of Z&S; that they were using Z&S to fund their own company, ZM; that the Bank made no misrepresentations to the Margosians; that Aron Margosian consulted with Z&S's Chief Financial Officer, Jeff Covey, prior to signing the Guaranty Agreement; that the Margosians fully understood the transactions at issue; and that, accordingly, "the Bank did not breach its Sumitomo duty to disclose facts it knew and reasonably believed materially increased a level of risk the Plaintiffs were willing to assume..." (Court's April 29, 2014 Ruling, Procel Decl., Ex. C.)

The Court gave judgment to the Bank, ordering that the Margosians should take nothing. (Id.)

### E. Trial On The Cross-Complaint

Trial was held on August 20, 2014 on the Bank's Cross-Complaint. The Court found that the Guaranty Agreement was valid and enforceable, that the Margosians owed money under the Agreement, and that they had not paid. (Procel Decl., Ex. D.) The Court again gave judgment to the Bank, ordering that the Margosians should pay the Bank $399,012.77 under the Guaranty Agreement. (Id.)

In accordance with the Court's order, the Bank prepared a final written Judgment and submitted it to Plaintiffs for comment and approval. (Procel Decl., ¶ 20.)

### Legal Standard

Civil Code Section 1717(a) provides:

> In any action on a contract, where the contract specifically provides that attorney's fees and costs, which are incurred to enforce that contract, shall be awarded either to one of the parties or to the prevailing party, then the party who is determined to be the party prevailing on the contract, whether he or she is the party specified in the contract or not, shall be entitled to reasonable attorney's fees in addition to other costs.

Cal. Civ. Code § 1717(a).

In determining the reasonableness of attorneys' fees and costs, the Court first computes the number of hours reasonably expended on the litigation multiplied by the reasonable hourly rate for each attorney. See PLCM Grp., Inc. v. Drexler, 22 Cal. 4th 1084,1097 (2000) (lodestar method is "presumably reasonable" when applied to contractual fees under Civil Code § 1717); Sternwest Corp. v. Ash, 183 Cal. App. 3d 74, 76-77 (1986) (applying "lodestar" test to application for attorneys' fees). Recoverable fees include time spent on the fee application itself. Serrano v. Unruh, 32 Cal. 3d 621, 632-38 (1982). Attorneys and paralegals are entitled to rates that reflect the reasonable market value of their services. Id. at 643.

The reasonableness of fees is determined according to principles of equity; those principles dictate that all services necessary to prepare for the filing and prosecution or defense of an action are recoverable. Hunt v. Fahnestock, 220 Cal. App. 3d 628, 633 (1990); Stokus v. Marsh, 217 Cal. App. 3d 647, 655-56 (1990). The Court of Appeal set forth factors that should be considered in determining the reasonableness of attorney fees:

> [C]ourts should consider the nature of the litigation, its difficulty, the amount involved, and the skill required and success of the attorney's efforts, his or her learning, age and experience in the particular type of work

demanded, the intricacies and importance of the litigation, the labor and necessity for skilled legal training and ability in trying the cause, and the time consumed.

*Contractors Labor Pool, Inc. v. Westway Contractors, Inc.,* 53 Cal. App. 4th 152, 168 (1997).

## Argument

## I. THE COURT SHOULD AWARD ATTORNEYS' FEES IN THIS CASE

### A. The Parties' Contract Provides For Attorneys' Fees

The contract at issue here specifically provides that the Margosians shall pay the Bank its reasonable attorneys' fees incurred in connection with the enforcement of the agreement. The Agreement provides as follows:
Attorney's Fees. Guarantor shall pay to Bank all costs and expenses, including, but not limited to reasonable attorney fees, incurred by Bank in connection with the administration [or] enforcement... of the Guarantor's obligations under this Guaranty..."). (Guaranty Agreement (Procel Decl., Ex. A at ¶ 20).)

That provision encompasses the Bank's fees in this case. Plaintiffs sued the Bank for rescission of the Guaranty Agreement, and the Bank cross-complained for enforcement of the Guaranty Agreement. Trial in Phase 1 of this case was held on Plaintiffs' rescission claim, and the Court entered judgment for the Bank. Trial in Phase 2 was held on the Bank's enforcement claim, and the Court again awarded judgment to the Bank.

### B. The Bank Is The Prevailing Party

In deciding which is the prevailing party for purposes of awarding attorneys' fees, the Court reviews the relief requested in the parties' claims and "their litigation objectives as disclosed by the pleadings, trial briefs, opening statements, and similar sources." Hsu v. Abarra, 9 Cal. 4th 863, 876 (1995).

Here, Plaintiffs' objectives were to rescind the Guaranty Agreement and to obtain $20 million in damages from the Bank. The Bank's objectives were to defend against the rescission and damages claims and to enforce the Guaranty Agreement. The Bank fulfilled its objectives; Plaintiffs did not

The Bank is the prevailing party as to every aspect of, and issue in, this litigation. The Bank won judgment on the pleadings as to Plaintiffs' Fourth Amended Complaint; won the dismissal with prejudice of Two Play as a putative plaintiff in the Fifth Amended Complaint; successfully demurred as to all causes of action in the Fifth Amended Complaint; prevailed at trial on the Sixth Amended Complaint; and prevailed at trial on its Cross-Complaint against Plaintiffs.

### C. The Firm's Discounted Rates And Hours Billed Were Reasonable

### 1. Plaintiffs' Retention Of A High-Profile Litigator Required A Commensurate Response

This was a high-stakes case for the Bank. Plaintiffs claimed more than $20 million in damages and were asserting a new and untested theory of liability that could potentially apply to hundreds or thousands of loans. The case had serious implications not just for the Bank, but also for the entire financial services industry.

Case 3:19-cv-01713-BAS-AHG Document 38-3 Filed 07/09/20 PageID.1030 Page 8 of 11

Aron MARGOSIAN, an Individual; and Carrie Margosian, an..., 2014 WL 12650937...

The stakes jumped even higher when, in December 2012, Plaintiffs hired Peter Bezek. Mr. Bezek is a successful plaintiffs' attorney who specializes in litigation against financial institutions and has, by his own account, "obtained verdicts, settlements, and workouts worth in excess of $2.0 billion." (Bezek Bio (Procel Decl., Ex. B).)

The Bank sought new trial counsel upon learning of Mr. Bezek's entry into the case, and it needed a firm of Miller Barondess' caliber to hold its own against Mr. Bezek's aggressive and skillful litigation tactics, Miller Barondess is one of California's premier litigation boutiques and has a well-earned reputation for taking over difficult cases as trial counsel.

Instead of its regularly hourly rates, Miller Barondess charged the Bank a blended, hourly rate of $500 for all attorneys and $250 for all paralegals. (Procel Decl., ¶ 32.) This rate is substantially below the average billing rate of the attorneys and paralegals who worked on the matter. Mr. Mason's normal rate is $595; Mr. Procel's is $675; and Mr. Miller's is $1095. (Procel Decl., ¶ 33.) (This Motion seeks recovery only of the lower fees actually incurred by the Bank and is thereby giving the Margosians the benefit of that fee discount.)

Copies of Miller Barondess's redacted litigation bills, which were paid by the Bank, are attached hereto. (Procel Decl., Ex. E.) As of September 24, 2014, the Bank has paid Miller Barondess $1,220,010. (Procel Decl., ¶ 41.) Preparing and litigating this motion will take an estimated 20 hours, or $10,000, resulting in an entitlement, in total, of $1,230,010. (Procel Decl., ¶ 42.)

The firm's founding partner, Louis Miller, is one of the nation's foremost trial lawyers. He has 40 years' experience and has tried dozens of high-profile cases. (Miller Bio (Procel Decl., Ex. F).) Mr. Miller was closely involved in planning the defense strategy and participated personally in the mediation proceedings. California has only a few litigators of his experience and skill, and he is in high demand at his regular rate of $1095. (Procel Decl., ¶ 33.) The $500 an hour he billed on this case constitutes a very substantial discount.

Brian Procel, a partner at Miller Barondess, and Caleb Mason, an associate at the firm, were primarily responsible for handling the case. (Procel Decl., 31.) They normally bill at $675 and $595 an hour, respectively. (Procel Decl., 33.) They have thirteen and nine years' experience, respectively, and regularly litigate complex, high-profile cases. (Procel & Mason Bios (Procel Decl., Exs. G-H).)

Mr. Procel has successfully represented banks in many lender liability cases. He prevailed at trial on behalf of East West Bank in a case that was recognized by the Daily Journal as a "Top Ten Defense Verdict of the Year." The trial court awarded $2.5 million in attorneys' fees in that action (see Ocean Fresh v. East West Bank, Case No. BC362244). Mr. Procel was part of the team that successfully resolved a nationwide class action on behalf of Union Bank involving a $250 million Ponzi scheme in federal court (see Neilson v. Union Bank, Case No. 2:02-cv-06942). And he has obtained dismissals and summary judgment in lender liability actions involving claims upwards of $50 million (the trial court awarded more than $1 million in attorneys' fees in Cameron Pointe v. East West Bank, Case No. BC443108, and in that case Miller Barondess prevailed on summary judgment). Mr. Procel was recently recognized as one of the Top 20 lawyers in California under 40 by the Daily Journal. He was formerly an associate at Quinn Emanuel, a highly regarded firm of trial attorneys in Los Angeles. Mr. Mason is a former Assistant United States Attorney and federal appellate clerk, and he also has extensive trial experience. (Procel Decl., ¶ 34.)

Miller Barondess has a significant track record of representing financial institutions facing high-stakes litigation. Among the banks the firm has recently represented in multi-million dollar lawsuits are California Bank and Trust, East West Bank, Union Bank and Cathay Bank. (Id.)

The $500 rate here is eminently reasonable in light of the rates charged by attorneys with comparable skill, qualification and experience at other firms of comparable size, resources and reputation that handle litigation of this sort. For example, a 2012 Daily Journal article provides an average hourly rate of $797 for partners in Los Angeles, while the associate average hourly rate in Los Angeles was $550. (Procel Decl., Ex. I) The Firm's blended $500 rate in this case is lower even than those average associate rates—and it is for all three attorneys, including Mr. Miller. It is also consistent with rates that California courts have

Case 3:19-cv-01713-BAS-AHG   Document 38-3   Filed 07/09/20   PageID.1031   Page 9 of 11

Aron MARGOSIAN, an Individual; and Carrie Margosian, an..., 2014 WL 12650937...

found reasonable. *See, e.g., Cates v. Chiang,* 213 Cal. App. 4 [th] 791, 820 (2013) (attorney blended hourly rate of $451 found reasonable).

Moreover, it bears emphasis that, as part of the retainer agreement, Miller Barondess also did not bill the Bank for any travel time. (Procel Decl., ¶ 29.) This is another very significant discount, given the amount of travel required. Mason and Procel made more than a dozen trips to Visalia to appear in court, and each made trips to Santa Barbara, Fresno, San Francisco, Sacramento, and Visalia for depositions. (Procel Decl., ¶¶ 21, 28.) Both all-day mediation sessions were held in Santa Barbara. (Procel Decl., ¶ 24.) Travel time for all Miller Barondess attorneys, and the Miller Barondess paralegal who was part of the trial team, was in excess of 500 hours—none of which was billed to the Bank. (Procel Decl., 29.)

Finally, the Bank's fees were likely less than Plaintiffs'. Plaintiffs poured money into the case. Mr. Margosian testified that he had paid Mr. Bezek over $700,000 as of February 2014, more than two months *before* the trial. (Margosian Deposition at 307:1-18 (Procel Decl., Ex. J).) Still to come were numerous depositions, dozens of written filings, preparation of exhibits and jury instructions, trial preparation, and then a two-week trial to which Plaintiffs brought a team of three attorneys, two paralegals and an expensive out-of-town expert witness. (Procel Decl., ¶ 30.)

Moreover, Plaintiffs' prior attorney, Ken Fitzgerald, who had represented Plaintiffs for the preceding three years, continued to represent Plaintiffs after Mr. Bezek joined the case. The full amount that Plaintiffs paid Mr. Fitzgerald is unknown.

In sum, it is very likely that Plaintiffs' legal bill was higher than the Bank's.

### 2. Plaintiffs Aggressively Litigated the Case From Start to Finish

After entering the case, Mr. Bezek propounded hundreds of new document requests on the Bank, took 9 additional depositions and amended the complaint twice. (Procel Decl., ¶¶21-30.) He added a new party as a putative plaintiff. (Id.) And he resisted the Bank's discovery efforts, forcing the Bank to resort to motions to compel compliance with discovery and deposition requests. (Id.)

Mr. Bezek honed a novel and sophisticated theory of liability under Sumitomo v. Iwasaki and crafted various creative theories of damages. Much litigation effort and expense, on both sides, was devoted to the question of what exactly Plaintiffs' damages theories were. The Bank had to resort to motions to compel before Plaintiffs would answer the question how they had been damaged. And after fact discovery was complete, Plaintiffs continued to attempt to introduce new theories of damages through their experts. They hired an accounting expert, John Slater, "to come up with thoughts or ideas on where Mr. Margosian was financially damaged." (John Slater Deposition at 26:8-27:4 (Procel Decl., Ex. K).) Accordingly, the Bank had to expend considerable resources preparing to respond to ever-shifting damages theories, most of which were ultimately rejected by the Court.

Work performed by the Bank's attorneys included, for example:
● Preparing for and attending more than 20 depositions, held in five different cities;

● Analyzing more than 25,000 of pages of documents produced by both sides, including contracts, internal banking records and accounting records of the various businesses at issue;

● Litigating more than 15 substantive motions, including two demurrers, two motions to strike, a motion for judgment on the pleadings, a motion for partial summary adjudication, and three motions to compel;

●Drafting two mediation briefs and participating in two day-long mediations;

● Responding separately to the seven different complaints filed by Plaintiffs;

Case 3:19-cv-01713-BAS-AHG   Document 38-3   Filed 07/09/20   PageID.1032   Page 10 of 11

Aron MARGOSIAN, an individual; and Carrie Margosian, an..., 2014 WL 12650937...

● Conducting extensive expert discovery, including depositions of four experts retained by Plaintiffs;

● Briefing and arguing 15 motions in limine filed by both sides; and

● Preparing for and conducting a 9-day trial.

(Procel Decl., ¶¶ 21-30.)

Now the Bank has prevailed, and Plaintiffs must live up to their contractual obligations as to attorneys' fees, as well as the underlying debt. The attorneys' fees incurred by the Bank are eminently reasonable given the length and complexity of the case and the aggressiveness of Plaintiffs' litigation tactics.

### 3. The Entirety of the Bank's Defense Expenses Are Covered by the Agreement

The entirety of the Bank's defense expenses are covered by the agreement, because, as the Court found, all of Plaintiffs' claims against the Bank are subsumed in, and disposed of by, the rescission claim. That claim is focused solely on whether the Guaranty Agreement is enforceable, and the Bank's defense throughout the case was that the Guaranty Agreement is enforceable because there was no fraud, misrepresentation or other violation of any Sumitomo obligation. Accordingly, all the costs incurred in defending the lawsuit are recoverable under the Agreement and section 1717.

### Conclusion

For the foregoing reasons, the Bank respectfully requests that the Margosians be ordered to pay the Bank's attorneys' fees in the amount of $1,230,010.

DATED: September 25, 2014

Respectfully submitted,

MILLER BARONDESS, LLP

By:

BRIAN PROCEL

Attorneys for Defendant and Cross-Complainant BANK OF THE WEST and Defendant ERIN BUSHELL

Footnotes

| 1 | The Court orally entered its Statement of Decision on April 29, 2014, ruling in favor of the Bank. The relevant facts are set forth in detail in the April 29, 2014 ruling and need only be briefly summarized here. Although the Court has not yet entered judgment, the Bank is proceeding with this Motion because it is clear the Bank is the prevailing party as to every issue in this case. |
| 2 | For example, a Foley Bezek lender liability case against a different bank, with very similar facts to this one, proceeded in Los Angeles County Superior Court during the same period the instant case was ongoing. It went to trial in September 2014 and resulted in a verdict for the plaintiffs of $40 million. See http://patch.com/california/arcadia/arcadia-couple-awarded-40-million-real-estate-foreclosure-0/#.VA90vKa9LCR (reporting verdict in F&F LLC v. East-West Bank). |

**End of Document**

© 2020 Thomson Reuters. No claim to original U.S. Government Works.