# EXHIBIT B

Case 3:19-cv-01713-BAS-AHG   Document 38-3   Filed 07/09/20   PageID.1024   Page 2 of 11

Aron MARGOSIAN, an individual; and Carrie Margosian, an..., 2014 WL 12650937...

2014 WL 12650937 (Cal.Super.) (Trial Motion, Memorandum and Affidavit)
Superior Court of California.
Tulare County

Aron MARGOSIAN, an individual; and Carrie Margosian, an individual, Plaintiffs,

v.

BANK OF THE WEST, a California corporation; Erin Bushell, an individual;, Defendants.

No. 10VCU238202.
September 25, 2014.

And Related Cross-Action.
Dept. 1
[declaration of Brian Procel and [proposed] Order filed Concurrently]
Date: October 20, 2014
Time: 8:30 A.M.
Dept: 1

**Notice of Motion and Motion for Attorneys' Fees; Memorandum of Points and Authorities in Support Thereof**

Louis R. Miller (State Bar No. 54141), smiller@millerbarondess.com, Brian Procel (State Bar No. 218657), bprocel@millerbarondess.com, Miller Barondess, LLP, 1999 Avenue of the Stars, Suite 1000, Los Angeles, California 90067, Telephone: (310) 552-4400, Facsimile: (310) 552-8400, for defendant and cross-complainant Bank of the West and Defendant Erin Bushell.

Assigned to the Honorable Melinda Reed.

TABLE OF CONTENTS

| | |
|---|---|
| Preliminary Statement | 1 |
| Factual and Procedural Background | 1 |
| A. Origin Of The Suit | 1 |
| B. Foley Bezek Joins The Case | 2 |
| C. Pre-Trial Proceedings | 3 |
| D. Trial On The Sixth Amended Complaint | 4 |
| E. Trial On The Cross-Complaint | 5 |
| Legal Standard | 5 |
| Argument | 6 |
| I. THE COURT SHOULD AWARD ATTORNEYS' FEES IN THIS CASE | 6 |
| A. The Parties' Contract Provides For Attorneys' Fees | 6 |
| B. The Bank Is The Prevailing Party | 7 |
| C. The Firm's Discounted Rates And Hours Billed Were Reasonable | 7 |
| 1. Plaintiffs' Retention of A High-Profile Litigator Required A Commensurate Response | 7 |
| 2. Plaintiffs Aggressively Litigated the Case From Start to Finish | 10 |
| 3. The Entirety of the Bank's Defense Expenses Are Covered by the Agreement | 11 |
| Conclusion | 12 |

TABLE OF AUTHORITIES
CASES

| | |
|---|---|
| *Cates v. Chiang,* 213 Cal. App. 4th 791 (2013) | 9 |
| *Contractors Labor Pool, Inc. v. Westway Contractors, Inc.,* 53 Cal. App. 4th 152 (1997) | 6 |

Case 3:19-cv-01713-BAS-AHG   Document 38-3   Filed 07/09/20   PageID.1025   Page 3 of 11

Aron MARGOSIAN, an individual; and Carrie Margosian, an..., 2014 WL 12650937...

*Hsu v. Abarra,* 9 Cal. 4th 863 (1995) ........................................................... 7
*Hunt v. Fahnestock,* 220 Cal. App. 3d 628 (1990) ..................................... 6
*PLCM Grp., Inc. v. Drexler,* 22 Cal. 4th 1084 (2000) ............................... 5
*Serrano v. Unruh,* 32 Cal. 3d 621 (1982) ................................................... 6
*Sternwest Corp. v. Ash,* 183 Cal. App. 3d 74 (1986) ................................ 6
*Stokus v. Marsh,* 217 Cal. App. 3d 647 (1990) .......................................... 6
*Sumitomo Bank v. Iwasaki,* 70 Cal. 2d 81 (1968) ..................................... 3, 4, 10, 11

STATUTES

California Civil Code
Section 1717 ................................................................................................ 6, 11
Section 1717(a) ........................................................................................... 5

**TO ALL PARTIES AND THEIR ATTORNEYS OF RECORD:**

PLEASE TAKE NOTICE that on October 20, 2014 at 8:30 a.m., or as soon thereafter as counsel may be heard, in Department 1 of the above-captioned Court, the Honorable Melinda Reed presiding, Defendant and Cross-Complainant Bank of the West (the "Bank") will, and hereby does, move this Court for an award of attorneys' fees pursuant to Civil Code section 1717, on the ground that the Guaranty Agreement between the parties provides for recovery of such fees. Having prevailed at trial both on Plaintiffs' Sixth Amended Complaint and on the Bank's Cross-Complaint, the Bank respectfully requests that Plaintiffs Aron and Carrie Margosian (the "Margosians") be ordered to pay $1,230,010 in attorneys' fees.

This motion is based on the attached Memorandum of Points and Authorities, the Declaration of Brian Procel and exhibits thereto, and such argument and authority as may be presented at or before the time of the hearing on the present motion.

DATED: September 25, 2014

Respectfully submitted,

MILLER BARONDESS, LLP

By:

BRTAN PROCEL

Attorneys for Defendant and Cross-Complainant BANK OF THE WEST and Defendant ERIN BUSHELL

**MEMORANDUM OF POINTS AND AUTHORITIES**

**Preliminary Statement**

In June 2010, Plaintiffs Aron and Carrie Margosian sued 11 separate defendants, making numerous allegations of wrongdoing in connection with the financial collapse of a fruit-processing facility they owned. Over the next four years, they dragged these defendants—their accountant; their lawyer; their bookkeeper; investors in their company; their management consultants—through multiple versions of their complaint, changing their allegations as they went. The only common denominator was that the Margosians wanted millions of dollars, from someone. But one by one, their claims were exposed as factually and legally meritless.

Plaintiffs' sprawling case was ultimately reduced, after seven versions of the complaint, to two causes of action against the Bank and one of its loan officers. That case could not withstand scrutiny at trial. The Court found that neither the Bank nor its employee had committed any wrongful conduct and that the Guaranty Agreement at issue was valid and enforceable. The

Court awarded judgment to the Bank, both on the Margosians' complaint and on the Bank's cross-complaint to enforce the Guaranty Agreement.

Having prevailed in this litigation, the Bank now seeks its reasonable attorneys' fees. The Guaranty Agreement at issue expressly provides for an award of attorneys' fees; and the amount incurred is reasonable, as set forth herein, in light of the high stakes of the case and the aggressive and resource-intensive litigation tactics employed by Plaintiffs and their counsel.

### Factual and Procedural Background

### A. Origin Of The Suit

On September 18, 2008, Aron and Carrie Margosian agreed to personally guarantee the debt of their company, Two Play Properties, LLC, to Bank of the West. (Declaration of Brian Procel ("Procel Decl."), Ex. A.) They signed a Guaranty Agreement to that effect. [1]

On that same day, September 18, 2008, they also signed a Credit Agreement on behalf of their company, Two Play, taking out loans of $370,000 and $1.4 million. Two Play subsequently defaulted on those loans. The Bank notified the Margosians of Two Play's default on July 17, 2009, and demanded payment. The Margosians did not pay.

Instead, on June 10, 2010, the Margosians sued the Bank and 10 other defendants, asserting more than 20 causes of action and telling a story in which everyone they had done business with for the past decade had systematically schemed to steal from them. (Procel Decl., ¶ 5.)

### B. Foley Bezek Joins The Case

Initially, both parties had local counsel. (Procel Decl., ¶ 6.) But in or about January 2013, Plaintiffs hired a plaintiffs' attorney, Peter Bezek, to take over as lead trial counsel. (Id.) Mr. Bezek, the managing partner of Foley, Bezek, Behle & Curtis, has made a 30-year career of suing banks. On his website, he claims to have recovered more than $2 billion for his clients. (Procel Decl., Ex. B.)

The entry of Foley Bezek into the case raised the stakes dramatically. [2] The Bank needed a litigation firm of comparable stature and experience. (Procel Decl., ¶ 7.) The Bank hired Miller Barondess that same month. (Id.)

Miller Barondess took over a case that was just five months from going to trial on a Fourth Amended Complaint that charged 11 named defendants with 22 causes of action. (Procel Decl., ¶ 8.) The firm had to quickly get up to speed on a complex case involving more than 25,000 pages of produced documents. (Id.) And Mr. Bezek worked quickly. Within six months of joining the case in January 2013, Mr. Bezek took nine additional depositions of Bank employees and served more than a hundred additional document requests and interrogatories. (Procel Decl., ¶ 9.) He then amended the complaint twice more, added multiple new theories of damages, and hired four different experts to support those theories. (Id.)

### C. Pre-Trial Proccedings

On March 14, 2013, Miller Barondess filed a motion for judgment on the pleadings as to the causes of action alleged against the Bank in the Fourth Amended Complaint. (Procel Decl., ¶10.) The motion argued that the causes of action against the Bank alleged injuries to Two Play Properties, LLC. (Id.) Under established case law, the owners of LLCs cannot sue individually for injuries to LLCs, and the plaintiffs had not alleged injuries to themselves personally. The Court granted the Bank's Motion for Judgment on the Pleadings. (Id.)

Plaintiffs requested leave to amend their complaint, which they subsequently did, filing their Fifth Amended Complaint on June 10, 2013. (Procel Decl., 11.) The Fifth Amended Complaint named Two Play Properties, LLC as a new named plaintiff and included a new set of factual allegations about an alleged oral agreement between Two Play Properties and the Bank—an agreement that had never been mentioned in any of the previous complaints or in the depositions of the plaintiffs. (Id.)

The Bank filed a demurrer as to the new plaintiff, Two Play, on the grounds that the statute of limitations had expired and the claims did not relate back, (Procel Decl., ¶ 12.) The Bank filed a motion to strike the new allegations as sham pleadings, on the grounds that they were inconsistent with prior pleadings and appeared calculated to plead around the successful demurrer to the Fourth Amended Complaint. (Id.) The Bank also filed a cross-complaint against Plaintiffs for enforcement of the Guaranty Agreement. (Id.)

The demurrer and motion to strike were both granted, and Plaintiffs again requested leave to amend, which they did, filing their Sixth Amended Complaint on September 30, 2014. (Procel Decl., ¶ 13.)

In the Sixth Amended Complaint, Plaintiffs abandoned the other Defendants and focused their attention on the deep pockets of the Bank. (Procel Decl., ¶ 14.) They claimed that the Bank had fraudulently induced them to sign a personal guarantee for one of their own companies and sought rescission of that guarantee and damages for fraud. (Id.)

Both claims were based on the same allegation: that the Bank was obligated under *Sumitomo Bank v. Iwasaki,* 70 Cal. 2d 81 (1968), but failed to provide the Margosians with information and/or analyses of the financial condition of another company, Z&S Fresh, whose debts to the Bank were guaranteed by Two Play. (Procel Decl., ¶ 15.)

After filing the Sixth Amended Complaint, Plaintiffs moved for partial summary adjudication as to the Bank's duty under Sumitomo. (Procel Decl., ¶16.) The scope of the Sumitomo duty is a difficult and nuanced legal question, and there is a relative scarcity of case law on point. The Bank argued that the scope of the Sumitomo duty was at a minimum a question of fact, because it depended, inter alia, on the nature of the relationship between Plaintiffs and their business partner; the management and ownership structure of the businesses at issue; the prior relationship among the & Bank, Plaintiffs and Plaintiffs' businesses; the Bank's reasonable beliefs about the materiality to Plaintiffs of, e.g., the Bank's internal analyses of Z&S's finances; and the details of the colloquy between Plaintiffs and the Bank at the September 18, 2008 meeting. (Id.) The Court denied the motion. (Id.)

**D. Trial On The Sixth Amended Complaint**

The case was finally tried in April 2014. As shown at trial, the Margosians were not tricked, duped or bamboozled.

Instead, Two Play failed, because they themselves diverted revenue from Two Play—and from their other companies—into another of their companies, ZM, through which they bought and renovated a fruit processing plant. They hoped to create a vertically integrated produce conglomerate, but the construction costs spiraled out of control, and they fell years behind schedule. To fund the ever-increasing capital costs of the new plant, they diverted operating revenue from their other companies, including Two Play, and they used Z&S as the conduit for that money.

Z&S was owned by the Margosians' longtime friend and business partner, Martin Zaninovich. Zaninovich co-owned several companies with the Margosians. The finances of the various companies co-owned by Zaninovich and the Margosians were closely connected.

Aron Margosian admitted that, when he could not secure financing directly for ZM, he used Z&S to redirect to ZM the proceeds of crop loans that he had obtained for his farming expenses. And he admitted that he intended to do the same thing with the September 18, 2008 loan to Two Play.

Case 3:19-cv-01713-BAS-AHG   Document 38-3   Filed 07/09/20   PageID.1028   Page 6 of 11

Aron MARGOSIAN, an Individual; and Carrie Margosian, an..., 2014 WL 12650937...

The Court, after considering extensive testimonial and documentary evidence, found that the Margosians were well aware of the financial condition of Z&S; that they were using Z&S to fund their own company, ZM; that the Bank made no misrepresentations to the Margosians; that Aron Margosian consulted with Z&S's Chief Financial Officer, Jeff Covey, prior to signing the Guaranty Agreement; that the Margosians fully understood the transactions at issue; and that, accordingly, "the Bank did not breach its Sumitomo duty to disclose facts it knew and reasonably believed materially increased a level of risk the Plaintiffs were willing to assume..." (Court's April 29, 2014 Ruling, Procel Decl., Ex. C.)

The Court gave judgment to the Bank, ordering that the Margosians should take nothing. (Id.)

### E. Trial On The Cross-Complaint

Trial was held on August 20, 2014 on the Bank's Cross-Complaint. The Court found that the Guaranty Agreement was valid and enforceable, that the Margosians owed money under the Agreement, and that they had not paid. (Procel Decl., Ex. D.) The Court again gave judgment to the Bank, ordering that the Margosians should pay the Bank $399,012.77 under the Guaranty Agreement. (Id.)

In accordance with the Court's order, the Bank prepared a final written Judgment and submitted it to Plaintiffs for comment and approval. (Procel Decl., ¶ 20.)

### Legal Standard

Civil Code Section 1717(a) provides:

> In any action on a contract, where the contract specifically provides that attorney's fees and costs, which are incurred to enforce that contract, shall be awarded either to one of the parties or to the prevailing party, then the party who is determined to be the party prevailing on the contract, whether he or she is the party specified in the contract or not, shall be entitled to reasonable attorney's fees in addition to other costs.

Cal. Civ. Code § 1717(a).

In determining the reasonableness of attorneys' fees and costs, the Court first computes the number of hours reasonably expended on the litigation multiplied by the reasonable hourly rate for each attorney. See PLCM Grp., Inc. v. Drexler, 22 Cal. 4th 1084,1097 (2000) (lodestar method is "presumably reasonable" when applied to contractual fees under Civil Code § 1717); Sternwest Corp. v. Ash, 183 Cal. App. 3d 74, 76-77 (1986) (applying "lodestar" test to application for attorneys' fees). Recoverable fees include time spent on the fee application itself. Serrano v. Unruh, 32 Cal. 3d 621, 632-38 (1982). Attorneys and paralegals are entitled to rates that reflect the reasonable market value of their services. Id. at 643.

The reasonableness of fees is determined according to principles of equity; those principles dictate that all services necessary to prepare for the filing and prosecution or defense of an action are recoverable. Hunt v. Fahnestock, 220 Cal. App. 3d 628, 633 (1990); Stokus v. Marsh, 217 Cal. App. 3d 647, 655-56 (1990). The Court of Appeal set forth factors that should be considered in determining the reasonableness of attorney fees:

> [C]ourts should consider the nature of the litigation, its difficulty, the amount involved, and the skill required and success of the attorney's efforts, his or her learning, age and experience in the particular type of work

Case 3:19-cv-01713-BAS-AHG   Document 38-3   Filed 07/09/20   PageID.1029   Page 7 of 11

Aron MARGOSIAN, an Individual; and Carrie Margosian, an..., 2014 WL 12650937...

demanded, the intricacies and importance of the litigation, the labor and necessity for skilled legal training and ability in trying the cause, and the time consumed.

*Contractors Labor Pool, Inc. v. Westway Contractors, Inc.,* 53 Cal. App. 4th 152, 168 (1997).

**Argument**

**I. THE COURT SHOULD AWARD ATTORNEYS' FEES IN THIS CASE**

**A. The Parties' Contract Provides For Attorneys' Fees**

The contract at issue here specifically provides that the Margosians shall pay the Bank its reasonable attorneys' fees incurred in connection with the enforcement of the agreement. The Agreement provides as follows:
Attorney's Fees. Guarantor shall pay to Bank all costs and expenses, including, but not limited to reasonable attorney fees, incurred by Bank in connection with the administration [or] enforcement... of the Guarantor's obligations under this Guaranty..."). (Guaranty Agreement (Procel Decl., Ex. A at ¶ 20).)

That provision encompasses the Bank's fees in this case. Plaintiffs sued the Bank for rescission of the Guaranty Agreement, and the Bank cross-complained for enforcement of the Guaranty Agreement. Trial in Phase 1 of this case was held on Plaintiffs' rescission claim, and the Court entered judgment for the Bank. Trial in Phase 2 was held on the Bank's enforcement claim, and the Court again awarded judgment to the Bank.

**B. The Bank Is The Prevailing Party**

In deciding which is the prevailing party for purposes of awarding attorneys' fees, the Court reviews the relief requested in the parties' claims and "their litigation objectives as disclosed by the pleadings, trial briefs, opening statements, and similar sources." Hsu v. Abarra, 9 Cal. 4th 863, 876 (1995).

Here, Plaintiffs' objectives were to rescind the Guaranty Agreement and to obtain $20 million in damages from the Bank. The Bank's objectives were to defend against the rescission and damages claims and to enforce the Guaranty Agreement. The Bank fulfilled its objectives; Plaintiffs did not

The Bank is the prevailing party as to every aspect of, and issue in, this litigation. The Bank won judgment on the pleadings as to Plaintiffs' Fourth Amended Complaint; won the dismissal with prejudice of Two Play as a putative plaintiff in the Fifth Amended Complaint; successfully demurred as to all causes of action in the Fifth Amended Complaint; prevailed at trial on the Sixth Amended Complaint; and prevailed at trial on its Cross-Complaint against Plaintiffs.

**C. The Firm's Discounted Rates And Hours Billed Were Reasonable**

**1. Plaintiffs' Retention of A High-Profile Litigator Required A Commensurate Response**

This was a high-stakes case for the Bank. Plaintiffs claimed more than $20 million in damages and were asserting a new and untested theory of liability that could potentially apply to hundreds or thousands of loans. The case had serious implications not just for the Bank, but also for the entire financial services industry.

The stakes jumped even higher when, in December 2012, Plaintiffs hired Peter Bezek. Mr. Bezek is a successful plaintiffs' attorney who specializes in litigation against financial institutions and has, by his own account, "obtained verdicts, settlements, and workouts worth in excess of $2.0 billion." (Bezek Bio (Procel Decl., Ex. B).)

The Bank sought new trial counsel upon learning of Mr. Bezek's entry into the case, and it needed a firm of Miller Barondess' caliber to hold its own against Mr. Bezek's aggressive and skillful litigation tactics, Miller Barondess is one of California's premier litigation boutiques and has a well-earned reputation for taking over difficult cases as trial counsel.

Instead of its regularly hourly rates, Miller Barondess charged the Bank a blended, hourly rate of $500 for all attorneys and $250 for all paralegals. (Procel Decl., ¶ 32.) This rate is substantially below the average billing rate of the attorneys and paralegals who worked on the matter. Mr. Mason's normal rate is $595; Mr. Procel's is $675; and Mr. Miller's is $1095. (Procel Decl., ¶ 33.) (This Motion seeks recovery only of the lower fees actually incurred by the Bank and is thereby giving the Margosians the benefit of that fee discount.)

Copies of Miller Barondess's redacted litigation bills, which were paid by the Bank, are attached hereto. (Procel Decl., Ex. E.) As of September 24, 2014, the Bank has paid Miller Barondess $1,220,010. (Procel Decl., ¶ 41.) Preparing and litigating this motion will take an estimated 20 hours, or $10,000, resulting in an entitlement, in total, of $1,230,010. (Procel Decl., ¶ 42.)

The firm's founding partner, Louis Miller, is one of the nation's foremost trial lawyers. He has 40 years' experience and has tried dozens of high-profile cases. (Miller Bio (Procel Decl., Ex. F).) Mr. Miller was closely involved in planning the defense strategy and participated personally in the mediation proceedings. California has only a few litigators of his experience and skill, and he is in high demand at his regular rate of $1095. (Procel Decl., ¶ 33.) The $500 an hour he billed on this case constitutes a very substantial discount.

Brian Procel, a partner at Miller Barondess, and Caleb Mason, an associate at the firm, were primarily responsible for handling the case. (Procel Decl., 31.) They normally bill at $675 and $595 an hour, respectively. (Procel Decl., 33.) They have thirteen and nine years' experience, respectively, and regularly litigate complex, high-profile cases. (Procel & Mason Bios (Procel Decl., Exs. G-H).)

Mr. Procel has successfully represented banks in many lender liability cases. He prevailed at trial on behalf of East West Bank in a case that was recognized by the Daily Journal as a "Top Ten Defense Verdict of the Year." The trial court awarded $2.5 million in attorneys' fees in that action (see Ocean Fresh v. East West Bank, Case No. BC362244). Mr. Procel was part of the team that successfully resolved a nationwide class action on behalf of Union Bank involving a $250 million Ponzi scheme in federal court (see Neilson v. Union Bank, Case No. 2:02-cv-06942). And he has obtained dismissals and summary judgment in lender liability actions involving claims upwards of $50 million (the trial court awarded more than $1 million in attorneys' fees in Cameron Pointe v. East West Bank, Case No. BC443108, and in that case Miller Barondess prevailed on summary judgment). Mr. Procel was recently recognized as one of the Top 20 lawyers in California under 40 by the Daily Journal. He was formerly an associate at Quinn Emanuel, a highly regarded firm of trial attorneys in Los Angeles. Mr. Mason is a former Assistant United States Attorney and federal appellate clerk, and he also has extensive trial experience. (Procel Decl., ¶ 34.)

Miller Barondess has a significant track record of representing financial institutions facing high-stakes litigation. Among the banks the firm has recently represented in multi-million dollar lawsuits are California Bank and Trust, East West Bank, Union Bank and Cathay Bank. (Id.)

The $500 rate here is eminently reasonable in light of the rates charged by attorneys with comparable skill, qualification and experience at other firms of comparable size, resources and reputation that handle litigation of this sort. For example, a 2012 Daily Journal article provides an average hourly rate of $797 for partners in Los Angeles, while the associate average hourly rate in Los Angeles was $550. (Procel Decl., Ex. I.) The Firm's blended $500 rate in this case is lower even than those average associate rates—and it is for all three attorneys, including Mr. Miller. It is also consistent with rates that California courts have

found reasonable. *See, e.g., Cates v. Chiang,* 213 Cal. App. 4th 791, 820 (2013) (attorney blended hourly rate of $451 found reasonable).

Moreover, it bears emphasis that, as part of the retainer agreement, Miller Barondess also did not bill the Bank for any travel time. (Procel Decl., ¶ 29.) This is another very significant discount, given the amount of travel required. Mason and Procel made more than a dozen trips to Visalia to appear in court, and each made trips to Santa Barbara, Fresno, San Francisco, Sacramento, and Visalia for depositions. (Procel Decl., ¶¶ 21, 28.) Both all-day mediation sessions were held in Santa Barbara. (Procel Decl., ¶ 24.) Travel time for all Miller Barondess attorneys, and the Miller Barondess paralegal who was part of the trial team, was in excess of 500 hours—none of which was billed to the Bank. (Procel Decl., 29.)

Finally, the Bank's fees were likely less than Plaintiffs'. Plaintiffs poured money into the case. Mr. Margosian testified that he had paid Mr. Bezek over $700,000 as of February 2014, more than two months *before* the trial. (Margosian Deposition at 307:1-18 (Procel Decl., Ex. J).) Still to come were numerous depositions, dozens of written filings, preparation of exhibits and jury instructions, trial preparation, and then a two-week trial to which Plaintiffs brought a team of three attorneys, two paralegals and an expensive out-of-town expert witness. (Procel Decl., ¶ 30.)

Moreover, Plaintiffs' prior attorney, Ken Fitzgerald, who had represented Plaintiffs for the preceding three years, continued to represent Plaintiffs after Mr. Bezek joined the case. The full amount that Plaintiffs paid Mr. Fitzgerald is unknown.

In sum, it is very likely that Plaintiffs' legal bill was higher than the Bank's.

### 2. Plaintiffs Aggressively Litigated the Case From Start to Finish

After entering the case, Mr. Bezek propounded hundreds of new document requests on the Bank, took 9 additional depositions and amended the complaint twice. (Procel Decl., ¶¶21-30.) He added a new party as a putative plaintiff. (Id.) And he resisted the Bank's discovery efforts, forcing the Bank to resort to motions to compel compliance with discovery and deposition requests. (Id.)

Mr. Bezek honed a novel and sophisticated theory of liability under Sumitomo v. Iwasaki and crafted various creative theories of damages. Much litigation effort and expense, on both sides, was devoted to the question of what exactly Plaintiffs' damages theories were. The Bank had to resort to motions to compel before Plaintiffs would answer the question how they had been damaged. And after fact discovery was complete, Plaintiffs continued to attempt to introduce new theories of damages through their experts. They hired an accounting expert, John Slater, "to come up with thoughts or ideas on where Mr. Margosian was financially damaged." (John Slater Deposition at 26:8-27:4 (Procel Decl., Ex. K).) Accordingly, the Bank had to expend considerable resources preparing to respond to ever-shifting damages theories, most of which were ultimately rejected by the Court.

Work performed by the Bank's attorneys included, for example:
● Preparing for and attending more than 20 depositions, held in five different cities;

● Analyzing more than 25,000 of pages of documents produced by both sides, including contracts, internal banking records and accounting records of the various businesses at issue;

● Litigating more than 15 substantive motions, including two demurrers, two motions to strike, a motion for judgment on the pleadings, a motion for partial summary adjudication, and three motions to compel;

●Drafting two mediation briefs and participating in two day-long mediations;

● Responding separately to the seven different complaints filed by Plaintiffs;

Case 3:19-cv-01713-BAS-AHG   Document 38-3   Filed 07/09/20   PageID.1032   Page 10 of 11

Aron MARGOSIAN, an individual; and Carrie Margosian, an..., 2014 WL 12650937...

● Conducting extensive expert discovery, including depositions of four experts retained by Plaintiffs;

● Briefing and arguing 15 motions in limine filed by both sides; and

● Preparing for and conducting a 9-day trial.

(Procel Decl., ¶¶ 21-30.)

Now the Bank has prevailed, and Plaintiffs must live up to their contractual obligations as to attorneys' fees, as well as the underlying debt. The attorneys' fees incurred by the Bank are eminently reasonable given the length and complexity of the case and the aggressiveness of Plaintiffs' litigation tactics.

### 3. The Entirety of the Bank's Defense Expenses Are Covered by the Agreement

The entirety of the Bank's defense expenses are covered by the agreement, because, as the Court found, all of Plaintiffs' claims against the Bank are subsumed in, and disposed of by, the rescission claim. That claim is focused solely on whether the Guaranty Agreement is enforceable, and the Bank's defense throughout the case was that the Guaranty Agreement is enforceable because there was no fraud, misrepresentation or other violation of any Sumitomo obligation. Accordingly, all the costs incurred in defending the lawsuit are recoverable under the Agreement and section 1717.

### Conclusion

For the foregoing reasons, the Bank respectfully requests that the Margosians be ordered to pay the Bank's attorneys' fees in the amount of $1,230,010.

DATED: September 25, 2014

Respectfully submitted,

MILLER BARONDESS, LLP

By:

BRIAN PROCEL

Attorneys for Defendant and Cross-Complainant BANK OF THE WEST and Defendant ERIN BUSHELL

Footnotes

1      The Court orally entered its Statement of Decision on April 29, 2014, ruling in favor of the Bank. The relevant facts are set forth in detail in the April 29, 2014 ruling and need only be briefly summarized here. Although the Court has not yet entered judgment, the Bank is proceeding with this Motion because it is clear the Bank is the prevailing party as to every issue in this case.

2      For example, a Foley Bezek lender liability case against a different bank, with very similar facts to this one, proceeded in Los Angeles County Superior Court during the same period the instant case was ongoing. It went to trial in September 2014 and resulted in a verdict for the plaintiffs of $40 million. See http://patch.com/california/arcadia/arcadia-couple-awarded-40-million-real-estate-foreclosure-0/#.VA90vKa9LCR (reporting verdict in F&F LLC v. East-West Bank).

---

**End of Document**  © 2020 Thomson Reuters. No claim to original U.S. Government Works.