

**FILED**

Sep 08 2021

**CLERK, U.S. DISTRICT COURT
SOUTHERN DISTRICT OF CALIFORNIA**
BY        s/ AKR        **DEPUTY**

UNITED STATES COURT OF APPEALS

FOR THE NINTH CIRCUIT

**FILED**

SEP 08 2021

MOLLY C. DWYER, CLERK
U.S. COURT OF APPEALS

| | |
|---|---|
| HERRING NETWORKS, INC., | No. 20-55579 |
| Plaintiff - Appellant, | |
| | D.C. No. 3:19-cv-01713-BAS-AHG |
| v. | U.S. District Court for Southern California, San Diego |
| RACHEL MADDOW; et al., | |
| Defendants - Appellees. | **MANDATE** |

The judgment of this Court, entered August 17, 2021, takes effect this date.

This constitutes the formal mandate of this Court issued pursuant to Rule

41(a) of the Federal Rules of Appellate Procedure.

FOR THE COURT:

MOLLY C. DWYER
CLERK OF COURT

By: Jessica Flores
Deputy Clerk
Ninth Circuit Rule 27-7

FOR PUBLICATION

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

| | |
|---|---|
| HERRING NETWORKS, INC., *Plaintiff-Appellant*, | No. 20-55579 |
| v. | D.C. No. 3:19-cv-01713-BAS-AHG |
| RACHEL MADDOW; COMCAST CORPORATION; NBCUNIVERSAL MEDIA, LLC; MSNBC CABLE, LLC, *Defendants-Appellees.* | OPINION |

Appeal from the United States District Court
for the Southern District of California
Cynthia A. Bashant, District Judge, Presiding

Argued and Submitted July 27, 2021
Pasadena, California

Filed August 17, 2021

Before: MILAN D. SMITH, JR. and JOHN B. OWENS,
Circuit Judges, and EDUARDO C. ROBRENO,[*]
District Judge.

Opinion by Judge Milan D. Smith, Jr.

---

[*] The Honorable Eduardo C. Robreno, United States District Judge
for the Eastern District of Pennsylvania, sitting by designation.

## SUMMARY[**]

### Defamation / Anti-SLAAP Motion

The panel affirmed the district court's judgment granting Appellees' motion to strike Herring Network, Inc.'s defamation complaint pursuant to California's anti-SLAPP statute, and dismissing Herring Networks, Inc.'s defamation suit with prejudice.

Herring launched One American News Network (OAN) in 2013.  Rachel Maddow, host of a show on MSNBC, ran a segment stating that OAN employee Kristen Rouz worked for OAN, but was "also being paid by the Russian government to produce government-funded pro-Putin propaganda for a Russian government funded propaganda outfit called Sputnik."  Herring sued Maddow and related entities for defamation.  Maddow filed a motion to strike the complaint pursuant to California's anti-SLAPP statute, which the district court granted.

The panel first addressed Herring's argument that the district court should have considered five pieces of proffered evidence outside of the pleadings in determining whether to grant Maddow's motion to strike.  Because the motion to strike mounted a legal challenge, not a factual challenge, to Herring's complaint, the panel held that Herring's reliance on evidence outside of its complaint in defending against the anti-SLAPP motion was improper and inconsistent with the Federal Rules of Civil Procedure.

---

[**] This summary constitutes no part of the opinion of the court.  It has been prepared by court staff for the convenience of the reader.

Turning to the merits, the panel held that Maddow's statement was well within the bounds of what qualified as protected speech under the First Amendment. The challenged statement was an obvious exaggeration, cushioned within an undisputed news story. The statement could not reasonably be understood to imply an assertion of objective fact, and therefore, did not amount to defamation.

Finally, the panel held that the district court did not abuse its discretion in dismissing the complaint without leave to amend because Herring never asked to amend, and if it had, amendment would have been futile.

## COUNSEL

Amnon Z. Siegel (argued), Colin H. Rolfs, and Justin P. McCarthy, Miller Barondess LLP, Los Angeles, California, for Plaintiff-Appellant.

Theodore J. Boutrous Jr. (argued), Scott A. Edelman, Theane Evangelis, Nathaniel L. Bach, and Marissa B. Moshell, Gibson Dunn & Crutcher LLP, Los Angeles, California, for Defendants-Appellees.

## OPINION

M. SMITH, Circuit Judge:

Appellant Herring Networks, Inc. (Herring) appeals the judgment of the district court granting Appellees' anti-SLAPP motion and dismissing Herring's defamation suit with prejudice. We have jurisdiction pursuant to 28 U.S.C. § 1291, and we affirm. We conclude that the challenged statement was an obvious exaggeration, cushioned within an undisputed news story. The statement could not reasonably be understood to imply an assertion of objective fact, and therefore, does not amount to defamation.

## FACTUAL AND PROCEDURAL BACKGROUND

### A.

Herring launched One American News Network (OAN) in 2013. As noted in the complaint, "OAN features news programming, political talk shows, and special documentary-style reports" and is a "leading conservative voice in American news." OAN is wholly owned by the Herring family, and has its principal place of business in San Diego, California.

Kristian Rouz is an employee of OAN. According to Herring, "Rouz collects and analyzes articles from other sources and writes articles based on those sources for OAN." While employed by OAN, Rouz also wrote articles as a freelancer for Sputnik News, a Russian state-financed news organization. According to Herring, "Rouz chose the topics and viewpoints of the articles he wrote for Sputnik News" and earned approximately forty dollars per article. Herring alleges that Rouz's work for Sputnik News "had no relation

to his work for OAN," despite Rouz working for the organizations at the same time.

On July 22, 2019, *The Daily Beast* published an article entitled "Trump's New Favorite Channel Employs Kremlin-Paid Journalist."   The article, written by Senior National Security Correspondent Kevin Poulsen, read: "If the stories broadcast by the Trump-endorsed One America News Network sometimes look like outtakes from a Kremlin trolling operation, there may be a reason.  One of the on-air reporters at the 24-hour network is a Russian national on the payroll of the Kremlin's official propaganda outlet, Sputnik."  The article asserted that Rouz was reporting for OAN while "simultaneously writing for Sputnik" and that "Kremlin propaganda sometimes sneaks into Rouz's segments on unrelated matters, dropped in as offhand background information."   The article provided two examples.  In a "segment on the Syrian rescue workers," Rouz referred to their "'involvement in military activities, executions, and numerous war atrocities,' but [did not] disclose that those 'allegations' were hoaxes that originated with Vladimir Putin and his proxies."  And in a different report, "Rouz cast Clinton's criticism of Brexit as an extension of her 'grievous insults and fake narratives against Russia'—an assertion that makes sense only in the context of Rouz's multiple reports claiming Russia was framed for hacking Democrats."   The article also quoted a former Federal Bureau of Investigation (FBI) agent, who stated: "This completes the merger between Russian state-sponsored propaganda and American conservative media. . . .  We used to think of it as 'They just have the same views' or 'They use the same story leads.' But now they have the same personnel."

On the same day the article was published, Rachel
Maddow, host of *The Rachel Maddow Show* on MSNBC, ran
a segment entitled "Staffer on Trump-Favored Network Is
on Propaganda Kremlin Payroll."  The entire segment ran
three and a half minutes, and throughout most of the piece, a
snapshot of *The Daily Beast* article remained on a screen
behind Maddow.  Maddow introduced the story with the
following:

> [P]erhaps the single most perfectly formed
> story of the day, the single most like sparkly
> story of the entire day is this scoop from
> reporter Kevin Poulsen at "The Daily Beast"
> who has sussed out that Trump's favorite
> more Trumpier than Fox TV network, the one
> that the president has been promoting and
> telling everyone they should watch and is
> better than Fox, turns out that network has a
> full time on air reporter who covers U.S.
> politics who is simultaneously on the payroll
> of the Kremlin.  What?

Maddow then repeated that "at the same time [Rouz] works
for Trump's favorite One America News team, he is also
being paid by the Russian government to produce
government-funded pro-Putin propaganda for a Russian
government funded propaganda outfit called Sputnik."
Maddow explained that Sputnik played a role in the Russian
government's interference in the 2016 presidential election
and had formally registered as a foreign power with the
United States Department of Justice.  She then provided
further commentary on the article:

> [A]mong the giblets the news gods dropped
> off their plates for us to eat off the floor today

is the actual news that this super right wing news outlet that the president has repeatedly endorsed as a preferable alternative to Fox News . . . . We literally learned today that that outlet the president is promoting shares staff with the Kremlin.

I mean, what? I mean, it's an easy thing to throw out, you know, like an epitaph in the Trump era, right? Hey, that looks like Russian propaganda. *In this case, the most obsequiously pro-Trump right wing news outlet in America really literally is paid Russian propaganda.* They're [sic] on air U.S. politics reporter is paid by the Russian government to produce propaganda for that government.

Maddow ended the segment noting that she expected OAN would not fire Rouz and President Trump would continue promoting the network.

## B.

On September 9, 2019, Herring sued Appellees Rachel Maddow, Comcast Corporation, NBCUniversal Media, LLC, and MSNBC Cable, LLC (collectively, Maddow or Appellees) for defamation. Herring did not sue *The Daily Beast* or Kevin Poulsen over the article. Instead, the crux of Herring's case concerned the following comment that Maddow included in her July 22nd segment: OAN "really literally is paid Russian propaganda." Herring alleged that "Maddow's statement is utterly and completely false" because "OAN has never been paid or received a penny from Russia or the Russian government."

Maddow then moved to strike the complaint pursuant to California's anti-SLAPP law, California Code of Civil Procedure § 425.16.  Maddow's motion was styled as a Federal Rule of Civil Procedure 12(b)(6) motion, asserting a facial attack on Herring's complaint.  Maddow argued that the challenged speech "is fully protected by California law and the First Amendment because it is an opinion based on fully disclosed facts, is not susceptible of the meaning [Herring] ascribes to it, and—even if it could be considered factual—is substantially true."   According to Maddow, because her comment concerned a public issue and Herring could not establish a likelihood of prevailing on its defamation claim, the district court was entitled to strike the complaint pursuant to California's anti-SLAPP statute.

In opposition to Maddow's motion, Herring filed an ex parte application to supplement the record.  Herring argued that "new evidence ha[d] come to light" that demonstrated Maddow's contested speech was not constitutionally protected.   The new evidence was a segment on Chris Matthews's show *Hardball*, also on MSNBC, where Matthews claimed OAN was "Russian owned" and then, immediately after a commercial break, retracted the statement.  In Matthews's retraction, he noted that OAN is "owned by an American."  Relying on this new evidence, Herring argued that Maddow's own colleague "understood her claim literally and reiterated it on his show." Therefore, claimed Herring, Maddow could not show that no reasonable person could construe her speech as provably false.

The district court granted the motion to strike, agreeing with Maddow that her "statement is an opinion that cannot serve as the basis for a defamation claim" and that Herring failed to show "a probability of succeeding on its defamation claims."  *Herring Networks, Inc. v. Maddow*, 445 F. Supp.

3d 1042, 1054 (S.D. Cal. 2020). In doing so, the district court declined to consider the declarations and exhibits submitted by Herring and denied Herring's ex parte application to supplement the record. *Id.* at 1047–48. The district court reasoned that "when a court considers a motion to strike 'based on alleged deficiencies in the plaintiff's complaint, the motion must be treated in the same manner as a motion under [Federal Rule of Civil Procedure] 12(b)(6).'" *Id.* at 1047 (quoting *Planned Parenthood Fed'n of Am., Inc. v. Ctr. for Med. Progress*, 890 F.3d 828, 834 (9th Cir. 2018)). The district court considered only the complaint, *The Daily Beast* article, and the relevant segment of *The Rachel Maddow Show*—the latter two being "referred to extensively in the complaint." *Id.* at 1048.

Herring timely appealed. First, Herring argues that the district court erred in excluding its evidence. Herring contends that the district court's reliance on *Planned Parenthood* "was misplaced and took a line from the decision out of context, ignoring the broader *Erie* [*Railroad Company v Tompkins*, 304 U.S. 64 (1938)] analysis governing application of [California's] anti-SLAPP statute in federal courts." According to Herring, *Planned Parenthood* "only resolved whether a plaintiff was *required* to submit evidence" in its opposition to an anti-SLAPP motion that challenges the legal sufficiency of a complaint, not whether a plaintiff was "*prohibited from submitting* evidence in opposition to an anti-SLAPP motion." Moreover, Herring argues, "[w]here a plaintiff submits evidence, as here, it does not conflict with [the Federal Rules of Civil Procedure] for a court to consider that evidence." Herring then asserted that if such an evidentiary submission did conflict with Rule 12(b)(6), the resulting conflict is "a reason to rethink [our court's] precedent like *Planned*

*Parenthood* and find that the anti-SLAPP statute should not apply in federal court."

Second, Herring argues that the district court erred in concluding that no reasonable viewer could have understood Maddow's statement as fact. Herring contends that the statement is susceptible of being proved true or false; that the inclusion of "really literally" demonstrates the statement was not opinion; that Maddow's use of *The Daily Beast* article made the statement appear as fact; and that the broad context of the statement indicated that the statement was not opinion. Moreover, Herring avers that even if Maddow's statement was hyperbole, she "falsely implied an actual connection between OAN's news content and Russia."

In response, Maddow argues that the district court correctly rejected Herring's proffered evidence because "anti-SLAPP motions brought as facial challenges pursuant to Rule 12(b)(6) are decided in the same manner as a typical motion to dismiss—on the pleadings." Maddow further argues that the district court correctly granted the motion to strike because, pursuant to our precedent, the statement was an "opinion made on fully disclosed facts" and therefore, constituted constitutionally protected speech. Finally, Maddow contends that even if the court considers the statement factual, "it is nonactionable because it is substantially true."

## STANDARD OF REVIEW

We review an order granting a special motion to strike under California's anti-SLAPP statute de novo. *Maloney v. T3Media, Inc.*, 853 F.3d 1004, 1009 (9th Cir. 2017). We review a district court's dismissal with prejudice and denial of leave to amend for abuse of discretion. *Eminence Cap., LLC v. Aspeon, Inc.*, 316 F.3d 1048, 1052 (9th Cir. 2003).

## ANALYSIS

### A.

California's anti-SLAPP statute allows a defendant to file a "special motion to strike" a plaintiff's complaint, and involves a two-step inquiry. Cal. Civ. Proc. Code § 425.16(b)(1). "To prevail on an anti-SLAPP motion, the moving defendant must make a prima facie showing that the plaintiff's suit arises from an act in furtherance of the defendant's constitutional right to free speech." *Makaeff v. Trump Univ., LLC*, 715 F.3d 254, 261 (9th Cir. 2013). If the defendant satisfies this requirement, "[t]he burden then shifts to the plaintiff . . . to establish a reasonable probability that it will prevail on its claim in order for that claim to survive dismissal." *Id.* The district court must grant the defendant's motion and dismiss the complaint if the "plaintiff presents an insufficient legal basis for the claims" or "'no reasonable jury' could find for the plaintiff." *Metabolife Int'l, Inc. v. Wornick*, 264 F.3d 832, 840 (9th Cir. 2001) (citation omitted). The purpose of the anti-SLAPP statute is "to allow for early dismissal of meritless [F]irst [A]mendment cases aimed at chilling expression through costly, time-consuming litigation." *Maloney*, 853 F.3d at 1009 (citation omitted). To achieve this purpose, courts are directed to "construe[]" the anti-SLAPP statute "broadly." Cal. Civ. Proc. Code § 425.16(a).

### B.

Before determining whether the district court properly granted Maddow's anti-SLAPP motion, we must first address Herring's argument that the district court should have considered five pieces of proffered evidence outside of the pleadings then before the court in determining whether to grant Maddow's motion to strike. This evidence includes:

(1) transcripts from some of Maddow's other shows; (2) an article in *The New York Times Magazine* about Maddow and her show; (3) an anonymous online comment submitted to OAN; (4) a linguistic expert's report; and (5) a statement made by Chris Matthews on an episode of *HardBall*. Herring avers that the district court's consideration of such evidence—pursuant to the California anti-SLAPP statute—would not have conflicted with the Federal Rules of Civil Procedure.

"The degree to which [California's] anti-SLAPP provisions are consistent with the Federal Rules of Civil Procedure has been hotly disputed." *Planned Parenthood*, 890 F.3d at 833. Although portions of the California anti-SLAPP statute are inapplicable in federal court, *see Metabolife*, 264 F.3d at 845–46, we have held that "there is no direct collision" between the special motion to strike subsection of the statute and the Federal Rules, *see United States ex rel. Newsham v. Lockheed Missiles & Space Co.*, 190 F.3d 963, 972 (9th Cir. 1999) (internal quotation marks omitted). To avoid such a collision, "we [ ] review anti-SLAPP motions to strike under different standards depending on the motion's basis." *Planned Parenthood*, 890 F.3d at 833. A defendant may move to strike "on purely legal arguments," in which case we analyze the motion pursuant to Rules 8 and 12. *Id.* (citation omitted); *see also Rogers v. Home Shopping Network, Inc.*, 57 F. Supp. 2d 973, 982 (C.D. Cal. 1999) ("[T]he Court refers to a motion that only identifies legal defects on the face of the pleading, analogous to a Rule 12(b)(6) motion to dismiss."). Or a defendant may assert "a factual challenge," which invokes the same treatment as "a motion for summary judgment," triggering discovery. *Planned Parenthood*, 890 F.3d at 833 (citation omitted). This "interpretation eliminates conflicts

between California's anti-SLAPP law's procedural provisions and the Federal Rules of Civil Procedure." *Id.*

The parties do not dispute that Maddow's motion to strike mounted a legal challenge to Herring's complaint, not a factual challenge. Quoting *Planned Parenthood*, 890 F.3d at 834, even Herring's briefing before the district court concedes that Maddow's motion "must be treated in the same manner as a motion under Rule 12(b)(6)." The issue is whether Herring is *permitted* to submit evidence in defending against Maddow's motion. Or, more precisely, whether the district court's consideration of evidence in determining whether to grant a motion to strike would conflict with Rule 12(b)(6).

In *Planned Parenthood*, we held that the defendant's anti-SLAPP motion challenged the legal deficiencies of the plaintiff's pleadings, not the factual sufficiency of the claims. 890 F.3d at 834–35. Given that the proper analysis of the motion to strike was a Rule 12(b)(6) analysis, we rejected the defendant's argument that the plaintiffs failed to meet "their burden of presenting evidence showing that their claims have minimal merit." *Id.* at 834. We held that "if the defendants have urged only insufficiency of [the] pleadings," then "there's no *requirement* for a plaintiff to submit evidence to oppose contrary evidence that was never presented by defendants." *Id.* (emphasis added).

The facts of *Planned Parenthood* are not identical to the facts of this case, but the applicable reasoning in *Planned Parenthood* squarely forecloses Herring's argument. "Echoing the point" we made in prior cases, *Planned Parenthood* reiterated the division of anti-SLAPP motions to strike into two categories: motions that challenge the legal sufficiency of complaints and motions that challenge the factual sufficiency of complaints. *Id.* The former of these

categories are analyzed pursuant to Rule 12; the latter are analyzed pursuant to Rule 56. *Id.* Just like the defendant in *Planned Parenthood*, Herring is attempting to blur these two categories by implanting the procedural requirements of Rule 56 into a Rule 12(b)(6) analysis. Herring, however, cannot convert Maddow's motion to strike into a motion for summary judgment. *See Ranch Realty, Inc. v. DC Ranch Realty, LLC*, 614 F. Supp. 2d 983, 987–88 (D. Ariz. 2007). The defendant determines which motions she files, not the plaintiff. Given that the parties do not dispute that Maddow's motion challenged the legal sufficiency of Herring's complaint, we conclude that Herring's reliance on evidence outside of its complaint in defending against the motion was improper and inconsistent with the Federal Rules.[1]

## C.

We now turn to the merits of the district court's order granting Maddow's anti-SLAPP motion. It is undisputed that Maddow's challenged speech was an act in furtherance of her right to free speech. Therefore, the first step of the anti-SLAPP analysis is satisfied. The only remaining question is whether the district court erred in holding that Herring failed to demonstrate a reasonable probability of

---

[1] Moreover, Herring's argument is contrary to the California legislature's reasons for enacting the anti-SLAPP statute. If we permitted plaintiffs to present evidence in defense of all anti-SLAPP motions, then every anti-SLAPP motion would necessarily become a motion for summary judgment. This would effectively negate the purpose of anti-SLAPP motions, which is to remedy the problem of SLAPP suits through "the prompt exposure, dismissal, and discouragement of [further] suits." *Newsham*, 190 F.3d at 971.

prevailing on its defamation claim. *See Maloney*, 853 F.3d at 1009–10.

Pursuant to California law, defamation "involves the intentional publication of a statement of fact which is false, unprivileged, and has a natural tendency to injure or which causes special damage." *Gilbert v. Sykes*, 53 Cal. Rptr. 3d 752, 764 (Ct. App. 2007) (quoting *Ringler Assocs. Inc. v. Md. Cas. Co.*, 96 Cal. Rptr. 2d 136, 148 (Ct. App. 2000)). Because the challenged speech must be a statement of fact, the threshold question in every defamation suit is "whether a reasonable factfinder could conclude that the [contested] statement implies an assertion of objective fact." *Unelko Corp. v. Rooney*, 912 F.2d 1049, 1053 (9th Cir. 1990) (alterations and internal quotation marks omitted). "If the answer is no, the claim is foreclosed by the First Amendment." *Gardner v. Martino*, 563 F.3d 981, 987 (9th Cir. 2009). We apply a three-factor test in resolving this question: "(1) whether the general tenor of the entire work negates the impression that the defendant was asserting an objective fact, (2) whether the defendant used figurative or hyperbolic language that negates that impression, and (3) whether the statement in question is susceptible of being proved true or false." *Partington v. Bugliosi*, 56 F.3d 1147, 1153 (9th Cir. 1995). When applied here, this "totality of the circumstances" test demonstrates that the district court properly held that Herring could not meet its burden because "a reasonable factfinder could only conclude that the statement was one of opinion not fact." *Herring Networks*, 445 F. Supp. 3d at 1054; *see also Knievel v. ESPN*, 393 F.3d 1068, 1074–75 (9th Cir. 2005).

## 1.

"[T]he context of a statement may control whether words were understood in a defamatory sense." *Koch v. Goldway*,

817 F.2d 507, 509 (9th Cir. 1987).   The broad context
"includes 'the general tenor of the entire work, the subject of
the statements, the setting, and the format of the work.'"
*Knievel*, 393 F.3d at 1077 (quoting *Underwager v. Channel
9 Austl.*, 69 F.3d 361, 366 (9th Cir. 1995)).   "[W]hen the
surrounding circumstances of a statement are those of a
heated political debate, where certain remarks are
necessarily understood as ridicule or vituperation, . . . the
statement cannot reasonably be taken as anything but
opinion." *Koch*, 817 F.2d at 509.

We agree with the district court's conclusion that the
broad context of Maddow's show makes it more likely that
her audiences will "expect her to use subjective language
that comports with her political opinions."         *Herring
Networks*, 445 F. Supp. 3d at 1050.   It seems Herring agrees
with this conclusion as well:   Herring's complaint
characterizes Maddow as "a liberal television host," and
MSNBC's cable programming as "liberal politics."
Although MSNBC produces news, Maddow's show in
particular is more than just stating the news—Maddow "is
invited and encouraged to share her opinions with her
viewers." *Id.* at 1049.   In turn, Maddow's audience
anticipates her effort "to persuade others to [her] position[]
by use of epithets, fiery rhetoric or hyperbole." *Info. Control
Corp. v. Genesis One Comput. Corp.*, 611 F.2d 781, 784 (9th
Cir. 1980) (citation omitted).   Therefore, the medium
through which the contested statement was made supports
Maddow's argument that a reasonable viewer would not
conclude the statement implies an assertion of fact.

Focusing one level closer, the tenor of the segment in
which Maddow made the contested statement also supports
the conclusion that a reasonable viewer would have
understood that Maddow was expressing her opinion.   As the

district court found, "Maddow's tone could be described as surprise and glee at the unexpectedness of the story." *Herring Networks*, 445 F. Supp. 3d at 1050. For example, Maddow opens the segment by calling *The Daily Beast* article "perhaps the single most perfectly formed story of the day, the single most like sparkly story of the entire day." She identifies the news as one of "the giblets the news gods dropped off their plates for us to eat off the floor today." After sharing a screenshot of the article and summarizing the news, Maddow laughs and asks her audience, "I mean, what?" Maddow concludes the piece, while shaking her head, "I mean, this is the kind of news we are supposed to take in stride these days. And we do our best." Maddow's gleeful astonishment with *The Daily Beast*'s breaking news is apparent throughout the entire segment. Thus, at no point would a reasonable viewer understand Maddow to be breaking *new* news. The story of a Kremlin staffer on OAN's payroll is the only objective fact Maddow shares.

On appeal, Herring primarily relies on *Unelko* to argue that the broad context of the contested statement demonstrates that reasonable viewers would take the statement as factual. Its reliance is misplaced. In *Unelko*, the plaintiffs sued Andy Rooney, arguing that his assertion on *60 Minutes* that the plaintiffs' product "didn't work" was a defamatory statement of fact. 912 F.2d at 1050. The segment in which the statement was made involved Rooney describing the "'junk' [that] he had received in the mail," including "caps, and a lot of cups," an expensive watch, pictures of himself, an orange peeler, and "an ashtray in the shape of a human lung." *Id.* at 1051. Among the "junk" was the plaintiffs' product: "something for the windshield of your car called Rain-X." *Id.* In describing the product, Rooney notes that he "actually spent an hour one Saturday putting it on the windshield of [his] car." *Id.* Rooney

presumes that "[t]he fellow who makes this . . . [would] like a commercial or a testimonial . . . [but i]t didn't work." *Id.* We ultimately reversed the district court's grant of Rooney's motion for summary judgment. *Id.* at 1052. Although the tenor of the segment was "humorous and satirical," we found that "[t]he humor in Rooney's statement" was derived "from the fact that his report of the product's effectiveness was the antithesis of what its inventor presumably desired." *Id.* at 1054. The statement, therefore, "receive[d] no protection based on the overall tenor of [the] segment." *Id.*

The facts in this case are much different. Maddow's astonishment and the segment's tone of "surprise and glee" were derived from the news presented in *The Daily Beast* article—a story that Herring does not allege is defamatory. *Herring Networks*, 445 F. Supp. 3d at 1050. In *Unelko*, the segment is funny only if Rooney's statement is an assertion of fact, 912 F.2d at 1054, whereas here, Maddow's segment maintains a gleeful tenor not because of Maddow's single line that OAN is "paid Russian propaganda," but because of *The Daily Beast*'s breaking news. Given the broad contexts of the two statements, a reasonable viewer would understand Maddow's statement as colorful commentary and Rooney's statement as a factual assertion of Rain-X's effectiveness. *See id.*; *see also Partington*, 56 F.3d at 1154.

The general context of Maddow's statement, therefore, "negates the impression that [she] impl[ied] a false assertion of fact." *Partington*, 56 F.3d at 1154. Maddow "fairly describe[d] the general events involved" in *The Daily Beast* article and "offer[ed her] personal perspective about some of its ambiguities." *Id.* A reasonable viewer would be able to differentiate between Maddow's commentary and the actual news she is reporting.

**2.**

Next, we must "examine the 'specific context and content of the statements, analyzing the extent of figurative or hyperbolic language used and the reasonable expectations of the audience in that particular situation.'"  *Knievel*, 393 F.3d at 1077 (quoting *Underwager*, 69 F.3d at 366).

Although Herring's complaint and appellate briefs suggest that we should consider only the challenged six-word phrase, our precedent requires us to expand our focus to the surrounding sentences.  *See id.* at 1074 ("Although the word 'pimp' may be reasonably capable of a defamatory meaning when read in isolation, . . . the term loses its meaning when considered in the context" of the publication (internal quotation marks omitted)).  Accordingly, it may be helpful to reiterate the portion of Maddow's segment at issue.  Maddow's dialogue includes a summary of *The Daily Beast* article, an exasperated and staged conversation about OAN's reporting resembling "Russian propaganda," the contested statement that "[OAN] really literally is paid Russian propaganda," and then a repetition of the story that an "on air U.S. politics reporter is paid by the Russian government to produce propaganda for that government."  Because Maddow discloses all relevant facts and employs colorful, hyperbolic language, we conclude that the specific context of the statement does not render it an assertion of fact.

Statements are less likely to be expressions of fact where—as here—the speaker fully discloses all relevant facts.  Our decision in *Standing Committee on Discipline of the United States District Court for the Central District of California v. Yagman* is instructive.  *See* 55 F.3d 1430 (9th Cir. 1995).  In that case, an attorney raised First Amendment objections to being disciplined for, among other things,

conveying his belief that a particular judge was anti-Semitic. *Id.* at 1435, 1438. In determining whether the contested statement "could reasonably be understood as declaring or implying actual facts," we noted that there are "two kinds of opinion statements: those based on assumed or expressly stated facts, and those based on implied, undisclosed facts." *Id.* at 1438–39. An "opinion based on fully disclosed facts can be punished only if the stated facts are themselves false and demeaning." *Id.* at 1439. This rule is quite logical: "When the facts underlying a statement of opinion are disclosed, readers will understand they are getting the author's interpretation of the facts presented; they are therefore unlikely to construe the statement as insinuating the existence of additional, undisclosed facts." *Id.* Applying this rule to the attorney's contested statement in *Yagman*, we held that the "remark [wa]s protected by the First Amendment as an expression of opinion based on stated facts." *Id.* at 1440.

Maddow's contested statement also fits squarely into *Yagman*'s first category of opinions: "those based on assumed or expressly stated facts." *See id.* at 1439. Maddow's dialogue before and after the contested statement is solely a reiteration of the material in *The Daily Beast* article. At no point before the contested statement does Maddow "imply the existence of additional, undisclosed facts." *See id.* at 1440. Instead, Maddow reports the undisputed facts and then transitions into providing "colorfully expressed" commentary. *See Cochran v. NYP Holdings, Inc.*, 58 F. Supp. 2d 1113, 1124 (C.D. Cal. 1998). Maddow's commentary reads: "I mean, what? I mean, it's an easy thing to throw out, you know, like an epitaph in the Trump era, right? Hey, that looks like Russian propaganda. In this case, the most obsequiously pro-Trump right wing news outlet in America really literally is paid Russian

propaganda." Maddow then repeats the undisputed fact that OAN hired a Sputnik-employed writer. By "disclos[ing] the factual basis" of her statement, Maddow reveals that the contested statement was merely her own "interpretation of the facts presented." *See Yagman*, 55 F.3d at 1439 (internal quotation marks omitted). The audience could "accept or reject [Maddow's] opinion based on their own independent evaluation of the facts" specifically because the undisputed news story is readily distinguishable from Maddow's commentary. *See id.*

Maddow's use of hyperbolic rhetoric bolsters this conclusion. "[L]oose, figurative, or hyperbolic language . . . negate[s] the impression" that the contested statement is an assertion of fact. *Milkovich v. Lorain J. Co.*, 497 U.S. 1, 21 (1990); *see also Underwager*, 69 F.3d at 367 (holding "colorful, figurative rhetoric" nonactionable because "reasonable minds would not take [it] to be factual"); *Unelko*, 912 F.2d at 1054 (considering whether "an audience might anticipate rhetoric or hyperbole" because of the "flavor" of the speaker's comments). In comparison to the undisputed facts that Maddow reports, the contested statement was particularly emphatic and unfounded: Maddow went from stating that OAN employs a Sputnik employee to stating that OAN reports Russian propaganda. A reasonable person would understand Maddow's contested statement as an "obvious exaggeration," *Gardner*, 563 F.3d at 989, that is, as Maddow explains, "sandwiched between precise factual recitations" of *The Daily Beast* article.

### 3.

Lastly, we consider "whether the facts implied by [Maddow's statement] are susceptible of being proved true or false." *Unelko*, 912 F.2d at 1055. The district court held that when "taken in isolation," the contested statement was

"capable of verification" because "[e]ither OAN receives money from the Russian government or it does not."  On appeal, Maddow does not challenge this finding.  Instead, her briefing leans on the general and specific contexts of the statement to support her argument that the statement is a nonactionable opinion.  We agree with the district court's determination.  Because the contested statement is susceptible of being proven true or false, the third factor leans in favor of a finding that Maddow's audience could conclude that the statement implied an assertion of objective fact.

### 4.

In sum, two of the factors outlined in *Partington*—the general context and the specific context of the contested statement—negate the impression that the statement is an assertion of objective fact.  While the third factor tilts in the other direction, we conclude that Maddow's contested statement fits within "the 'rhetorical hyperbole' [that] has traditionally added much to the discourse of our Nation." *Milkovich*, 497 U.S. at 20.  We therefore affirm the district court's grant of Maddow's anti-SLAPP motion.

### D.

A much closer question is whether the district court abused its discretion in dismissing Herring's suit with prejudice.  Federal Rule of Civil Procedure 15(a)(2) provides that the district court should "freely give leave when justice so requires."  We have previously "stated that 'this policy is to be applied with extreme liberality.'" *Owens v. Kaiser Found. Health Plan, Inc.*, 244 F.3d 708, 712 (9th Cir. 2001) (quoting *Morongo Band of Mission Indians v. Rose*, 893 F.2d 1074, 1079 (9th Cir. 1990)).  "In determining whether leave to amend is appropriate, the district court

considers the presence of any of four factors: bad faith, undue delay, prejudice to the opposing party, and/or futility." *Id.* (citation and internal quotation marks omitted). "A district court's failure to consider the relevant factors and articulate why dismissal should be with prejudice instead of without prejudice may constitute an abuse of discretion." *Eminence Cap.*, 316 F.3d at 1052.

The district court concluded that there was "no set of facts that could support a claim for defamation based on Maddow's statement" and dismissed the complaint with prejudice. Herring contends that the court's conclusion was inconsistent with its refusal to consider Herring's evidence: "For the District Court to find that Herring's evidence would make no difference, the District Court needed to consider that evidence, which it did not." In response, Maddow argues that the district court acted within its discretion by dismissing the complaint without leave to amend, specifically because Herring never asked for leave to amend.

We agree with Maddow. The district court did not abuse its discretion in dismissing the complaint without leave to amend because Herring never asked to amend, and if it had, amendment would have been futile. Moreover, contrary to Herring's briefing, the district court's rejection of Herring's evidence, given the applicable Rule 12(b)(6) analysis, is not inconsistent with its conclusion that such evidence would not make a difference. Evidence can be both improperly proffered and unhelpful. *See Planned Parenthood*, 890 F.3d at 834; *Partington*, 56 F.3d at 1162. For example, here, the deficiency in Herring's complaint would not have been overcome by incorporation of the rejected evidence. Herring's evidence only tangentially relates to the general context of the contested statement and does not concern the specific context of the statement or the statement's

susceptibly of being proven true.  Thus, despite our "policy that favors allowing parties to amend their pleadings," *Partington*, 56 F.3d at 1162, the district court's dismissal with prejudice was within its discretion.  *See id.*; *see also Gardner*, 563 F.3d at 991–92.

## CONCLUSION

Maddow's statement is well within the bounds of what qualifies as protected speech under the First Amendment. No reasonable viewer could conclude that Maddow implied an assertion of objective fact.  The judgment of the district court is therefore affirmed.

**AFFIRMED**.